

DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL - 6 2022

CLERK, U.S. DISTRICT COURT
By_____ 2:30pm
Deputy

RW058303

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

No. **4 - 22 CV - 576 - P**

**COMPLAINT**

**KYLE STRONGIN,**
a voter of Hood County, Texas;
**LINDSEY GREMONT,**
a voter of Travis County, Texas;
**CHRISTINE KOEPKE,**
a voter of Bexar County, Texas;
**AMANDA EUBANKS,**
a voter of Bexar County, Texas;
**TRAVIS WAYNE EUBANKS,**
a voter of Bexar County, Texas;
**KRISTEN PLAISANCE,**
a voter of Montgomery County, Texas;
**KAREN RENE TOWELL,**
a voter of Hood County, Texas;
**JASON SCOTT BUSTER,**
a voter of Bexar County, Texas;
**ALEXANDRA CAMPO,**
a voter of Williamson County, Texas;
**JAMES L. CLARK,**
a voter of Hays County, Texas;
**SONJA ZIELSDORF,**
a voter of Williamson County, Texas
**BEVERLY FOLEY,**
a voter of Denton County, Texas

**JUAN CARLOS ARIAS,**
a voter and candidate of Harris County,
Texas
**JOSE CHRISTINE SILVESTER,**
a voter of Comal County, Texas;
**TOMMIE DICKINSON,**
a voter of Atascosa County, Texas;
**ROBERT JAMES BROOKS JR.,**
a voter of Travis County, Texas;
**ALANA S. PHILLIPS,**
a voter of Denton County, Texas;
**JENNIFER B. EDWARDS,**
a voter and Precinct 320 Chair-elect of
Parker County, Texas;
**AUBREY BRANDON RHYMES,**
a voter of Collin County, Texas;
**AMBER CLOY,**
a voter of Tarrant County, Texas;
**JENNIFER MIENKE,**
a voter of Tarrant County, Texas;
**JENNIFER WILLIAMS,**
a voter of Parker County, Texas;
**SHERON JENNIFER LIPPER,**
a voter of Dallas County, Texas
**LYNN DAVENPORT,**
a voter and candidate of Dallas County,
Texas

**PLAINTIFF(s),**

v.

SECRETARY OF STATE OF TEXAS.
JOHN B. SCOTT, in his individual
capacity and in his official capacity as the
TEXAS SECRETARY OF STATE; and
DEPUTY SECRETARY OF STATE.
JOSE A. "JOE" ESPARZA, in his
individual capacity and in his official
capacity.
113 TEXAS SECRETARY OF STATE
RUTH R. HUGHS, in her individual
capacity and in her official capacity.
KEITH INGRAM, in his individual and
official capacity as the Director of the
Elections Division;
JACQUELYN CALLANEN, Bexar
County Elections Administrator;
NELSON WOLFF, Bexar County Judge
and head of the Bexar County Elections
Commission;
REBECA CLAY-FLORES, Bexar
County Commissioner;
JUSTIN RODRIGUEZ, Bexar County
Commissioner;
MARIALYN BARNARD, Bexar County
Commissioner;
TOMMY CALVERT, Bexar County
Commissioner;
BOBBIE KOEPP, Comal County clerk;
CYNTHIA JACQUA, Comal County
Deputy under the clerk and Elections
Coordinator;
FRANK PHILLIPS, Denton County
Elections Administrator;
ANDY EADS, Denton County Judge;
RYAN WILLIAMS, Denton County
Commissioner;
RON MARCHANT, Denton County
Commissioner;

BOBBIE J. MITCHELL, Denton County
Commissioner;
DIANNE EDMONDSON, Denton County
Commissioner;
LINA HIDALGO, Harris County
Judge;
RODNEY ELLIS, Harris County
Commissioner;
ADRIAN GARCIA, Harris County
Commissioner;
TOM S. RAMSEY, Harris County
Commissioner;
R. JACK COLE, Harris County
Commissioner;
ISABEL LONGORIA, Harris County
Elections Administrator;
JENNIFER DOINOFF, Hays County
Elections Administrator;
RUBEN BECERRA,
Hays County Commissioner's Court
Judge;
DEBBIE INGALSBE
Hays County Commissioner Court;
MARK JONES
Hays County Commissioner Court;
LON SHELL
Hays County Commissioner Court;
WALT SMITH
Hays County Commissioner Court;
RON MASSINGILL, Hood County Judge
and head of the Hood County Elections
Commission;
MICHELE CAREW, Elections
Administrator of Hood County;
PAT DEEN, Parker County Judge and
head of the Parker County Elections
Commission;
CRICKETT MILLER, Elections
Administrator of Parker County;

**GEORGE CONLEY, Parker County Commissioner;**

**CRAIG PEACOCK, Parker County Commissioner;**

**LARRY WALDEN, Parker County Commissioner;**

**STEVE DUGAN, Parker County Commissioner;**

**HEIDER GARCIA, Tarrant County Elections Administrator;**

**ROY CHARLES BROOKS, Tarrant County Commissioner;**

**DEVAN ALLEN, Tarrant County Commissioner;**

**GARY FICKES, Tarrant County Commissioner;**

**J.D. JOHNSON, Tarrant County Commissioner;**

**ANDREW STEVEN BROWN, Travis County Judge;**

**DANA DEBEAUVOIR, Travis County Clerk;**

**REBECCA GUERRERO, Travis County Clerk;**

**BILL GRAVELL, Williamson County Judge;**

**CHRISTOPHER DAVIS, Williamson County Elections Administrator;**

**TERRY COOK, Williamson County Commissioner;**

**CYNTHIA LONG, Williamson County Commissioner;**

**VALERIE COVEY, Williamson County Commissioner;**

**ROSS BOLES, Williamson County Commissioner;**

**SUZIE HARVEY, Montgomery County Elections Administrator,**

**CHARLIE RILEY, Montgomery County Commissioner;**

**ROBERT C. WALKER, Montgomery County Commissioner;**

**JAMES NOACK, Montgomery County Commissioner;**

**JAMES METTS, Montgomery County Commissioner;**

**GLENN WHITLEY, Tarrant County Judge;**

**all in their individual and official capacities**

**DEFENDANT(S)**

# TABLE OF CONTENTS

1.  Table of Authorities .......................................................................................v
2.  Parties to the Proceedings ............................................................................1
3.  Jurisdiction and Venue...................................................................................2
4.  Rule 47 Disclosure .........................................................................................3
5.  Rule 501 ..........................................................................................................3
6.  Constitutional Questions ...............................................................................3
7.  Introduction ....................................................................................................4
8.  Factual Allegations ........................................................................................6
    a.  Accreditation Failure .............................................................................6
    b.  Election System & Software (ES&S) ..................................................23
        Hash Mismatch Due to Uncertified Installation Method
        Bug In ES&S Hash Verification Script
        ES&S Conducting Hash Validation Test
        Texas Certifies 6.1.1.0. Despite Hash Validation Concerns
    c.  Hart InterCivic ....................................................................................34
        Hart Intercivic Ballot Issues
        Hart Intercivic eSlate
    d.  Election Software Whistleblower (Maras)...........................................51
    e.  Halderman Declaration ........................................................................56
    f.  Smith Declaration ................................................................................59
    g.  Texas County Failures .........................................................................63
        Hood.....................................................................................................63
        Parker...................................................................................................67
        Comal...................................................................................................69
        Tarrant..................................................................................................72
        Bexar....................................................................................................80
        Travis....................................................................................................84
        Hays......................................................................................................85
        Montgomery.........................................................................................87
        Williamson...........................................................................................95
        Collin....................................................................................................98
        Denton................................................................................................102
        Harris..................................................................................................105
9.  Failures, Neglect and Offensive Violations ..............................................110
10. Plaintiff(s) Face Difficult Circumstances .................................................115
11. Counts .........................................................................................................118
12. Prayer For Relief.........................................................................................123

# I.     TABLE OF AUTHORITIES

## Cases

Andrade v. NAACP of Austin, 345 S.W.3d 1, 8 (Tex. 2011)......................................................108

*Assoc. Indus. of New York v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943)* .................................119

Baker v. Carr, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)....................................108

Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958) .................................................................120

*DeVries v. Secretary of State, 329 Mich.  68 (1950).  44 N.W.2d 872* ....................................118

Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa. 1973) ...........................................................121

Harper v. Va. State Bd. of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)....................108

Kari Lake, et al. v. Karie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt)..............62

Krier v.Navarro, 952 S.W.2d 25 ..................................................................................................42

*Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643*
   *March 16, 2022. United States Court of Appeals, Fifth Circuit* ...........................................120

Texas v. Pennsylvania.....................................................................................................................9

*Wesberry v. Sanders, 376 U.S. 1, 10 (1964).*................................................................................9

## Statutes

*18 U.S.C. 245* ...................................................................................................................122, 123

18 USC Section 245(1)(a)............................................................................................................119

42 U.S.C. § 1983 .........................................................................................................................121

*42 U.S.C. §1983* ...........................................................................................................122, 123, 125

42:1983cv Civil Rights Act ............................................................................................................5

42:1985 ............................................................................................................................................5

5 U.S.C. $3331 ................................................................................................................................5

5 U.S.C. § 3333 ...............................................................................................................................5

5 U.S.C. § 7311 ...............................................................................................................................5

5 U.S.C. app. 2 §1-15....................................................................................................................13

52 U.S.C. § 10101 (42:1971) Voting Rights Law, 28:1331dp ......................................................6

52 U.S.C. § 20511 (42:15483) ........................................................................................................5

*52 U.S.C. §20962* ..........................................................................................................................13

52 U.S.C. §551 *et seq* ...................................................................................................................13

52 U.S.C. 20971 ....................................................................................................................115, 118

*APA 5 U.S.C. §551 et seq* .............................................................................................................13

Elec. Code Ann § 31.032 ..............................................................................................................42

HAVA...................................................................................................................................passim

HAVA of 2002 § 231(b) ...............................................................................................................21

HAVA, 52 U.S.C. §20901 *et seq* .................................................................................................13

*Id. § 20962(d)(1)-(2* ....................................................................................................................13

*Id.* §20962(a)(1)-(3). .......................................................................................... 13

Senate Bill 12333 ................................................................................................ 42

TAC § 7.125(a)(10) ............................................................................................ 114

TEX ELEC § 122.001 ......................................................................................... 68

TEX ELEC § 122.0371 ....................................................................................... 87

Tex. Admin. Code § 81.60 ............................................................... 113, 115, 118

Tex. Con. Art. 6, Sec 4 ................................................................................. passim

**Tex. Elec Code § 51.006** ................................................................................ 43

**Tex. Elec Code § 51.007** ................................................................................ 44

**Tex. Elec Code § 51.008** ................................................................................ 44

**Tex. Elec Code § 51.010** .......................................................................... 45, 46

Tex. Elec Code § 52.001 ................................................................................... 43

Tex. Elec Code § 52.062 ............................................................................. passim

**Tex. Elec Code § 62.007** .......................................................................... 45, 46

**Tex. Elec Code § 62.009** .......................................................................... 45, 46

Tex. Elec Code 31.014 ...................................................................................... 97

Tex. Elec. Code § 122.032 ......................................................................... passim

Tex. Elec. Code § 273 ..................................................................................... 120

*TEX. ELEC. CODE § 276.013(a)(4)* ............................................................ 123

Tex. Elec. Code § 43.007(j) .............................................................................. 81

Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10) ............. 116

Tex. Elec. Code § 52.062 .......................................................................... 69, 113

Tex. Elec. Code §§ 52.062, 51.006, 51.007, and 51.008 ......................... 69, 114

*TEX. ELEC. CODE Chp. 65* .............................................................................. 5

*TEX. PEN. CODE § 37.03, § 37.10* ............................................................... 124

*TEX. PEN. CODE § 39.02* ............................................................................. 125

*TEX. PEN. CODE § 39.06* ............................................................................. 123

*TEX. PEN. CODE §39.03(2)* .......................................................................... 125

Tex. Penal Code § 37.10(3) ...................................................................... 114, 116

TX Admin. Code § 81.60 (8)(B) ..................................................................... 105

TX Admin. Code § 81.61 ............................................................. 105, 113, 115, 118

TX Election Code § 122.001 ..................................................................... 105, 106

TX Election Code § 52.062, §51.006, §51.007, §51.008, §51.010, §62.007, §62.009 ........... 68, 71

## Other Authorities

"In my humble opinion, those who come to engage in debates of consequence, and who challenge accepted wisdom, should expect to be treated badly. Nonetheless, they must stand undaunted. That is required. And that should be expected. For it is bravery that is required to secure freedom."

-- **Clarence Thomas** ........................................................................................ 8

Accardi doctrine ............................................................................................... 125

Clarence Thomas quote ............................................................................................. 8
Election Advisory 2019-23.  Sec. 13(1)(a)(iv)(1) ..................................................... 43
Tex. Att'y Gen. Op. No. LO-88-62 (1988 ................................................................ 42

## Rules

**RULE 47** ............................................................................................................... 6
**RULE 501** ............................................................................................................. 6

## Regulations

(OMB 3265-0018) ................................................................................................... 10
(RQ-0405-KP) ........................................................................................................ 70
CFR Title 34, § 602 ................................................................................................ 24
Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1 ......................................... 105
*The Certification Procedures for Electronic Pollbooks* ......................................... 23
Voting System Test Laboratory Accreditation Program Manual .............................. 10
Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1 .....passim
Voting System Testing and Certification Program .................................................. 12
**Voting System Testing and Certification Program Manual** (OMB 3265-0018).......................................... 54
Voting Voluntary System Guidelines ......................................................... 64, 79, 95

## Constitutional Provisions

Tex Const. Art. 1, § 19 ................................................................................ 124, 125
Tex. Const Art 6, § 2(c) ....................................................................................... 106
Tex. Const. Art. 1 § 28 .............................................................................. 114, 116, 117
Tex. Const. Art. 1, § 13 ............................................................................... 124, 125
TEX. CONST. art. 16 § 1 ........................................................................................ 5
Tex. Const. Art. 2 Sec. 1 ........................................................................................ 47
Tex. Const. Art. 6, § 2 ................................................................................. 113, 115
Tex. Const. Art. 6, § 2(c) ..................................................................................... 114
*TEX. CONST. art. VI § 4* ............................................................................. 5, 106
U.S. Const. Amendment I ....................................................................................... 122
U.S. Const. Ann., Amendment XV ........................................................................ 122
US Const 15 Amen. ................................................................................................ 119

## II.    **PARTIES TO THE PROCEEDINGS**

Plaintiff(s), pro se, hereby file and serve this Complaint against Defendants John B. Scott, Jose A "Joe" Esparza, Ruth R. Hughs, Keith Ingram; Jacquelyn Callanen, Nelson Wolff, Rebeca Clay-Flores, Justin Rodriguez, Marialyn Barnard, Tommy Calvert, Bobbie Koepp, Cynthia Jacqua, Frank Phillips, Andy Eads, Ryan Williams, Ron Marchant, Bobbie Mitchell, Diane Edmondson, Jennifer Doinof, Ron Massingill, Michele Carew, Pat Deen, Cricket Miller, George Conley, Craig Peacock, Larry Walden, Steve Dugan,  Heider Garcia, Roy Charles Brooks, Devan Allen, Gary Fickes, J.D. Fickes, Andrew Steven Brown*, Dana Debeauvoir, Rebecca Guerrero, Bill Gravell, Christopher Davis, Terry Cook, Cynthia Long, Valerie Covey, Ross Boles, Suzie Harvey, Robert C. Walker, Charlie Riley, James Noack, James Metts, Lina Hidalgo, Rodney Ellis, Adrian Garcia, Tom S. Ramsey, R. Jack Cagle, Isabel Longoria. In support of the claims set forth herein, Plaintiff(s) allege and aver facts as follows: Defendants knowingly and willfully:

    a. neglected to uphold the Constitution,
    b. had foreknowledge of the events unfolding,
    c. chose to perpetrate unconstitutional measures by violating election laws.
    d. all of which constitutes breach of contract through the violations of their Oaths of Office (TEX. CONST. art. 16 § 1, 5 U.S.C. $3331, 5 U.S.C. § 3333, 5 U.S.C. § 7311).
    e. * Andrew Steven Brown **allegedly** does not have an oath of office on file **in Travis County** (TEX. PEN. CODE § 37.11).

1.    As a result of the above-mentioned actions of the Defendants, the quality, accuracy and effectiveness of the Plaintiff(s)' expression of their will, intent and consent of their vote(s) were impaired and are entitled to remedy under the U.S. Constitution Guarantee Clause.[1] "The elective mode of obtaining rulers is the characteristic policy of republican government."

2.    Plaintiff(s) have a vested interest in protecting the quality, accuracy, and effectiveness of our individual votes to ensure our representative servants are lawfully elected by the consent of the governed for the protection against tyranny and for healthy maintenance of

---

[1] https://avalon.law.yale.edu/18th_century/fed57.asp The Federalist No. 57

our Republican form of government afforded to us by our ancestors and for the benefit of our successors.[2]

3.  Plaintiff(s) seek an Order that the Defendants adhere to the constitutionally protected process of collecting and counting votes that ensures integrity and transparency. This is to require hand-marked paper ballots that can be cast with anonymity, following all Texas state election laws, and hand-counted by residents of the state of Texas, not machines as Texas Election law specifies. (*TEX. CONST. art. VI § 4 and TEX. ELEC. CODE Chp. 65*). Additionally, Plaintiff(s) seek redress for the abuse and devastation of our Constitutional rights and protections by our elected officials.

### III.    JURISDICTION AND VENUE

4.  Plaintiff(s) bring this cause of action under original federal jurisdiction 52 U.S.C. § 20511 (42:15483) HAVA, 42:1983cv Civil Rights Act - Civil Action for Deprivation of Rights, 42:1983vp Violation of Due Process and Equal Protection, 42:1985 Conspiracy to interfere with civil rights, 42:1986 Neglect of Duty, 52 U.S.C. § 10101 (42:1971) Voting Rights Law, 28:1331dp Violation of Due Process (federal question), 28:1331vc Violation Constitutional Rights (federal question), and cause of action recognized in Ex parte Young, 209 U.S. 123 (1908) as well as its progeny to challenge government officers "ongoing violation of federal law and [to] seek[] prospective relief" under the equity jurisdiction conferred on federal district courts by the Judiciary Act of 1789.

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 because this action seeks to protect civil rights under the Fourteenth Amendment to the United States Constitution.

6.  This Court has supplemental jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1367.

7.  This Court has authority to grant declaratory relief based on 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure.

8.  This Court has jurisdiction to grant injunctive relief based on 28 U.S.C. § 1343(a)(3) authority to do so under Federal Rule of Civil Procedure 65.

---

[2] *Declaration of Independence and Preamble to the United States Constitution*

9.      This Court has jurisdiction to award nominal and compensatory damages under 28 U.S.C.
        § 1343(a)(4).

10.     There exists an actual and justiciable controversy between Plaintiff(s) and Defendant(s)
        requiring resolution by this Court.

11.     Plaintiff(s) have no adequate remedy at law.

12.     Venue is proper before the United States District Court for the Northern District of Texas
        under 28 U.S.C. §1391 (a)(1) governs the venue of all civil actions brought in district
        courts of the United States; and (b) A civil action may be brought in (1)a judicial district
        in which any defendant resides, if all defendants are residents of the State in which the
        district is located. Because a substantial part of events or omissions giving rise to
        Plaintiff's claims occurred in this District.


## IV.      **RULE 47 DISCLOSURE**

13.     Plaintiff(s) seek only non-monetary relief.


## V.      **RULE 501**

14.     Plaintiff(s) reside under the laws enacted by the Texas state legislatures and actions by
        Defendants referenced below are violations of said laws.


## VI.      **CONSTITUTIONAL QUESTIONS**

15.     The specific questions brought before this court are:

   a.   If the electronic voting systems are not lawfully certified in compliance with voting
        system standards, does it impede the Plaintiff(s)' lawful vote in elections? TEX.
        CONST. art 6 § 4, US CONST. amend XIV.

   b.   If the electronic voting systems and their various devices are not lawfully certified,
        does it cause the Plaintiff(s) to cast illegal ballots? 52 U.S.C. § 10307(a), Due Process
        Clause.

   c.   Since Texas officials presented uncertified voting systems as certified, did they abridge
        the Plaintiff(s)' federally protected right to vote, as well as affronted TEX. PEN. CODE
        § 37.03, § 37.09, § 37.10, 18 U.S.C. § 245

3

d.  Would it dilute the expressed intent and effectiveness of the Plaintiff(s)' voice if the electronic voting systems and their various devices are vulnerable to hacking, tampering, and algorithmic preprogramming? TEX. CONST. art 6 § 4, Right to Vote Clause.

e.  If the electronic voting systems are – by design – unreliable mechanisms for accurately collecting, retaining, and communicating the expression of the Plaintiff(s)' vote, is it acceptable to injure the Plaintiff(s)' voice and will under the Constitutional premise of the consent of the governed.? Declaration of Independence, Guarantee Clause.

f.  Were Constitutionally protected free and fair elections negatively impacted by Texas officials' modification of election laws? TEX. ELEC. CODE § 276.019 and TEX. CONST. art 1 § 28.

g.  If the acting representative servants were unlawfully elected as a result of unreliable, unlawful vote collection devices are they acting in their official capacity? TEX. CONST. art I § 19 and § 29.

h.  Would they not, then, be impersonating public servants? TEX. PEN. CODE § 37.11.

i.  The "elected" officials within the Texas courts prevent a fair hearing of cases involving the election. Where can Plaintiff(s) find an objective perspective without being denied redress of grievances? TEX. CONST. art I § 3, § 13 § 27, and US CONST. amend I.

j.  What is the Constitutional remedy for the usurpation of the Plaintiff(s)' role as the underlying governmental authority, and for forcing the Plaintiff(s) to participate in their own servitude through fraudulent policies, systems, and measures? TEX. CONST. art I § 29, US CONST. amend XIII § 1 and US CONST. amend X.

## VII.   <u>INTRODUCTION</u>

16.  Plaintiff(s)s have performed all necessary conditions as precedent to bring this suit.

17.  The United States and Texas Constitutions protect our First Amendment rights, including the right to petition the government to seek resolution for grievances.

18.  We the voters of the sovereign state of Texas have addressed both houses of the Texas State Legislatures, school boards across the state, district attorneys' offices, city councils, county commissioners, judges, Governor Abbott, Attorney General Paxton, Texas Secretary of State Office, filed suits in district and federal courts including the Texas

Supreme Court and have found no relief. Plaintiff(s) have been called conspiracy theorists, labeled domestic terrorists by the DOJ and Attorney General Merrick Garland. Yet "We" remain undaunted in our quest to seek redress for the violations of our rights.

19. Plaintiffs have not received justice in the matter of the 2020 election and have been forced to utilize the same uncertified, internet connected voting machines for the November 2, 2021, election and beyond.

> "In my humble opinion, those who come to engage in debates of consequence, and who challenge accepted wisdom, should expect to be treated badly. Nonetheless, they must stand undaunted. That is required. And that should be expected. For it is bravery that is required to secure freedom."
>
> -- **Clarence Thomas**

20. We come before this court with the acquired knowledge that we are free solely on paper. We attempted to exercise our constitutional rights to duly elect state and federal officials, but our rights have been deprived due to lack of integrity and accountability. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders, 376 U.S. 1, 10 (1964)*.

21. Lawful elections are the backbone of our local, state and federal government. The right to vote is protected by the Equal Protection Clause and the Due Process Clause alongside the 1st and 15th Amendment, which guarantee we are not be denied the right to cast our ballots by malicious and/or conspiring actors. *U.S. CONST. amend. XIV, § 1, cl. 3-4.* Because "the right to vote is personal," *Reynolds, 377 U.S. at 561-62*. "[e]very voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted."

22. Justice Thomas wrote in his Dissent regarding The State of Texas v. Pennsylvania:

> "Here, we have the opportunity to do so almost two years before the next federal election cycle. Our refusal to do so by hearing these cases is befuddling. One wonders what this Court waits for. We failed to settle this dispute before the election, and thus provide clear rules. Now we again fail to provide clear rules for future elections. The decision to leave election law hidden beneath a shroud of doubt is baffling. By doing nothing, we invite

> further confusion and erosion of voter confidence. Our fellow citizens
> deserve better and expect more of us. I respectfully dissent."[3]

23.   Plaintiff(s) believe we deserve better, and we expect more from our elected and appointed officials in the judicial, executive, and legislative branches. The time has come, as Justice Thomas inquired of the court, to address the legal failures outlined in this suit.

## VIII.   FACTUAL ALLEGATIONS

### A. ACCREDITATION FAILURES

24.   The Help America Vote Act of 2002 (HAVA)[4] was passed by the United States Congress to address improvements to voting systems and voter access following the 2000 election hanging chads.[5]

25.   HAVA creates mandatory minimum standards for states to follow for several areas of election administration.[6]

26.   HAVA law provides funding to help states meet new standards, replace, and purchase new voting systems, and improve election administration such as security.

27.   HAVA established the Election Assistance Commission (EAC) to assist states in HAVA compliance and to distribute HAVA funds.

28.   EAC is also charged with regulating and creating voting system guidelines and operating/managing the first federally run voting system certification program.[7]

29.   HAVA provided directives to the National Institute of Standards and Technology (NIST) to assist the EAC in its accreditation of voting system testing laboratories (VSTL).[8] [9]

> When the NIST evaluates laboratories to assess whether they
> can be accredited or not, the NIST relies on the National
> Voluntary Laboratory Accreditation Program (NVLAP) to
> determine competency. An on-site review of the lab is to
> take place and the lab is to demonstrate competency in
> performing multiple tasks in a voting system review.[10]

---

[4] https://www.eac.gov/about_the_eac/help_america_vote_act.aspx (Last visited 5/20/22)
[5] See U.S.C. § 20922
[6] https://www.eac.gov/sites/default/files/eac_assets/1/6/HAVA41.PDF (Last visited 5/20/22)
[7] See 52 U.S.C.§ 20962, 20971
[8] See 42 U.S.C. § 15371(b)
[9] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (Last visited 5/20/22)
[10] https://www.thegatewaypundit.com/2022/05/exclusive-based-thorough-review-election-regulations-not-single-voting-system-testing-lab-used-2020-election-accredited-based-law-part/ (Last visited 5/20/22)

30.     EAC and NIST work together assessing laboratories to evaluate whether they can be accredited. The NIST relies on the NVLAP to determine competency.

31.     EAC developed the EAC's Voting System Test Laboratory Accreditation Program. The procedural requirements of this program are contained in:

   a.  EAC's Voting System Test Laboratory Accreditation Program Manual[11]

   b.  EAC's Voting System Test Laboratory Program Manual (OMB 3265-0018)[12]

32.     Pro V&V and SLI Compliance, per the EAC, were the only two accredited VSTLs during elections from 2020 to present.

33.     VSTLs are responsible for the examination of the use of Commercial Off-The-Shelf (COTS) components as well as the examination of other applications, software, and components deemed to be proprietary.[13]

34.     Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1. Certificate of Accreditation:  A Certificate of Accreditation shall be issued to each laboratory by vote of the Commissioners. The certificate shall be signed by the **CHAIR** of the Commission and state:

> 3.6.1.   Certificate of Accreditation. A Certificate of Accreditation shall be issued to each laboratory accredited by vote of the Commissioners. The certificate shall be signed by the Chair of the Commission and state:
>
> 3.6.1.1.   The name of the VSTL;
>
> 3.6.1.2.   The scope of accreditation, by stating the Federal standard or standards to which the VSTL is competent to test;
>
> 3.6.1.3.   The effective date of the certification, which shall not exceed a period of two (2) years; and
>
> 3.6.1.4.   The technical standards to which the laboratory was accredited.

35.     "The effective date of the certification, which shall not exceed a period of two (2) years…."

36.     So not just the date is important but the signature on the Lab Certification of Accreditation is very crucial.

37.     Commission Chairman only serve one (1) year, but their signature is good on these certificates for two (2) years.

---

[11] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf (Last visited 5/20/22)
[12] https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf (Last visited 5/20/22)
[13] https://www.eac.gov/sites/default/files/EAC_FACT_SHEET_Testing_and_Certification_Program.pdf (Last visited 5/20/22)

38.     Both Donald Palmer AND Benjamin Hovland were appointed by President Trump and confirmed in the senate on Feb. 4, 2019, as EAC Commissioners but not Chairman.[14]

**Note title of press release:**



39.     Donald Palmer was elected Commission Chairman Feb. 24, 2021. [15]

40.     Benjamin Hovland was appointed Commission Chairman Feb. 2020.[16]

41.     Neither of the above could be valid signatures on the Laboratory Certificates of Accreditation since none were issued in 2020.  Quorum according to the EAC was not restored until appointment of Palmer and Hovland on February 4, 2019.

42.     Christy McCormick was elected as Commission Chairwoman on Feb. 24, 2019.[17]

43.     For the 2020 General Election, Christy McCormick's signature should be on **ALL EAC** Laboratory Certificates of Accreditation.

44.     According to a list of the state's own requirements posted on the EAC's website and the U.S. Election Assistance Commission Voting System Testing and Certification Program, the State of Texas participates as set forth:[18]

---

[14] https://www.eac.gov/news/2019/02/06/commissioners-hovland-palmer-sworn-restore-quorum-eac (Last visited 5/20/22)

[15] https://www.eac.gov/news/2021/02/24/donald-palmer-begins-term-eac-chairman Last visited 5/20/22

[16] https://www.eac.gov/news/2020/02/27/benjamin-hovland-begins-term-eac-chairman Last visited 5/20/22

[17] https://www.eac.gov/news/2019/02/22/mccormick-elected-new-eac-chairwoman Last visited 5/20/22

[18] https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf Last visited 5/20/22

8

# TEXAS

| | |
|---|---|
| *State Participation:* | **Requires federal certification.** TX requires that its voting systems meet the current FEC standards as well as state requirements. |
| *Applicable Statute(s):* | "A voting system may not be used in an election unless the system: (3) operates safely, efficiently, and accurately and complies with the error rate standards of the voting system standards adopted by the Federal Election Commission…" TX Elec Code § 122.01 (2019) |
| *Applicable Regulation(s):* | "For any voting machine … to be certified for use in Texas elections, the system shall have been certified, if applicable, by means of a qualified testing by a Nationally Recognized Test Laboratory (NTRL) and shall meet or exceed the minimum requirements set forth in the Performance and Test Standards for Punch Card, Mark Sense, and Direct Recording Electronic Voting Systems, or in any successor voluntary standard document developed and promulgated by the FEC." 1 TX Admin. Code § 81.61 (2019) |
| *State Certification Process:* | The Secretary of State accepts applications to examine and certify voting systems and appoints four people to examine the voting system. While the Attorney General appoints two people as examiners. Each examiner inspects the voting system and submits a report to the Secretary of State. The Secretary of State will conduct a public hearing to provide interested persons an opportunity to express their views for or against the approval of the voting system. Following the public hearing, the Secretary of State shall prepare a written report stating why the voting system was approved or denied. 1 TX Admin. Code § 81.61 (2019) |

45.    The manual also states that VSTLs must renew their accreditation in a timely manner.

3.8.  **Expiration and Renewal of Accreditation.**  A grant of accreditation is valid for a period not to exceed two years.  A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation.  VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date.  Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending.  VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.

46.     The EAC issued the modifications to the manual regarding 3.8 on July 23, 2021[19] without proper action under 52 U.S.C. §551 *et seq.,* HAVA, 52 U.S.C. §20901 *et seq,* and Federal Advisory Committee Act (FACA), 5 U.S.C. app. 2 §1-15.  Modifications shall be reviewed and commented on by the EAC Board of Advisors and the EAC Standards Board or the requirement by HAVA and the APA guidelines of any modifications shall be provided to the public for notice and comment prior to approval.  *52 U.S.C. §20962, APA 5 U.S.C. §551 et seq.*

    a.  HAVA prohibits the EAC from voting to adopt final guidelines until it has given both the Board of Advisors and the Standards Board 90 days to review and comment on the proposed guidelines and has "tak[en] into consideration" their comment process and recommendations. *Id. § 20962(d)(1)-(2).*

    b.  HAVA additionally requires a public notice and comment process that includes publication of the proposed guidelines in the Federal Register, opportunity for public comment on the proposed guidelines, and opportunity for a public hearing on the record. *Id. §20962(a)(1)-(3).*

47.     SLI Compliance Certification Issued January 10, 2018, Effective January 10, 2021. (Exceeding, more than two (2) years – Should be signed by Chair of Commission)[20]

---

[19] https://www.eac.gov/sites/default/files/2021-07/NOC%2021.01_VSTL%20Accreditation%20Status_1.pdf **(Last visited 5/20/22)**

[20] https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Certificate_of_Accreditation011018.pdf **(Last visited 5/20/22)**



United States Election Assistance Commission

### Certificate of Accreditation

## SLI Compliance,
## Division of Gaming Laboratories International, LLC
## Wheat Ridge, Colorado

*is recognized by the U.S. Election Assistance Commission for the testing of voting systems to the 2002 Voting Systems Standards, the Voluntary Voting Systems Guidelines versions 1.0 and 1.1 under the criteria set forth in the EAC Voting System Testing and Certification Program and Laboratory Accreditation Program. SLI Compliance is also recognized as having successfully completed assessments by the National Voluntary Laboratory Accreditation Program for conformance to the requirements of ISO/IEC 17025 and the criteria set forth in NIST Handbooks 150 and 150-22.*

*Effective Through*

Date: 1/10/18

January 10, 2021

*Brian Newby,*
*Executive Director, U.S. Election Assistance Commission*

EAC Lab Code:  0701

11

48.   ProV&V - EAC Certification, Issued February 24, 2015, Effective Through February 24, 2017.[21] (Should be signed by Chair of Commission)



21
https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_accreditation_certificate_2015.pdf
(Last visited 5/20/22)

49.   SLI Compliance Certification Original Issued February 28, 2007, Dated February 1, 2021.
      (Exceeding, more than two (2) years – Should be signed Chair of Commission)[22]



---

[22]

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI%20Certificate%20of%20Accreditation%20
2021.pdf (Last visited 5/20/22)

50. ProV&V EAC Certification, Original Issued February 24, 2015, Dated February 21, 2021. (Exceeding, more than two (2) years – Should be signed by Chair of Commission)[23]



51. Taking into consideration of just the certificates issued in 2021; the Certificates of Accreditation have multiple issues with them indicating they are still **NOT** in compliance with laws and guidelines set by HAVA and the state of Texas. *(Emphasis added)*

52. The accreditations are not signed by the Chair of the Commission but by the EAC Executive Director, Mona Harrington. The Chair is Thomas Hicks. Mona Harrington has never even been a commissioner.

---

23

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro%20V%26V%20Accreditation%20Certificate.pdf (Last visited 5/20/22)

14

## EAC's Commissioners

Thomas Hicks and Christy McCormick were sworn in January 13, 2015 as EAC commissioners following their nomination by President Barack H. Obama and unanimous confirmation by the U.S. Senate. Benjamin Hovland and Donald Palmer were sworn in on February 4, 2019 as EAC commissioners following their nomination by President Donald Trump and unanimous confirmation by the U.S. Senate.

Commissioner Thomas Hicks, <u>Chairman</u>

Commissioner Christy McCormick, Vice Chair

Commissioner Benjamin W. Hovland

Commissioner Donald L. Palmer

53.   A vote for a VSTL's reaccreditation is taken by the EAC and shall be passed by a vote of (3) three commissioners.  The EAC did not met quorum for the year of 2018 due to only having (2) commissioners.  Until Hovland and Palmer were nominated; no quorum was met until February of 2019 in which Christy McCormick's signature would be required.

54.   This means that no VSTLs were properly accredited for the 2020 Presidential election on November 3, 2020 and continue to be unaccredited due to lack of compliance.





55. EAC provided the following for SLI Compliance[24] and Pro V&V[25] dated January 21, 2021, stating Covid-19 circumstances which was not in accordance to VSTL Version 2.0 Section 3.8. ("**PRE**" Covid-19 pandemic)

56. Reaccreditation should have been properly issued in 2017 and 2018 respectively prior to Covid 19. The Covid excuse falls flat and crosses over to dishonesty.

57. During quorum, the EAC is required to vote on reaccreditation. There was no quorum for a year prior to 2019.

58. Accreditation would not have been possible in order to be in accordance with HAVA of 2002 Section 231(b) and the Voluntary Voting System Guidelines in clear violation of law. Quorum would have and needed to be held well before any real or perceived complications due to COVID-19.

---

24

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Accreditation_Renewal_dela y_memo012721.pdf (Last visited 5/20/22)
25

https://www.eac.gov/sites/default/files/voting_system_test_lab/files/Pro_VandV_Accreditation_Renewal_delay_me mo012721.pdf (Last visited 5/20/22)

16



**U.S. ELECTION ASSISTANCE COMMISSION**
633 3rd St. NW, Suite 200
Washington, DC 20001

**FROM:**      Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:**   SLI Compliance EAC VSTL Accreditation

**DATE:**      1/27/2021

---

SLI Compliance, a division of Gaming Laboratories International, LLC (SLI) has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> *Expiration and Renewal of Accreditation. A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, SLI retains its EAC VSTL accreditation.



**U.S. ELECTION ASSISTANCE COMMISSION**
633 3rd St. NW, Suite 200
Washington, DC 20001

**FROM:**      Jerome Lovato, Voting System Testing and Certification Director

**SUBJECT:**   Pro V&V EAC VSTL Accreditation

**DATE:**      1/27/2021

---

Pro V&V has completed all requirements to remain in good standing with the EAC's Testing and Certification program per section 3.8 of the Voting System Test Laboratory Manual, version 2.0:

> *Expiration and Renewal of Accreditation. A grant of accreditation is valid for a period not to exceed two years. A VSTL's accreditation expires on the date annotated on the Certificate of Accreditation. VSTLs in good standing shall renew their accreditation by submitting an application package to the Program Director, consistent with the procedures of Section 3.4 of this Chapter, no earlier than 60 days before the accreditation expiration date and no later than 30 days before that date. Laboratories that timely file the renewal application package shall retain their accreditation while the review and processing of their application is pending. VSTLs in good standing shall also retain their accreditation should circumstances leave the EAC without a quorum to conduct the vote required under Section 3.5.5.*

Due to the outstanding circumstances posed by COVID-19, the renewal process for EAC laboratories has been delayed for an extended period. While this process continues, Pro V&V retains its EAC VSTL accreditation.

59.     EAC again provided on it's website July 22. 2021 on both Pro V&V[26] and SLI Compliance[27] VSTL accreditation pages yet another excuse regarding the lack of proper and legal accreditations.

---

[1] Pro V&V was accredited by the EAC on February 24, 2015, and SLI Compliance was accredited by the EAC on February 28, 2007.  Federal law provides that EAC accreditation of a voting system test laboratory **cannot be revoked unless the EAC Commissioners vote to revoke the accreditation:** "The accreditation of a laboratory for purposes of this section may not be revoked unless the revocation is approved by a vote of the Commission." **52 U.S. Code § 20971(c)(2).** The EAC has never voted to revoke the accreditation of Pro V&V.  Pro V&V has undergone continuing accreditation assessments and had new accreditation certificate issued on February 1, 2021.

60.     "3.6.1.3. The effective date of the certification, which shall not exceed a period of two (2) years." To revoke is the process of **"taking away".** The accreditation was not "taken away". The regulation clearly states that the accreditation is for (2) two-year periods only. The EAC's use of this section is disingenuous.

61.     52 U.S. Code § 20971(c)(2) is not applicable to 3.6.1.3 and the effective date of the accreditation as the accreditation **EXCEEDED** the period of two (2) years.  The statute does not refer to continued accreditation due to any failure of action by the private laboratories and or the EAC Program Director.  This is erroneous reasoning at best, fraud at worst.  Pro V&V and SLI Compliance were not accredited laboratories in accordance with HAVA of 2002 § 231(b).  The EAC is not a legislative body and cannot create or establish law but must abide by HAVA of 2002.  This is an overreach of power by disregarding the law set forth by HAVA of 2002 Section 231(b) and the federal legislative body.

62.     Note that the same document provides another excuse as to why the VSTLs are not properly accredited. Accordingly, the "Accardi" decision requires that even governmental officials must follow agency regulations and guidelines.  By the EAC's own admission of "administrative error"; the foundation of the rule of law under the Accardi doctrine; the EAC did not observe their own rules and guidelines, therefore violating the laws set by HAVA affording a domino effect of substantive restraints and violations of protected

---

[26] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/pro-vv (Last visited 5/20/22)
[27] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/sli-compliance-division-gaming-laboratories (Last visited 5/20/22)

persons (class) from arbitrary or capricious treatment thus violating Plaintiffs' voting rights.

Due to administrative error during 2017-2019, the EAC did not issue an updated certificate to Pro V&V causing confusion with some people concerning their good standing status. Even though the EAC failed to reissue the certificate, Pro V&V's audit was completed in 2018 and again in early 2021 as the scheduled audit of Pro V&V in 2020 was postponed due to COVID-19 travel restrictions. Despite the challenges outlined above, throughout this period, Pro V&V and SLI Compliance remained in good standing with the requirements of our program and retained their accreditation.  In addition, the EAC has placed appropriate procedures and qualified staff to oversee this aspect of the program ensuring the continued quality monitoring of the Testing and Certification program is robust and in place.

63.    Following the elections of 2016, Senator Ron Wyden sent a letter[28] to Traci Mapps, Director of Operations for SLI Compliance, specifically asking if the company had implemented the best practices described in the National Institute of Standard and Technology (NIST) 2015 VVSG 1.1.

64.    According to the "General Information on Texas Voting System Certification Process" found on the SoS' website[29]

    a.    "The Secretary of State requires new systems and modifications to previously-certified systems be qualified by the Election Assistance Commission (EAC), with 2002 Voting System Standards/guidelines (VSSG) or newer, prior to being submitted for examination."

    b.    "The vendor applying for certification must complete and deliver application forms (Form 100[30], Form 101[31], and if applicable, Form 100 Schedule A), user operating and maintenance manuals, training material, final report(s) from an independent testing laboratory accredited by the EAC, a change log detailing changes from any previously-certified system or component, and application fee(s), to the Secretary of State no later than 45 days prior to examination."

---

[28] https://www.wyden.senate.gov/imo/media/doc/wyden-sli-compliance-election-cybersecurity-letter.pdf (Last visited 5/20/22)
[29] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/20/22)
[30] https://www.sos.texas.gov/elections/forms/form100.pdf#search=form%20100 (Last visited 5/20/22)
[31] https://www.sos.texas.gov/elections/forms/form101.pdf#search=form%20101 (Last visited 5/20/22)

## FORM 100

**Materials Checklist (Indicate materials submitted with an "X")**

| 7 copies of the following (5 copies in electronic format and 2 hard copies): | |
|---|---|
| | Completed application Forms 100 and Form 101 |
| | If applicable, attach Form 100 - Schedule A, listing recommendations/issues made from previous Texas examination.  List how they have been corrected or addressed.  If the have not, explain why. |
| | If component has been modified, include log detailing changes from the previously Texas certified version |
| | Nationally accredited voting system test laboratory reports of all tests (including summary) conducted on items submitted |
| | Operating Manual(s) |
| | Maintenance Manual(s) |
| | Training Manual(s) |
| | Technical Specifications |
| | Operational Specifications |
| | List all COTS hardware/software used with the system and their version numbers – If listed in a nationally accredited test laboratory reports, state where |
| | List all configurations that will be marketed and sold in Texas - indicate if the optical scan will be used as a precinct count, central count, or both |
| | Provide complete step-by-step installation instructions for all software installs and configurations specific to Texas |
| | List of other election jurisdictions where system is in use or has been in use |

**Acknowledge which voting system test laboratory has been notified to send a copy of the software and source code and expected delivery date to our office.**

| Nationally accredited voting system test laboratory Name | Delivery Date |
|---|---|
| | |
| | |

65. According to *"The Certification Procedures for Electronic Pollbooks,"* certification involves "Technical examination by a NIST-certified testing laboratory."  However, which laboratories perform this type of testing, as well as their findings, are not listed on the SoS's website and remain in question.[32]

66. Not only must voting systems in Texas be EAC certified by an accredited VSTL...they must also be examined and approved for use by the Secretary of State and the Attorney General.[33]

---

[32] https://www.sos.state.tx.us/elections/laws/generalinfo.shtml (Last visited 5/23/22)
[33] See Tex. Elec § 122.031

a. Before a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state as provided by this subchapter.

b. The secretary of state may seek a temporary restraining order, or a writ of injunction obtained through the attorney general to prevent the use of any part of a voting system or voting system equipment that has not been approved.

c. A person commits an offense if the person executes a contract to sell, lease, or otherwise provide a voting system or voting system equipment that the person knows has not been approved. An offense under this subsection is a Class A misdemeanor.

67. "Accreditation is the independent evaluation of conformity assessment bodies against recognized standards to carry out specific activities to ensure their impartiality and competence. Through the application of national and international standards, government, procurers and consumers can have confidence in the calibration and test results, inspection reports and certifications provided."[34]

68. Accreditation and certification are used in many aspects of our society. For example, universities and colleges are accredited by private agencies known as an accrediting agency or accreditor. The Department of Education administers and approves these accreditors under CFR Title 34, § 602.[35] Accreditation for the private accreditors is for five years; accreditors must reapply for renewal two years before accreditation lapses.

69. There are currently over 60 accreditors approved for accrediting our nation's colleges and universities[36]. The Harvard University of Institutional Research website explains:

70. Accreditation is a voluntary, peer review process. It serves 4 main purposes: (1) to assure quality to the public, (2) to ease student transfer between institutions by signaling quality, (3) provides institutions with access to federal financial aid, and (4) certifies a graduate's credentials to employers.

71. An "accredited" university meets the Standards for Accreditation established by an accrediting agency. The Standards ensure that an institution has appropriate and clear

---

[34] https://ilac.org/about-ilac
[35] https://www.ecfr.gov/current/title-34/subtitle-B/chapter-VI/part-602
[36] https://www2.ed.gov/admins/finaid/accred/accreditor-federal-recognition-process-steps.pdf

21

goals, sufficient resources to achieve them, is fulfilling its objectives, and will continue to do so.

72.     The process provides colleges and universities with an opportunity for reflection, honest assessment of strengths and weaknesses, along with a chance to develop strategies for continued improvement.[37]

73.     Both accredited and non-accredited colleges and universities accept money, deliver a product (courses) and then award certificates and diplomas to attendees and graduates to document course and program completion. Imagine the public response if colleges and universities turn out to not be accredited due to an accreditor's lack of credentials. This would inspire demands for action loudly across the country, as should the lack of VSTL accreditation.

74.     ES&S EVS 6.1.1.0 was only "certified" by the Election Assistance Commission (EAC) on July 27, 2020, by Pro V&V which did so with an expired EAC accreditation and was not certified to do the examination at the time.

75.      On August 21, 2020, Election Systems & Software ("ES&S" or the "Vendor") presented the EVS 6.1.1.0 system for examination and certification by the Texas Secretary of State.

76.     Travis county officials have confirmed that Election Systems & Software's EVS 6.1.1.0 system was used to conduct the November 3, 2020, elections.

77.     On December 9, 2020, pursuant to TEX ELEC § 122.0371 of the Texas Election Code, the Office held a public hearing, by telephone, for interested persons to express views for or against the certification of the EVS 6.1.1.0 system.

78.     On January 8, 2021, The Secretary of State's office pursuant to Section 122.039 wrote and filed their official report certifying Election Systems & Software's EVS 6.1.1.0 system for use in Texas elections.

79.     ES&S EVS 6.1.1.0 was NOT CERTIFIED for use in any election prior to the state certification on January 8, 2021.

>           "Words do have a limited range of meaning, and no interpretation that goes beyond that range is permissible."   --Antonin Scalia, From 1995 speech at Stanford University
>
>           https://time.com/4220735/antonin-scalia-dead-quotes-opinions/

---

[37] https://oir.harvard.edu/faq/what-accreditation-why-should-university-be-accredited

### B. ELECTION SYSTEM & SOFTWARE (ES&S) VOTING SYSTEM

80.   Election System and Software (ES&S) Voting System is one of two voting systems utilized in the state of Texas.

81.   "Election Assistance Commission Investigated ES&S Voting Systems" is an article published by WhoWhatWhy.org on March 8, 2021, containing documents obtained from the SoS that provides a detailed timeline of events leading up to the SoS certifying ES&S software/systems for Texas use in the 2020 election and currently in use-that were not legally certified by the EAC and had alarming issues.[38]

82.   40 days before the 2020 election, the EAC quietly investigated concerns that ES&S's software installation and validation methods could have left touch-screen voting systems in up to 19 states vulnerable to installation of malicious or otherwise unapproved software.

83.   The investigation arose from a discovery by the Texas SoS voting machine examiners that ES&S had used an **uncertified** USB stick method to install updates to software for versions of ExpressVote touch-screen.

84.   Software installed with this method did not match the software certified by the EAC and failed hash-validation testing (a mathematical algorithm that maps data generated from an installed copy, and then compares that data to the algorithm of the software certified by the EAC).

---

[38] https://whowhatwhy.org/politics/elections/election-assistance-commission-investigated-ess-voting-systems/ Last visited 06/07/22

23



From National Institute of Standards and Technology. File verification is the process of using an algorithm for verifying the integrity of a computer file. A popular approach is to generate a hash of the copied file and comparing that to the hash of the original file. Photo credit: WhoWhatWhy

85.   ES&S told Texas that the discrepancy was caused by a single benign image called "sysload.bmp".

86.   Brain Mechler, Texas examiner states that this left the system vulnerable to an "insider threat".

87.   September 23, 2020, more than a month of interoffice communications, Texas reported the issue to the EAC.

88.   The EAC opened an investigation which expanded to include up to 18 other states and up to 35 versions of ExpressVote.

89.   The EAC never reported or referenced publicly the issue nor the investigation.

90.   October 13, 2020, the EAC sent an email to officials in the affected states implying that it had resolved the issue by approving ES&S's stick-installation method as a "de minimis"[39] engineering change order.

91.   The EAC said they thought it had minimal effect and said its decision was based on the advice of SLI Compliance and Pro V&V.

92.   The lab report shows only 19 versions out of the 35 affected versions were forensically analyzed for the stick method.

93.   The EAC forwarded to state officials and gave instructions for jurisdictions to distinguish between expected/benign mismatches and unexpected, possibly malicious ones.[40]

---

[39] De minimis meant a change to a certified voting system's hardware, software, TDP, or date that does not materially alter the system's reliability, functionality, capability, or operation
[40] https://drive.google.com/file/d/1S7vyc6veOybIDkVMDc1paTRR072H3Mf4/view Last visited 06/7/22

94.     The EAC did not post the "engineering change order" to their website until February 11, 2021, which left the issue widely unnoticed and out of the public eye.

95.     Initially, the website stated that the change order was approved on February 11, 2021, and that it applied to 35 ExpressVote versions; 16 more than the labs had analyzed before the 2020 election.

96.     The EAC quickly changed the website to reflect that the change order was instead granted in October for 19 systems.[41]

97.     Other concerns arose from Texas Examiners regarding ES&S hash-verification scripts for election-management systems.

    a.   Included a bug that caused it to incorrectly report a match under certain circumstances

    b.   ES&S conduction hash-validation tests itself as opposed to having the jurisdiction; "fox guarding the henhouse" situation.[42]

98.     Despite these concerns, Texas certified ES&S's new systems.[43]

99.     The EAC has failed to publish the results of its investigation and or respond adequately to questions which has not been transparent.[44]

100.    ES&S's procedures and coding practices warrant further scrutiny which travails and illustrates the risk associated with using touch-screens to do what a voter could easily do with a pen, mark paper ballots.


**HASH MISMATCH DUE TO UNCERTIFIED INSTALLATION METHOD**

101.    Brian Mechler's, Texas examiner, report for ES&S system version EVS 6.0.3.0 stated that when the examiners asked to run the ExpressVote hash-validation process on the system in August of 2020, ES&S disclosed that it had two methods for that version.[45]

    a.   "Full Inno burn" method matched ES&S's EAC-certified software thus passed the hash-validation test.

---

[41] https://drive.google.com/file/d/1Yr5bs9iyaKWis2MS-iQzlyTuNfu7xCVH/view Last visited 06/7/22
[42] See Election Advisory No. 2019-23
[43] https://www.sos.texas.gov/elections/forms/sysexam/ess-evs-6110-certification-order.pdf Last visited 06/07/22
[44] https://whowhatwhy.org/politics/elections/election-assistance-commission-investigated-ess-voting-systems/ Last visited 06/07/22
[45] https://drive.google.com/file/d/1u5RM5PA29qU8mR_9qrAXRrDXHFRdL1bT/view (5.1) Last visited 06/07/22

b.  USB stick method did not match the EAC-certified software due to what ES&S described as a single benign file called "sysload.bmp" thus resulting in in a hash-mismatch report which Mechler's report called a "Hash Verification Failure".

c.  Mechler further reported, "The fact that the failure occurs on only one file is of no comfort because it still opens a vulnerability to an insider threat".

102.  Keith Ingram the director of elections sent a letter to ES&S advising that "our examiner noted that this issue could create a potential security vulnerability as a proper software validation could not occur".[46]

103.  Sometime in early September, ES&S representative Susan Parmer told Chuck Pinney, an attorney for the SoS, that the voting system test lab knew about the stick-installation method and hash discrepancy when it tested EVS 6.0.2.0 and 6.0.3.0 for EAC certification and "considers it a match if this the only file that comes up as a mismatch during verification" and acknowledged that it was not documented.[47]

104.  Mechler sent an email to Pinney, stating that it was "troubling" that they were being "asked to take ES&S at their word" and that the EAC test labs said "this is fine" expressing concern that ES&S may actually have hidden it's stick-installation method and resulting hash discrepancy during the prior examination and certification of a third system 6.0.2.0 as "it does not appear in any of the examiners' reports. Either this issue was not disclosed or exposed during that exam or there is some nuance that I failed to understand".

105.  Mechler continues by adding that "bmp files can be used to exploit systems". He also expressed concern that jurisdictions had no mechanism to verify whether hash discrepancies resulting from stick installations were due to the expected bmp file mismatch or an unexpected one:

106.  Susan Parmer finishes her response by claiming, "Any other modification to that file would also produce a mis-match and be flagged by the export process, providing the information needed to verify the file and detect an external attack."

---

[46] https://drive.google.com/file/d/1oDq5-ykF7Qs20sw6sB6qRfpVj3dyAOZv/view Last visited 06/07/22
[47] https://drive.google.com/file/d/1ZvcJ0hCJxvFuzWE5-MORibG_k-vmVQPg/view Last visited 06/07/22

107. Mechler's response to Parmer's email; "But that is not true. There is already a mis-match and if customers are being told to ignore it, there is nothing to be flagged."[48]

108. Another Texas examiner, Tom Watson, agreed with Mechler's original assessment via email to the SoS attorney.[49]

109. Mechler responded with stronger verbiage.

> "It's a gift-wrapped opportunity to an insider threat, however unlikely. Under the current guidance from ES&S, an insider now knows specifically which file is not being inspected. It's similar to a bank robber knowing that the camera covering teller #3 is broken."

110. As noted, in September; ES&S admitted that the stick-installation method "was not presented to the EAC as part of certification".[50]

111. A draft letter approved by the SoS on September 29, 2020, written by Executive Director of the EAC, Mona Harrington suggests that ES&S may have misrepresented what the VSTL knew and said about the issue:[51]

> "The ES&S representative performing the installation during the examination used a method that was not tested by an EAC-accredited voting system test laboratory (VSTL) or certified by the EAC to install the software. When questioned by the Texas SOS representatives, the representative claimed that the installation method was reviewed/approved by the lab as part of their certification. Both SLI (VSTL for EVS 6.0.2.0) and Pro V&V (VSTL for EVS 6.0.3.0) deny that they had reviewed this installation method as part of certification testing."

112. On September 15, 2020, Christina Adkins, the legal director for the SoS, learned the uncertified installation method had been used in the field after all and sent an email to Parmer of ES&S stating that "Essentially what you've told us…is that there are Texas customers who received software upgrades that failed the hash validation process, and that…you did not inform our office…This is very concerning and *raises doubts about our ability to trust your team to report and address these issues with us"[52] (Emphasis added)*

[48] https://drive.google.com/file/d/1Yr5bs9iyaKWis2MS-iQzlyTuNfu7xCVH/view Last visited 06/07/22
[49] https://drive.google.com/file/d/1Yr5bs9iyaKWis2MS-iQzlyTuNfu7xCVH/view Last visited 06/07/22
[50] https://drive.google.com/file/d/1oDq5-ykF7Qs20sw6sB6qRfpVj3dyAOZv/view Last visited 06/07/22
[51] https://drive.google.com/file/d/1ilNJS_3VDjl5vRZAShXfVExce2sYBuDT/view Last visited 06/07/22
[52] https://drive.google.com/file/d/1X--u10N85CsFvlFdM2O2SbBtKlJ-1NG2/view Last visited 06/07/22

113.  Parmer tried to sway Adkins that the hash-mismatch "did not fail" and therefore was "never…an issue to report". Her reasoning for the mismatch caused by a single benign file was prior knowledge by ES&S for the discrepancy and was "expected".

> "The hash validation process…did not fail.  On the contrary, the software did exactly what we expected it to do when a sick update is used on an ExpressVote 1.0 and verified the SYSLOAD.BMP file was not present.  This was the expected result, and, as such, is considered a match…There has never been an issue to report and it is disheartening to think you team would doubt our integrity in this matter."

114.  This reasoning was unacceptable to Adkins.[53]

> "The only thing that the jurisdiction has to go on here is your word that this mismatch is the expected result.  They have no way of knowing whether the mismatch occurred because it is the expected mismatch, or because the mismatched file was somehow altered or manipulated.  The hash verification process does not distinguish between "expected" mismatches and malicious mismatches, it simply identifies that a mismatch occurred…Regardless of whether ES&S considers this to be a successful hash verification and a successful match, our office does not consider that verification process to be successful under those conditions."

115.  October 1, 2020, Harrington of the EAC sent a letter to state election directors stating that, "Initially, we were under the impression that only EVS 6.0.2.0 systems in Texas were impacted.  We [are] requesting information from ES&S to better understand the scope and to date have received information that the states listed in Table 1 have at least one jurisdiction that may be affected."[54]

   a.  Alabama (105 units potentially affected)

   b.  Arkansas (2072 units potentially affected)

   c.  Arizona (496 units potentially affected)

   d.  Washington, DC (102 units potentially affected)

   e.  Florida (2893 units potentially affected)

   f.  Iowa (532 units potentially affected)

   g.  Idaho (346 units potentially affected)

   h.  Indiana (731 units potentially affected)

---

[53] https://drive.google.com/file/d/1uYuJvUxdJ_pzKozqH9fW_RllHcxxiTPD/view Last visited 06/07/22
[54] https://drive.google.com/file/d/11BFFOoa--Fmc2o0HtQAXkKvpKACrmtHx/view Last visited 06/07/22

i.   Kansas (1742 units potentially affected)

j.   Kentucky (400 units potentially affected)

k.   Maryland (3501 units potentially affected)

l.   Michigan (548 units potentially affected)

m.   Missouri (538 units potentially affected)

n.   Ohio (168 units potentially affected)

o.   Tennessee (671 units potentially affected)

p.   Washington (3 units potentially affected)

q.   Wisconsin (667 units potentially affected)

r.   Wyoming (20 units potentially affected)

### Hash Validation Errors in ES&S machines



Credit: Nadya Chikurova

116.  The letter further states "Table 2 displays all affected EVS voting systems" in which 35 different EVS systems are listed.

117.  October 7, 2020, Harrington emailed state officials with talking points in case of injuries. They stated as a remedial measure, the EAC had asked ES&S to submit all information and affected versions for forensic testing by VSTLs (SLI and Pro V&V) to see if they would qualify as a minor change.

118.  Harrington again emailed state officials a week later declaring both labs had completed all the testing ahead of schedule and approved the stick-installation method as a "de minimis" change.

119.  Harrington followed up a few days later with a change-order approval from the EAC.

120.  Buried in the SLI's report on page 18 is an instruction for jurisdictions using the stick-installation method.  SLI states that in the event of a hash mismatch..." the jurisdiction must...verify that the sysload.bmp files' hash codes...match the corresponding hash codes listed in Table 1.  If the hash match, installation may continue.  If the hashes don't match, the jurisdiction must follow ES&S's recommendations and perform a Production Image installation on the device."[55]

121.  Harrington did forward the lab reports in her email on October 15, 2020, but only stated "As promised, attached are the final lab reports" and nothing about the instructions for jurisdictions.

122.  The day before she stated that the labs had approved the "de minimis" finding and the EAC had concurred and that she would be "sending the reports, nothing beyond that".

123.  State officials were left to find the buried instructions provided from SLI and in turn specify these instructions to the jurisdictions.

124.  ES&S's uncertified installation method and resulting hash discrepancy were effectively buried.

125.  The EAC did not post the change order to its website until February 2021.

126.  The SoS extending the deadline for examiners to submit reports for the system where the issue came up until after the election and gave ES&S permission to "withdraw" its certification request for the system.

---

[55] https://drive.google.com/file/d/1RZ_bHE3xLI8oBobirynFRJiP89VeOhaq/view Last visited 06/07/22

127. Withdrawing it's certification provided the SoS Office  the avenue to NOT have to publish these reports on their website. SoS's office told the examiners that, in light of the withdrawal, the attorney general's examiners need not submit their reports to the SoS at all.  None of the reports had to say whether the examiners would have recommended the certification of these systems.

128. Per the SoS's request; ES&S did not use a full Inno burn installation on all Texas counties that ES&S had stated were impacted by the mismatch issue (stick installation).

129. November 8, 2020, after the 2020 election, Adkins emailed Mechler scheduling a "meeting with ES&S in December to discuss the scope of this (stick installation and hash mismatch) issue as it appears to have affected more systems than they initially disclosed to us."[56]

130. Mechler wrote in his report on November 19, 2020, "it is unclear at this time whether there are more affected systems in Texas than initially disclosed by ES&S".

**BUG IN ES&S HASH VERIFICTION SCRIPT**

131. Mechler's report explains that the hash-validation method included a bug in ES&S's hash-verification script as two USB thumb drives were required to complete and needed to match.

    a. One with the export date being verified

    b. One with the scripts and hash file

132. Mechler neglected to include in his report to add the hash file for the certified version of the software, yet the software still reported as a match.[57]

> "While working through the [hash validation] process, I initially overlooked the instruction to add the trusted hash file to the scripting media. Despite the missing trusted hash file, the verification script erroneously reported that the exported hashes matched the trusted [certified] hashes."[58]

> "In my opinion, this bug (in addition to the overall process) indicates that ES&S has not developed their hash verification with sufficient care, quality assurance, and concern for usability."

---

[56] https://drive.google.com/file/d/1wEIBD_-bQJ8ZnIIdSlQi3cvodjlGX7Ta/view Last visited 06/07/22
[57] https://drive.google.com/file/d/1u5RM5PA29qU8mR_9qrAXRrDXHFRdL1bT/view Last visited 06/07/22
[58] This means that even though no hash comparisons were made, the verification implies a good result.

**ES&S CONDUCTING ITS OWN HASH VALIDATION TESTS**

133. Parmer of ES&S mentioned in an email to Pinney that ES&S technicians were conducting the hash-validation tests themselves not the jurisdictions conducting them.

134. This posed a red flag as the purpose of the hash validations is to ensure the vendor is not giving the customers something different than what is certified by the EAC and the SoS's office.

135. As Adkins explained to Parmer in an email; "If the hash validation process is performed by the same vendor technician who performed the installation, then that validation process loses one of its major purposes, which is to keep the vendor honest."[59]

136. One SoS examiner, Brandon Hurley to Adkins via email states "It is the ultimate "fox watching the henhouse" scenario. It is them [ES&S] self-certifying systems for use".

137. "Jurisdictions should always perform this process themselves," Mechler wrote in his reports. "To have the vendor [ES&S] perform a required component of acceptance testing creates, at best, a conflict of interest."

138. Freedom to Tinker reported[60] one ES&S contract in Collin County, Texas expressly requires the customer to use ES&S for hash-validation testing.[61] Below is the provision:

> b.    **Exclusive Remedies/Disclaimer.** IN THE EVENT OF A BREACH OF SUBSECTION 7(a), ES&S' OBLIGATIONS, AS DESCRIBED IN SUCH SUBSECTION, ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES. ES&S EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHICH ARE NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  FURTHER, IN THE EVENT CUSTOMER DECLINES ES&S' INSTALLATION AND ACCEPTANCE TESTING SERVICES OR IN ANY WAY AT ANY TIME ALTERS, MODIFIES OR CHANGES ANY EQUIPMENT, SOFTWARE, THIRD PARTY ITEMS AND/OR NETWORK (COLLECTIVELY "SYSTEM") CONFIGURATIONS WHICH HAVE BEEN PREVIOUSLY INSTALLED BY ES&S OR WHICH ARE OTHERWISE REQUIRED IN ACCORDANCE WITH THE CERTIFIED VOTING SYSTEM CONFIGURATION, ALL WARRANTIES OTHERWISE PROVIDED HEREUNDER WITH REPECT TO THE SYSTEM PURCHASED, LEASED, RENTED AND/OR LICENSED UNDER THIS AGREEMENT SHALL BE VOID AND OF NO FURTHER FORCE AND EFFECT.

139. **General Terms 7(b)**

140. Eddie Perez, an election technology expert with ONSET Institute calls this type of contract provision unconscionable.[62]

---

[59] https://drive.google.com/file/d/1X--u10N85CsFvIFdM2O2SbBtK1J-1NG2/view Last visited 06/07/22

[60] https://freedom-to-tinker.com/2021/03/05/voting-machine-hashcode-testing-unsurprisingly-insecure-and-surprisingly-insecure/ Last visited 06/07/22

[61] https://eagenda.collincountytx.gov/docs/2020/CC/20200601_2483/48428_2018-241%20Contract.pdf Last visited 06/07/22

[62] https://twitter.com/eddie1perez/status/1367844687541854211?s=20 Last visited 06/07/22



**Edward Perez**
@eddie1perez

Replying to @SEGreenhalgh @EACgov and @jennycohn1

I find the issue of acceptance testing far more maddening. I have known for yrs that ES&S often does "acceptance testing" for customers (totally inappropriate) & has the gall to *charge* customers for the "service" (unacceptably mercenary); but voiding warranty is unconscionable.

8:29 AM · Mar 5, 2021 · Twitter for iPhone

141.



**Edward Perez**
@eddie1perez

Forcing customers to permit the vendor to do acceptance testing is like buying a new home and before the closing the seller says, "You don't need a final walk-through. Just trust me."

And then *voiding the warranty* if they don't agree? Unethical strong-arming at its worst.

9:00 AM · Mar 5, 2021 · Twitter for iPhone

142.

## TEXAS CERTIFIES 6.1.1.0 DESPITE HASH-VALIDATION CONCERNS

143.   The Tex. Elec Code states that a "voting system may not be used in an election unless the system…is safe from fraudulent or unauthorized manipulation."[63]

144.   Mechler's assertion that "the hash verification process has been a growing issue of concern over the past few certification exams"[64]; he and other examiners still recommended certifying EVS 6.1.1.0.[65]

145.   Ironically, Texas Attorney General Ken Paxton publicly assailed Dominion voting but ignored our own state's use of ES&S.

---

[63] See Tex. Elec Code § 122.001(a)(4)
[64] https://www.sos.texas.gov/elections/forms/sysexam/brian-mechler-ESS-exam-report-EVS6110-aug.pdf#search=evs%206.1.1.0 (Sec. 8 Conclusions) Last visited 06/07/22
[65] https://www.sos.texas.gov/elections/forms/sysexam/ess-evs-6110-certification-order.pdf Last visited 06/07/22

## C. HART INTERCIVIC VERITY

146.    There is no universal definition of "paper ballot" which enables vendors and their surrogates to characterize "machine-marked paper printouts from ballot marking devices" (BMD) as "paper ballots".

147.    The machine-marked ballot is then counted on a separate scanner.

148.    Most independent cybersecurity election experts caution against putting these insecure BMDs between voters and their ballots and instead recommend hand-marked paper ballots as primary voting system.[66]

149.    Currently "hybrid" systems that combine both a BMD and a scanner into a single unit are more controversial.

150.    Verity Touch Writer DUO are daisy chain configurations comprised of a Verity controller device, a proprietary cord, connecting up to twelve BMD devices.[67]

151.    The software application, Verity Relay, is a remote transmission software application that receives election data transmissions sent by Verity Scan device (tabulator) unit that scans, Verity Touch Duo scanner firmware and digital scanner devices that are equipped with the Relay modem accessory.  Per the contract obtained through PIA requests, it appears that Tarrant County purchased this capability.

152.    Two manufacturers of the voting machines utilized in Texas, ES&S and Hart, testified before the House Administration Committee, that some tabulators have wireless modem capabilities.[68]

153.    Several aspects/components of Hart InterCivic's Verity Voting are concerning when in close proximity to the internet.

154.    One known county contract of the Hart InterCivic tabulators indicates that (9) nine of the add-on modems were purchased.

---

[66] https://whowhatwhy.org/politics/elections/philly-ignores-cybersecurity-and-disability-access-in-voting-system-selection/ Last visited 06/21/22

[67]
https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf See page 21 Last visited 06/21/22

[68] https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 Last visited 06/21/22

a. Per Hart contract, a modem kit is required for electronic transmission from Verity Scan.

C. Voting Devices continued

| Component | Version | Description | Year 1 | | | Year 2 | | | Year 3 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) | Unit Price ($) | Est. Qty. | Total ($) |
| Relay Modem Kit | | Modem kit required for electronic transmission from Verity Scan. May be shipped separately pending customer carrier selection; invoicing and testing will be independent if shipped separately. | $ 500 | 9 | $ 4,500 | | | | | | |
| AutoBallot Kit | | Barcode scanner kit for automatic Verity access code creation from VR/electronic poll book data | $ 419 | 400 | $ 167,600 | | | | | | |
| License & Support for Verity Hardware | | Annual License & Support Fee | $471,880 | 1 | $ 471,880 | $471,880 | 1 | $471,880 | $471,880 | 1 | $ 471,880 |
| TOTAL | | | $ | | 13,303,792 | $ | | 471,880 | $ | | 471,880 |

b. On August 1, 2019, the SoS Office sent a letter of approval for the above contract, which contained the add-on modems, to Heider Garcia. (Relay Modem Kit).

c. The Rely Modem Kit is listed as required by Hart in order for the ENR to function but is not a listed component on the SoS examination or on the certification.

155. Brandon Hurley, an SOS appointed examiner, pointed out the connectivity capabilities of this make and version of voting system in his examination report.[69]

156. The exact component that allows this was not identified in Hurley's report, however, the visuals of Verity Voting, as well as several item descriptions in SLI Compliance's testing report could be points of vulnerability given the lack of compliance with VVSG.[70]  See 1.6.1 Block Diagram

---

[69] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf
[70] https://www.eac.gov/sites/default/files/voting_system/files/Attachment%20F1%20-%20Hart%20Verity%20Voting%202.4%20Modification%20Test%20Plan%20As%20Run%20v1.2.pdf Last visited 06/21/22

SLI

Hart InterCivic
Verity Voting 2.4
EAC Modification Test Plan

## 1.6  Scope of Testing

### 1.6.1   Block Diagram



Overview of the diagram:

- The components are displayed as touch points of data access, transfers, and verification.
- Dotted lines show the flow of data and air gaps using vDrives and are also used to separate the deployment models shown within the polling place.
- Verity Print is a ballot production device that provides unmarked printed ballots.
- Verity Touch Writer and Scan may be installed in polling places to support paper-based voting.
- Verity Controller, Touch Writer Duo, and Scan may be installed in polling

EAC Modification Test Plan v1.2
Document No. HRT-19003-CTP-01

Page 17 of 33

---

71

https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EAC%20Certification%20Test%20Report%20v1.1.pdf
Last visited 06/21/22.

157. "Air-gapping" measures that are intended to prevent internet/network access have several experts presenting testimonies and demonstrations that contradict "air-gapping" as fail safe.

158. "Most traditional air gaps involve what is popularly known as a "sneakernet," a physical method of transferring data, e.g., a Wi-Fi dongle or USB port."[72]

> At this point, human nature takes over. Even well-intentioned users will accidentally leave doors unlocked or USB ports unguarded. They may get lazy and neglect to follow security procedures. One worrisome example of this risk occurs on merchant ships and naval vessels, whose mechanical control and navigation systems are air-gapped because, well, they're on a ship and generally not connected to the Internet (though even that is starting to change.) Once a ship is docked, however, a malicious actor can gain access to the ship and use a USB stick to insert malware into the system. When a ship undergoes maintenance, and hundreds of semi- or non-vetted workers are aboard the vessel while the regular crew is away, it's easy to see how an air gap will
>
> fall apart.

**2.5  Materials**

Items identified in the table reflect materials required to perform hardware, software, telecommunications, security, accuracy and integrated system tests in a manner that reflects real world use and needs.

The following test materials are required for the performance of testing including, as applicable, test ballot layout and generation materials, test ballot sheets, and any other materials used in testing.

- Ballots & blank ballot grade paper
- Thumb drives
- USB dongles
- Ballot marking pens
- Printer paper rolls                                              73

159. Further, Brandon Hurley noted an *over vote* issue "….bring up a warning when more than one candidate can be voted for in a specific race. However, when you make your selection

---

[72] https://www.rubrik.com/insights/what-is-an-air-gap-and-why-is-it-important Last visited 06/21/22
[73]
https://www.eac.gov/sites/default/files/voting_system/files/Hart%20Intercivic%20Verity%20Voting%202.4%20EA
Last visited 06/21/22

to continue, there is an automatic de-selection of another candidate chosen rather than allowing the voter to decide who gets deselected……. led to a voter confusion….casting of an unintended vote without voter's knowledge."[74]

### HART INTERCIVIC BALLOT ISSUES

160.    Hood County District Attorney Matthew Mills contacted the Attorney General, Ken Paxton, requesting clarification of ballot numbering issues associated with the use of Hart InterCivic voting systems.

161.    Mills pointed out the following issues with electronic voting systems, specifically Hart's hybrid voting system.[75]

    a.    Questions arising about compliance with election code.[76]

    b.    Who has the authority to select the method for numbering ballots?

162.    Texas Secretary of State legal director of the elections division informed election administrators of two ways to comply.[77]

    a.    First method:  Pre-print numbers on blank ballot stock, email deems "simplest and easiest way"

    b.    Second method:  The voting machine to generate random numbers on blank ballots.

163.    Mills poses (3) three questions regarding the ballot numbering issues with Hart.

        The relevant language in § 52.062 is the following: "[t]he ballots prepared by each authority responsible for having the official ballot prepared." Does this indicate that using pre-printed numbers on blank ballot stock is the only legal way to comply with the statute? Or does the machine generation method also comply with the numbering requirement?
[78]

    a.    A memorandum from a staff attorney, Chuck Pinney, to the Director of Elections, Keith Ingram, dated May 18, 2020, states machine-generated numbering on the Hart Verity 2.4 system complies with Texas ballot numbering requirements.

---

[74] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf#search=hart%202.4.2
[75] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/24/22
[76] See Tex. Elec Code § 520.62
[77] https://www.sos.texas.gov/elections/forms/sysexam/chuck-pinney-hart-2.4.pdf See page 3 Last visited 06/22/22
[78] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 12 Last visited 06/22/22

b. According to Elec. Code Ann § 31.032 the election commission has the authority to appoint an election administrator as well as suspend or terminate the administrator under § 31.037. Under § 31.039, the commissioners court maintains authority over various budgetary issues including salary and staffing.

   i. A 1988 Tex. Att'y Gen. Op. No. LO-88-62 (1988)[79] the AG's office opined that election administrators should be "largely independent of both the commissioners court and election commission." Essentially, stating that the elections commission does not possess the authority to suspend an elections administrator.

   ii. Senate Bill 12333 in 2011 may render the AG opinion moot which gave new authority to elections commissions to suspend elections administrators.

   iii. In 1997, the San Antonio Court of Appeals provided a different conclusion in Krier v.Navarro, 952 S.W.2d 25 the elections administrator was greatly restricted in the exercise of his duties from "…selecting polling places and early voting sites, issuing orders calling for elections, adopting a voting system, selecting election judges and phone bank clerks…leasing voting systems…The evidence presented establishes that the governmental functions performed by Navarro were not exercised 'largely independent of the control of others."*Id*

Assuming the reasoning in *Krier* is correct, is the method of ballot numbering akin to "adopting a voting system," which is controlled by the commissioners court? Or has the commissioners court already determined the voting system by purchasing voting equipment, and the elections administrator may then determine which method of ballot numbering is appropriate?

Chapter 52 of the Election Code contains various provisions for the preparation of ballots. Under § 52.001, ballots are for the "vote in *an election*." (emphasis added) Does the suggestion in the director's advisory that jurisdictions may conduct subsequent elections with ballot numbers starting higher than "1" comply with § 52.062? Or should ballots begin with the number "1" for each election?

---

[79] https://www2.texasattorneygeneral.gov/opinions/opinions/47mattox/lo/1988/pdf/lo1988062.pdf Last visited 06/22/22

c. On October 23, 2019, Keith Ingram of the Texas Secretary of State office published Election Advisory 2019-23.   Sec. 13(1)(a)(iv)(1)[80], the director suggests that jurisdictions *MAY* start with the number "1" and then start subsequent elections with ballots with much higher starting numbers. *(Emphasis added)* See below Election Advisory 2019-23 reads as follows:

iv. The jurisdiction can pre-number the ballots and split them into batches for each election, with each batch beginning with a number that ends in the number "1". Those batches must be no smaller than units of 100, though a jurisdiction could batch in larger units if needed (1000, 10,000, etc.).

1. **Example:** For the November election, the jurisdiction could use ballots 1-1500, and for the May election that jurisdiction could then use ballots 1501-2400, and for the following November election the jurisdiction could use ballots 2401-4200, etc.

164.   Is the Director of Elections advising jurisdictions to ignore Tex. Elec Code § 52.001?

165.   Matthew Mills, Hood County Attorney; raises three very specific questions concerning the numbering of the ballots in which Hart InterCivic voting systems does not comply in accordance with Tex. Elec Code.[81]

166.   In response to Mill's request for an opinion regarding numbering of the ballots; Roger B. Borgelt, Borgelt Law, provided an opinion to the Attorney General's office on July 29, 2021.[82]

167.   The Texas legislature is constitutionally required to provide for ballot numbering in Texas.[83]

168.   The Texas legislature passed the consecutive ballot number statute 35 years ago[84]and provides integrity of the ballot by detecting counterfeited, missing or duplicate ballots.

169.   Tex. Elec Code § 52.062 requiring consecutive ballot numbering consecutively beginning with number "1", is referenced in (6) six other Election Code provisions thereby making it an established mandatory procedure.

a. § 51.006.  PREPARING BALLOTS FOR DISTRIBUTION

---

[80] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[81] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009
[82] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf See page 3 Last visited 06/22/22
[83] See Tex. Con. Article 6 Sec. 4
[84] See Tex. Elec Code § 52.062

"The authority responsible for distributing election supplies shall package and seal each set of ballots before their distribution and shall mark the package with the number of ballots enclosed and the range of the ballot serial numbers..."

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.  Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.47;  Acts 1991, 72nd Leg., ch. 554, Sec. 18, eff. Sept. 1, 1991.

### b. § 51.007.  RECORD OF BALLOT DISTRIBUTION

(a)  As soon as practicable after the ballots are packaged for distribution, the authority responsible for distributing election supplies shall prepare a record of the number of ballots and the range of serial numbers on the ballots to be distributed to each presiding judge and the early voting clerk.

(b)  The authority shall preserve the record for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.  Amended by Acts 1991, 72nd Leg., ch. 203, Sec. 2.48;  Acts 1991, 72nd Leg., ch. 554, Sec. 19, eff. Sept. 1, 1991.

### c. § 51.008.  SUPPLEMENTING DISTRIBUTED BALLOTS

(a)  The authority responsible for distributing election supplies shall retain a reserve of ballots to supplement the distributed ballots and on election day may reallocate previously distributed ballots among the polling places.

(b)  The authority shall enter on the record of ballot distribution the number of ballots reserved and the number of ballots distributed from the reserve to each polling place.  The range of serial numbers on the ballots shall be included in the record.

(c)  If distributed ballots are reallocated, the authority shall indicate the reallocation on the record of ballot distribution and shall issue a receipt to each presiding election judge showing the number of ballots and the range of serial numbers on

the ballots taken from the judge's polling place for redistribution. Each presiding judge shall indicate on the ballot register any reallocation of ballots affecting that polling place.

(d) The authority shall retain the undistributed reserve for the period for preserving the precinct election records.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

### d.   § 51.010.   FAILURE TO DISTRIBUTE OR DELIVER SUPPLIES

(a) A person commits an offense if the person is responsible for distributing election supplies for an election and intentionally fails to distribute any of the supplies by the deadline prescribed by Section 51.004(b).

(b) A person commits an offense if the person is entrusted with the delivery of election supplies for use at polling places and intentionally fails to deliver any of the supplies within the time specified by the person who entrusted the delivery to the person.

(c) An offense under this section is a Class C misdemeanor.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.  Amended by Acts 1997, 75th Leg., ch. 864, Sec. 46, eff. Sept. 1, 1997.

### e.   § 62.007.   EXAMINING BALLOTS

(a) An election officer shall unseal the ballot package, remove the ballots, and examine them to determine whether they are properly numbered and printed.

(b) An unnumbered or otherwise defectively printed ballot shall be placed in ballot box no. 4.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.

### f.   § 62.009.   DISARRANGING BALLOTS FOR VOTERS' SELECTION

(a)  As needed for voting, an election officer shall disarrange a supply of the ballots so that they are in random numerical order.

(b)  The disarranged ballots shall be placed face down on a table in a manner preventing an election officer or other person from ascertaining the number of a ballot selected by a voter.

(c)  The provisional ballots shall be placed separately from the regular ballots.

Acts 1985, 69th Leg., ch. 211, Sec. 1, eff. Jan. 1, 1986.  Amended by Acts 1997, 75th Leg., ch. 1078, Sec. 6, eff. Sept. 1, 1997;  Acts 2003, 78th Leg., ch. 1315, Sec. 22, eff. Jan. 1, 2004.

170.    As noted above in Election Advisory 2019-23, the SoS notates that jurisdiction using ES&S and Hart InterCivic systems does not comply with § 52.062.[85]

i. ES&S ExpressVote – Tracking Ballot Numbers Through the ExpressVote Activation Card Printer/ExpressLink Software
1. Each ExpressVote Activation card printer that is assigned to a specific polling place will be given a two to three digit alpha code. This code will be printed on each Ballot Card as it is generated for the voter.
2. In addition to the alpha code, each polling place will print a randomly generated serial number between 1 to 99,999 on the card along with the identifying information related to the election.
3. The system will generate a report showing which ballots (based on their serial number) were used at each location. This report must be retained with your precinct election records.
4. For tracking purposes, you will continue to have the presiding judge fill out the Ballot Register (PDF), and the original and duplicate forms will be returned in the applicable envelopes. The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the exception of notating the serial number of the ballot ranges.

171.    Randomized ballot numbering procedures will cause jurisdictions to violate several election codes.[86]

172.    In the same advisory[87] the SoS Office  does not advise how jurisdictions will comply with the following Tex. Elec Codes:

a.  § 51.010 – how will officials distribute serial numbered range records to polls.

b.  § 62.007 - how officials at polls determine if ballots are properly numbered.

c.  § 62.009 – how will election judges place numbered ballots face down.

173.    Allowing voting machines to generate random text values on ballots will cause confusion and violate several Tex. Elec Code statues, which are punishable by law.[88]

---

[85] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[86] See Tex. Elec Code § 52.062, 51.006, 51.008
[87] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/22/22
[88] See Tex. Elec Code § 51.010(c), § 51.007(b), 51.008 (d) and 13 TAC § 7.125(a)(10) and Tex. Penal Code § 37.10(3)

174.    The SoS is provided the authority to prescribe "operating procedures" related to voting systems.  The Tex. Elec Code does not provide the SoS the authority to advise to ignore any sections of the Election Code as law and procedure are not the same.

175.    There is no authority that grants the SoS defendants to *interpret* Tex. Elec Code for the following:

   **a.**  Advising to jurisdictions to ignore Tex. Elec Code § 52.062.

   **b.**  The Legislative Branch did not provide the SoS the authority to ignore Tex. Election code nor to advise to jurisdiction to do the same in violation of Tex. Con. Art. 6 Sec. 4. in regards to numbering of the tickets/ballots.

   **c.**  Hinders jurisdictions' ability to "detect and punish fraud and preserve the purity of the ballot box. ....as randomized ballot numbers prevent election judges from recording, validating, and tracking the official ballot serial number ranges they were in possession of, personally distributed, and retained at their polling locations, again violating Tex. Con. Art. 6, Sec 4."[89]

176.    The Election Code specifically assigns the SoS duties[90] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code.[91]

177.    The SoS Defendants and County Officials disregard for Tex. Elec Code in their guidance to jurisdictions violates the Separation of Powers clause of Art. 2 Sec. 1 of the Texas Constitution.

178.    The Texas Constitution provides that only the Legislature can suspend laws – not the SoS, a member of the Executive Branch.

179.    These actions are in contradiction to the Election Code and how it is to be interpreted and applied for uniformity across the state of Texas for all voting systems.[92]

180.    By suspending laws and authorizing exceptions to the Election Code, the SoS Defendants have and continue to unlawfully modify election law.[93]

---

[89] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf Last visited 06/22/22
[90] See Elec. Code § 31.003
[91] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)
[92] See Tex. Elec Code § 122.032
[93] See Tex. Elec Code § 276.019. UNLAWFUL ALTERING OF ELECTION PROCEDURES - A public official or election official may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by this code.

181. The Legislature provided a very clear and specific mandate: prepare and distribute detailed and comprehensive written directives and instructions that comply with the Election Code to state and local election authorities.[94]

182. The SoS Defendants' and County Officials' defiance of Election Code knowingly caused the Plaintiff(s), registered voters of Texas; to cast a vote

   a. under false pretense[95]

   b. prevent a cast of a legal vote in which Plaintiff(s) are eligible to vote.[96]

   c. Cause the ballot not to reflect the intent of the Plaintiff(s)/voter[97]

   d. Defendants committed the offense while acting in the capacity of an elected official.[98]

183. Randomized ballot numbering generated by Hart InterCivic Verity 2.4 results in multiple election law violations, the Texas Constitution, and the Texas Penal Code.

**HART INTERCIVIC ESLATE**

184. During the 2018 midterms a number of "straight-ticket" voters complained that Hart's eSlate system had switched their choices to the opposite party. [99]

185. Others reported that the Hart eSlate machines appear to remove any selection for the U.S. Senate. [100]

186. In 2008, the Texas Democratic Party sued then-Secretary of State Roger Williams over a similar straight ticket voting error affecting the same Hart eSlate machine.[101]

187. April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification.[102]

188. California Secretary of State Debra Bown released results of the state's review of the voting systems used in the state.[103]

---

[94] See Elec. Code § 31.003
[95] See Tex. Elec Code 273.013(1)
[96] See Tex. Elec Code 273.013(2)
[97] See Tex. Elec Code 273.013(6)
[98] See Tex. Elec Code 273.013(b)(1)
[99] https://techcrunch.com/2018/10/26/texas-voting-machines-changing-votes-hart-eslate/ Last visited 06/21/22
[100] https://www.houstonchronicle.com/news/politics/texas/article/Voting-machine-errors-changed-some-Texans-13339298.php Last visited 06/21/22
[101] https://www.austinchronicle.com/news/2008-08-08/658341/ Last visited 06/21/22
[102] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[103] https://www.wired.com/2007/07/ca-releases-res/ Last visited 06/23/22

a. Red Team led by UC Davis computer scientist Mathew Bishop, tasked with examining security vulnerabilities found that Hart InterCivic could be compromised. Many of the attacks could be mitigated but *not all*. *(Emphasis added)*

b. Red Team also noted that they did not have enough time to fully examine the systems and were confident that further examination would reveal additional security vulnerabilities in the voting system.

c. Samples of the kinds of attacks the team was able to conduct on the Hart InterCivic System:

> 1. Election Management System. The testers did not test the Windows systems on which the Hart election management software was installed because Hart does not configure the operating system or provide a default configuration. Hart software security settings provide a restricted, Hart-defined environment that the testers bypassed, allowing them to run the Hart software in a standard Windows environment. They also found an undisclosed account on the Hart software that an attacker who penetrated the host operating system could exploit to gain unauthorized access to the Hart election management database. 2. eScan. The testers were able to overwrite the eScan firmware. The team also accessed menus that should have been locked with passwords. Other attacks allowed the team to alter vote totals; these attacks used ordinary objects. The team, in cooperation with the source code review team, was able to issue administrative commands to the eScan.
>
> 3. JBC. The team developed a surreptitious device that caused the JBC to authorize access codes without poll worker intervention. The team verified that the mobile ballot box (MBB) card can be altered during an election. The team also found that post-election safeguards to prevent the altered data on a tampered MBB card from being counted can be easily bypassed.
> 4. eSlate. The testers were able to remotely capture the audio from a voting session on an eSlate with audio enabled, thereby providing an attack that violates voter privacy.
> The team was also able to force an eSlate to produce multiple barcodes after printing
> "BALLOT ACCEPTED" on the VVPAT records. This could cause a county that used bar code readers to read the VVPAT to produce erroneous vote totals.

189. Brandon Hurley an SoS examiner notates on his examination report dated February 19, 2008, "…January 18, 2008, all of the appointed Examiners gather with Hart officials for remainder of the inspection and testing of the 6.2.1 System…. The examiner and the Hart officials held a lengthy discussion concerning past published issues and issues in other states that have come up with the Hart Intercivic 6.2.1 System and its predecessors. In particular, a previous "decertification" by the California Secretary of

State was discussed…Hart officials represented that California immediately recertified the system after it was decertified."[104]

190.    Hurley further noted: "…recommendation is conditioned on satisfactory answers being provided by Hart to the Secretary of State's office in response to the list provided to Hart on February 6, 2006.   The answers to these questions are due from Hart on February 22, 2008.  If any of the questions or additional issues, then I would suspend this recommendation pending the resolution of such issues."

191.    Tom Watson an SoS examiner notates on his examination report the following:

192.    "Tally, Rally, and SERVO employ the "secure desktop" feature which is supposed to prevent access to the operating system by the operator during the election processing. A flaw in the "secure desktop" was discovered during the Tally examination.   The standard Windows file dialog is used to select a file when exporting VR data…This is a significant flaw because it allows an operator to delete files or launch a program that could manipulate the data files."

193.    "…but there is a security issue.   The file dialog flaw is significant and must be corrected."

194.    Stephen Berger prepared a report for the SoS on Hart InterCivic Voting System Version 6.2.1 in which he recommended that this system NOT be certified until Hart InterCivic addressed the issues he cited below.[105]

    a.  Conditions of Certification

        i.   "All files installed with the system must be filed with the NIST NSRL. Hart InterCivic's response is egregiously deficient. To support incoming inspection of new systems a list of all files installed is need so that the new system can be verified as having only the system as certified. Pre and post election checks to confirm that software has not been changed or tampered with are recommended. To do this local jurisdictions must have HASH codes of all static files. Further, to avoid the system having a single point vulnerability the non-static files, that change with use, should be evaluated by an entity other than the vendor. Why

---

[104] https://www.sos.texas.gov/elections/forms/sysexam/brandonhurley.pdf#search=hart%206.2.1 Last visited 06/23/22
[105] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 Last visited 06/23/22

non-static files change should be understood by state and local authorities. Election officials should make their own independent determination that files that change with use and are not included in pre and post election checks are appropriate and do not represent a security vulnerability."

ii.   "In response to the question:

"Beyond the files installed with the Hart software, what other files in the operating system and elsewhere do the applications in the Hart 6.2.1 system use?"

Hart responded:

"Like most Windows based software, System 6.2.1's HVS applications make broad use of Windows resources, including hundreds of DLLs and other executable files. Hart would be happy to provide information on the identification of each of these individual files and there respective purpose and characteristics (e.g. why does its HASH code value change from one day to the next or one install to the next), but the information was not required during the original ITA and NASED certification testing, nor during subsequent "

"In its response Hart illustrates the importance of this point. The Hart software makes "broad use of Windows resources, including hundreds of DLLs and other executable files". Each of those files represents a potential vulnerability, an opportunity to introduce malicious code into the system. For that very reason it is essential that the information be available to verify these files both in the certification process and pre and post election. Past deficiencies are no reason to propagate a vulnerability into the future. Being able to confirm that the software certified at the national and state level is identical to that installed and used in elections is one of the most significant improvements to total election system security that can be made. Implementing such checks requires not modification or recertification of a voting system, unlike many changes. The tools to verify HASH codes are readily available and do not require extensive training to use. It is hard to imagine why a change that is this beneficial is being resisted."

iii.   In its response on the HASH code issue Hart InterCivic states:

"These criteria have been imposed on Hart HASH code submissions by arrangements agreed between Hart and NIST in the absence of other specific authoritative requirements for vendor reference files."

"This statement is inaccurate and misleading. This examiner has met personally and had multiple telephone conversations with NIST NSRL staff. NIST NSRL will HASH and post any files a vendor gives them to post."

iv. "Although the Hart InterCivic system is NASED certified it fails to meet some requirements for NASED certification dealing with operating system configuration. A secure configuration of the operating systems provided must be provided with instructions on how to check the configuration. To assure that the system is adequately secure Hart must specify an operating system configuration, with adequate safeguards to assure that the Hart applications will only run in a secure configuration of the operating system. The configuration should be consistent with industry practice as represented in the NIST security configuration checklist for its operating system, Windows 2000 Professional?"

    a. In its response to questions about the Hart Intercivic recommended configuration the company stated:

        "Setup and configuration of HVS application computers is accomplished only by qualified Hart technical personnel and includes all Windows updates as of the date of the install."

        "This practice is not acceptable. Voting system applications use many operating system functions. Changes to the operating system should only be made after approve by the Texas Director of Elections after appropriate review. Further, safeguards are needed to assure that only the approved update is installed on systems. The current practice potentially allows additional software to be installed under the guise that it is part of the operating system update."

"To assure a secure election system there should never be a point at which individuals from a single organization can change software. At a minimum individuals from two different organizations should approve and verify any changes to the operating system. In the case of operating system upgrades it would be preferable that the vendor recommend and the Director of Elections approve any patches to the operating system. Then that the vendor install the patches and the local jurisdiction have the tools and information to verify that the system delivered to them have only certified software, including the version and updates to the operating system. Further local jurisdictions should have the tools and information to confirm that no additional software has been added to the system."

v. Recommended administrative use procedures for this system are needed.

195. Hart InterCivic has a history of issues regarding hash validations to include version 6.2.1 yet the SoS's office did certify without publishing answers regarding if condition had been met.

196. Berger's report is listed a multitude of security flaws presented in the Hart InterCivic 6.2.1 voting system.

3.  **VSS 2002 Vol. 1 Sec. 2.2.5.3**

"**2.2.5.3        COTS General Purpose Computer System Requirements**

Further requirements must be applied to COTS operating systems to ensure completeness and integrity of audit data for election software. These operating systems are capable of executing multiple application programs simultaneously. These systems include both servers and workstations (or "PCs"), including the many varieties of UNIX and Linux, and those offered by Microsoft and Apple. Election software running on these COTS systems is vulnerable to unintended effects from other user sessions, applications, and utilities, executing on the same platform at the same time as the election software.

"Simultaneous processes" of concern include unauthorized network connections, unplanned user logins, and unintended execution or termination of operating system processes. An unauthorized network connection or unplanned user login can host unintended processes and user actions, such as the termination of operating system audit, the termination of election software processes, or the deletion of election software audit and logging data. The execution of an operating system process could be a full system scan at a time when that process would adversely affect the election software processes. Operating system processes improperly terminated could be system audit or malicious code detection.

To counter these vulnerabilities, three operating system protections are required on all such systems on which election software is hosted. First,

25 of 33

|  |  |  |
|---|---|---|
| Version: | 2.0 | |
| Date: | March 3, 2008 | 106 |

197.    These security vulnerabilities provide access to election system in a way in which vote totals may be altered.

198.    The SoS's office issued a "Preliminary Statement" on April 30, 2009, under conditions the examiners discovered two potential security concerns and advised security protocols to follow to mitigate these vulnerabilities.

199.    If these security protocols are not followed, then it is theoretically possible to have access to the operating system and run or delete other programs.  Jurisdictions are advised to (1) restrict usage of the voting system[107] and (2) restrict what software is loaded onto the voting system computer.

200.    The SoS's office further "conditioned" the certification of version 6.2.1 by applying procedures for jurisdictions.  (1) Two-person access with one person login on Windows 2000 OS and one person to start the application.  (2)  Two-person control team on the Tally when open.  (3) Windows 2000 audit logs which tracks log-ons and attempts.  (4) Windows 2000 to harden operating systems.  (5)  Jurisdiction must file an initial written confirmation with the SoS that they are in compliance with the procedures.[108]

201.    By the SoS's current website, there are 35 counties utilizing this version of Hart.[109]

---

[106] https://www.sos.texas.gov/elections/forms/sysexam/stephenberger621.pdf#search=hart%206.2.1 See page 25 Last visited 06/23/22

[107] Election Advisory 2008-09, Section 5(f)(i-iii)

[108] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22

[109] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf Last visited 06/23/22

50

### D. ELECTION SOFTWARE WHISTLEBLOWER

202.   The Affidavit of Terpsehore Maras attesting the 2017 elections is null and void due to lack
of Election Assistance Commission (EAC) certifications of Voting Systems and the Voting
System Test Laboratories (VSTL) used to certify the Voting Systems.  (Exhibit Q) [110]

> RULE:  Section 231(b) of the Help America Vote Act (HAVA) of 2002 (*42 U.S.C.
> §15371(b)*) requires that the EAC provide for the accreditation and revocation of
> accreditation of independent, non-federal laboratories qualified to test voting systems
> to Federal standards. Generally, the EAC considers for accreditation those laboratories
> evaluated and recommended by the National Institute of Standards and Technology
> (NIST) pursuant to HAVA § 231(b)(1). However, consistent with HAVA §
> 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those
> recommended by NIST upon publication of an explanation of the reason for any such
> accreditation.

203.   To meet its statutory requirements under HAVA §15371(b), the EAC has developed the
EAC's Voting System Test Laboratory Accreditation Program. The procedural
requirements of the program are established in the proposed information collection, the
**EAC Voting System Test Laboratory Accreditation Program Manual**. Although
participation in the program is voluntary, adherence to the program's procedural
requirements is mandatory for participants. The procedural requirements of this Manual
will supersede any prior laboratory accreditation requirements issued by the EAC. This
manual shall be read in conjunction with the EAC's **Voting System Testing and
Certification Program Manual** (OMB 3265-0018).

204.   The person filing the affidavit is over the age of 21 and under no legal disability which
would prevent them from giving this declaration. The election software whistleblower has
extensive experience gathering foreign intelligence in support of operations which took
place within the Continental United States (CONUS) and Outside the Continental United
States (OCONUS). She is a trained Cryptolinguist, holds a completed degree in Molecular

---

[110] https://storage.courtlistener.com/recap/gov.uscourts.wied.92717/gov.uscourts.wied.92717.9.13.pdf

and Cellular Physiology with formal training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, and Predictive Analytics. Terpsehore Maras possess more than two decades of experience in mathematical modeling and pattern analysis as well as lesser experience in network tracing and cryptography. Additionally, she has extensive involvement in overseeing OCONUS elections and the HAVA Act for CONUS elections. The information presented in the affidavit is her personal, first-hand account.

205. Voting Systems rely on foreign made Commercial Off The Shelf (COTS) components rather than custom components manufactured in the United States. While this presents an affordable and economic solution to meet the voting demand, it also means these COTS components introduce vulnerabilities into the Voting Systems. These vulnerabilities can take the form of proprietary hardware and software that has not been through vulnerability testing. The components are manufactured in countries that have strained political and economic relations with the United States. There are numerous intelligence reports, both US Government and Commercial-sourced, highlighting the vulnerabilities in hardware and software components manufactured by foreign countries. (See Exhibit Q for a detailed explanation of COTS)

206. Two companies in particular are Huawei and Akamai, the latter of which is partnered with SCYTL, which is linked to Dominion Software. SCYTL receives the tallied votes on behalf of Dominion and, under contract with Associated Press (AP), provides the results for reporting. This shows that voting information is under the control of the companies that provide the Voting Systems.

207. A further vulnerability are the algorithms which, under the guise of posing as encryption methodologies, provide a means by which votes can be changed. This process will be summarized below.

208. Observation made during the 2020 election:

> Step 1: A ballot containing votes is encrypted by Dominion and sent to SCYTL.
>
> Step 2: SCYTL takes those ballots and using a key generator agreed to by both parties (Dominion and SCYTL) accesses the contents of the encrypted ballots.

52

Step 3: The algorithm then re-encrypts the ballots using the same key generator to create a ciphertext such that the encrypted processed ballots appear as the original from Dominion.

Step 4: Decryption and public release of the vote tallies.

209. This means that SCYTL can read the contents of each ballot because it uses the same key as Dominion to encrypt/decrypt. This key provides access to the "commitments" which are the values of the votes cast. In the 2020 Presidential election there would have been commitments for Trump and for Biden. Those commitment values can be altered by SCYTL, re-encrypted using the same key and appear as though nothing has been changed. When challenged they fake a proof of ciphertexts.

210. The issue with this is randomness of votes. During the 2020 election, there were periods where blocks of votes for Biden were seen without any votes for Trump. That is statistically improbable and points to block allocation of votes to one candidate by the algorithm. This was witnessed when there were massive spikes of votes for Biden in certain geographical locations instead of the natural progression.

211. It is further attested of first-hand knowledge by the Obama-Biden administration to deploy this same election software in [redacted] in 2013. Further, on or about April 2013, a one-year plan was set to fund and introduce elections in [redacted]. Joe Biden was designated by Barack Hussein Obama to ensure the [redacted] accepted assistance. John Owen Brennan and James Clapper were responsible for the ushering of the intelligence surrounding the elections in [redacted]. Under the guise of Crisis support the US Federal Taxpayers funded the deployment of the election software and machines in [redacted] signing on with SCYTL.

212. Using the same process outlined above, SCYTL was allowed to tally the votes rather than the election machines. The elections were held on May 25, 2014, but the results were delayed allowing the election results to be modified in favor of [redacted]. There was a false claim of Russian DDoS when in fact it was an injection of block votes.

213. In the case of the US elections, Dominion, ES&S, Smartmatic, Hart InterCivic would have to manually deploy keys if remote access to Voting Systems failed. This occurred nationwide for days and in the case of Alaska, with a mere 300,000 registered voters was stuck at 56% reporting for nearly a week. This indicates a failed deployment of a script to block allocate votes remotely from one location. This would also justify the presence of the election machine

software representatives making physical appearances in states where election results are being contested.

214. This is why accredited VSTLs are so important to the election process. This also underscores why it is imperative VSTLs maintain their accreditation to ensure compliance with and adherence to updated standards.

215. There are only two accredited VSTLs: Pro V&V and SLI Compliance.

216. Pro V&V is owned and operated by Ryan Jackson "Jack" Cobb and headquartered out of Huntsville, AL, USA. (See Exhibit Q regarding ties to Aerospace Defense Contracting Entity and address discrepancies)

217. SLI Compliance is a Division of Gaming Laboratories International, LLC and headquartered out of Wheat Ridge CO, USA.

218. Pro V& V and SLI Compliance both lack evidence of EAC Accreditation as per the Voting System Testing and Certification Manual. Certifications expired in 2017 for VSTLs and for Voting Systems as well. This means the Voting Systems used in the 2020 elections were not certified.

219. CONCLUSION:  This affidavit presents unambiguous evidence of:

    a.  Foreign interference

    b.  Complicit behavior by the previous administrations from 1999 to present to hinder the voice of the American people

    c.  Knowingly and willingly colluding with foreign powers to manipulate the outcome of the 2020 election

    d.  Foreign nationals, through investments and interests, assisted in the creation of the Dominion software

    e.  Akamai Technologies merged with a Chinese company that makes and distributes the COTS components of election machines

    f.  US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections

    g.  The EAC failed to abide by standards set in HAVA ACT 2002

    h.  The IG of the EAC failed to address complaints since their appointment regarding vote integrity

    i.    Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

    j.    Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then

    k.    The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

    l.    AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations

220.    "For the people of the United States to have confidence in their elections our cybersecurity standards should not be in the hands of foreign nations

221.    "Those responsible within the Intelligence Community directly and indirectly by way of procurement of services should be held accountable for assisting in the development, implementation, and promotion of GEMS" (Dominion Software Foundation)

222.    "In my opinion and from the data and events I have observed [redacted] with the assistance of SHADOWNET under the guise of L3-Communications which is MPRI. This is also confirmed by us.army.mil making the statement that ShadowNet has been deployed to 30 states which all happen to be using Dominion Machines."

223.    "Based on my research of voter data – it appears that there are approximately 23,000 residents of a Department of Corrections Prison with requests for absentee ballot in Wisconsin. We are currently reviewing and verifying the data and will supplement."

224.    Currently a defamation complaint has been filed, Case. No. 1:21-cv-00317-DCLC - CHS in the United States District Court for the Eastern District of Tennessee Chattanooga presiding Judge Clifton L. Cocker. Terpsehore Maras has filed this complaint in regards defamation in which several defendants have been named regarding the affidavit summarized above.

       For all the reasons above a complete failure of duty to provide safe and just elections are observed.

### E. DECLARATION OF HALDERMAN

225.     This is a summary of the Declaration of Mr. J. Alex Halderman in regard to the case of Curling et al v. Raffensperger et al.[111] Mr. Halderman makes these claims under oath and this summary will neither make inferences from nor inflate his statements.

226.     Mr. Halderman claims the 2016 presidential election was subject to multiple attempts to interfere with and undermine the election process through cyberspace. He cites incidents such as compromised email accounts belonging to the Democratic National Committee and John Podesta. He also cites attempted intrusions into election-related systems via cyberspace in at least 18 States. Voter data was successfully exfiltrated in two states and in a subset of those 18, attackers could have altered or deleted voter registration data.

227.     Mr. Halderman states Russia has sophisticated offensive cyber capabilities as well as intent to use them to hack elections in other locations. He goes on to cite published reports of Russian involvement in hacking the Ukrainian election in 2014. He states that countries other than Russia have similar offensive cyber capabilities.

228.     The U.S. Senate Select Committee on Intelligence reported findings and recommendations based upon its investigation into cybersecurity threats to U.S. election infrastructure. Mr. Halderman cites this report as evidence of vulnerabilities in the existing election system used in the United States. Further he quotes DNI Coats and DHS Secretary Nielsen of Russia's continuing goal to interfere in the elections within the U.S. to achieve a variety of outcomes favorable to Russia. He specifically calls out the Paperless Direct Recording Electronic (DRE) voting machines as being particularly vulnerable to exploit.

229.     The DRE machines do not create a paper record of each vote. Paperless DRE machines are notoriously vulnerable to cyber attacks that can cause a multitude of issues. Votes can be changed or erased. Extra votes can be cast, and machines can be made to not work at all. He goes on to state that paperless DRE machines do not provide even adequate security against cyber attacks.

230.     He points out Dominion voting systems as being exclusively used in the State of Georgia and that over the past 15 years he, and others, have repeatedly warned of the vulnerabilities

---

[111] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Halderman

in this system. These vulnerabilities include both hardware and software flaws. There are also network architectural weaknesses that cannot be repaired through software updates.

231. These types of voting systems use software that can be reprogrammed. Any attacker gaining privileged access to that software can modify it to do anything. He has proven through multiple demonstrations how easy it is to install malware on these systems.

232. Mr. Halderman cites the first major study of voting systems conducted in 2003 where it was discovered the source code contained multiple errors and vulnerabilities. The States of Maryland and Ohio commissioned independent studies and the resulting assessments confirmed the vulnerabilities in the Dominion voting systems.

233. In 2006, another independent security researcher also identified vulnerabilities, primarily in the software update mechanism that would allow upload of malware. That same year, Mr. Halderman and others reverse engineered a Dominion voting system and identified multiple additional vulnerabilities.

234. As part of this study, they developed malware that would modify all the vote records, audit logs, and protective counters, preventing any forensic examination from discovering the crime. The malware was also designed to spread automatically to other voting machines. This was propagated by the removable memory cards used to program the ballot design.

235. In 2007, Mr. Halderman participated in two independent studies for the States of California and Ohio. In both studies, additional vulnerabilities were discovered that would allow malware to be installed and propagated to cause even more harm than the virus created during the 2006 test. Mr. Halderman states that some of the vulnerabilities could be resolved by improving the underlying software. Other vulnerabilities are more serious and require hardware and software changes. As a result, California, despite having a paper ballot trail, decided to decertify the Dominion voting system in use at that time.

236. Mr. Halderman points out there are a variety of techniques available to sophisticated attackers to compromise non-internet connected systems. One of those techniques is the removable media cards being exploited via the Election Management System (EMS) prior to insertion in the voting machine. He also states the EMS has recently had remote access software installed which creates another means of exploitation. The physical security measures in place to secure the removable memory cards is also weak and can be easily compromised.

237. Mr. Halderman goes on to describe how a potential attack might take place. The attacker would gain access to the election management computers via weak cyber security. The attacker would then target the pre-election ballot programming with malware that would spread from machine to machine. This malware would automatically shift "a few percent of the vote" to a particular candidate.

238. Mr. Halderman then describes the inadequacy of certain physical security measures, such as tamper evident seals. These would be less than adequate when the memory card is inserted with the malware already loaded. Furthermore, logic and accuracy tests only validate the ballot design or counting logic. Such tests would fail to detect malware as it could be programmed to detect and circumvent logic and accuracy tests or only perform on election day.

239. Mr. Halderman states the existing measures to defeat election and voting fraud do not provide a way to determine if fraud occurred during the election or afterward. Malware could be programmed to make it appear statistically probable despite the countermeasure testing taking place. In fact, the malware would delete itself and all log files, thereby preventing any kind of forensic evidence.

240. Mr. Halderman states the only way to reliably safeguard a voting system from future cyber attacks is to generate and examine physical evidence of voter intent, in the form of a voter-verifiable paper trail. Optical scan paper ballots are the most widely used and secure technology available for casting votes, according to Mr. Halderman. The manipulation of both paper and electronic ballots could still be compromised but would require more extensive resources.

241. Mr. Halderman points out that with the monies associated with the Help America Vote Act (HAVA) 2002 in conjunction with the U.S. Senate Select Committee on Intelligence recommendation that States replace outdated voting systems with newer systems that have a verified paper trail. He also states the use of all DRE type machines should be discontinued.

## F.  DECLARATION OF SHAWN SMITH

242.  Shawn Smith, retired Military officer with a Master's degrees in National Security Affairs and in Aeronautical Science, filed a declaration on 6/8/22 into Kari Lake, et al. v. Karie Hobbs, Arizona Secretary of State (case 2:22-cv-00677-JJt)[112].

243.  In this declaration, he states that his military occupational specialty was space and missile operations, and he has extensive experience in operating, planning, training, testing, and commanding the employment of complex, computer-based military weapons systems.

244.  He states that 'I have been asked to testify about the threat of the compromising of our supply chain and attack(s) to U.S. national security systems and critical infrastructure, in particular to election related systems, including voting systems and consequently, to elections." As noted in other expert affidavits and declarations, Smith describes the vulnerability of the U.S.'s critical systems, resulting from compromised supply chains, to include elections. He states that it is his, "conclusion that U.S. elections are critically vulnerable to exploitation by foreign adversaries through compromising of our computerized election systems through supply chains."

245.  He goes on to say, that despite this fact, the U.S. Government appears to be keenly aware of the risk of supply chain compromise to the nation's critical systems. This same awareness does not appear to extend to any agency responsible for the "procurement, security, certification or use of election and voting systems, nor to imbue them with any capacity to respond effectively."

246.  The targeting of U.S. voting and election systems must be an extraordinarily high priority for foreign powers and bad actors.

247.  Smith demonstrates that supply chain compromise is pervasive, sophisticated, widespread and can take place at any stage of the supply chain including: Manipulation of development tools, development environment, source code repositories (public or private), source code in open-source dependencies, software update/distribution mechanisms, compromised and/or infected system images (multiple cases of removable media infected at the factory), replacement of legitimate software with modified versions, sales of modified/counterfeit products, and shipment interdiction.

---

[112] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Declaration of Shawn Smith

248.   Smith explains that the public lacks awareness of the severity and pervasiveness of threats to supply chain compromise from malicious cyber activity commonly being portrayed by media as an opportunistic hacker, rather than nation state operated or sponsored advanced persistent threat (APT) groups.

249.   Smith identifies a multitude of such APT groups that have in the past and are currently utilizing supply chain attacks, as well as evidence of many investigations and reports. Prosecutions have occurred by several U.S. entities including the DOJ, Department of Commerce, National Counterintelligence and Security Center, Office of the Director of National Intelligence, National Institute of Standards and Technology, CISA, and the FBI. Smith demonstrates that the institutions, measures, laws, and guidelines intended to secure U.S. elections are grossly inadequate:

   a.   Supply chain threats for critical computer-based infrastructure, such as election ecosystems, are so severe and extensive that the "computer networks of the Cybersecurity and Infrastructure Security Agency (CISA), the very U.S. government institution responsible for critical infrastructure security, were compromised by software supply chain attacks in 2020, the SolarWinds, SUNBURST and SUPERNOVA attacks, for ten months or more without detection and, even then, that compromise only became known to CISA due to the intervention of a private company."

   b.   "In the light of CISA's inability to defend even its own computer systems from nation-state level supply chain attacks from March through December 2020, little credence can be given to CISA's July declaration that the 2020 election would be 'the most secure election in modern history, and its declaration in November 2020 that the 2020 election was the "most secure in American history.'"

   c.   "CISA has acknowledged, as early as October 2020, that APRs have targeted not only the Federal government, but state, local, tribal, and territorial (SLTT) governments, critical infrastructure, and elections organizations, including successful APT establishment of unauthorized access to election support systems."

   d.   Despite repeated warnings and recommendations from NIST, the technical body and agency identified in TITLE 52, USC to advise the EAC, to take measures to secure against supply chain attacks since 2012, the EAC has effectively provided no standards,

procedure or safeguards to implement those recommended protections for election systems and elections.

e. To date, nearly all the systems certified and in use in the United States have no supply chain security, nor any testing or verification of the security as a result of the EAC's failures to implement protections. Although the latest version of the VVSG acknowledges supply chain risk manages as a necessity, no real safeguards were added. Smith states, "these standards are barely better than the EAC's non-existent standards for electronic poll books, centralized statewide voter registration systems, and election auditing systems.

f. According to VVSG, security testing guidelines do not even require VSTLs to review common vulnerabilities and exploits that are publicly available.

g. "The EAC's standards of accreditation for VSTLs do not even ask, let alone require, awareness in the VSTLs of supply chain vulnerabilities in computerized voting systems, much less awareness or proficiency in the detection of supply chain compromises, or in their assessment of effective mitigation, where even possible, by voting system vendors."

h. The Technical Guidelines Development Committee (TGDC) is the advisory body established by HAVA to "assist the (EAC) in the development of (VVSG)", includes far more "lawyers, politicians, public affairs, and psychology grads than computer scientists or software expert, at a 4:1 ratio." In addition, of those few committee members that are computer scientists and software experts included the director for software development at one of the largest US voting system vendors.

i. Although NIST recommended to the TGDC that no wireless devices be permitted on voting systems as early as 2006, the "TGDC" in 2020 still held a "compromise position" with no prohibition on wireless devices for the latest 2021 VVSG. Smith states, "permitting wireless devices in computerized voting systems is irrational and indefensible in light of the known and persistent threats to those systems."

j. "The EAC has demonstrated inadequate awareness, comprehension, and response to the clear and present danger posed by foreign nation states, supply chain attacks against the computers and components used in U.S. voting systems." Furthermore, the EAC

"can't be relied upon to protect U.S. elections by competently examining voting systems, prior to use, for indicators of compromise and vulnerability."

k.  Laboratory Director, and corporate principal, for the VSTL Pro V & V, stated that he had no "specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis," in a federal court testimony in 2020.

l.  Furthermore, the same VSTLs, despite lacking specialized expertise in cybersecurity testing or cybersecurity risk analysis, are responsible to not only conduct initial and modification testing, but are also responsible to recommend to the EAC whether those changes may be implemented without testing, as "de minims." Smith describes several other factors that further negatively impact the security of elections

m.  "Even if states and localities could afford the caliber of cybersecurity expertise needed to defend voting systems, the U.S. workforce of qualified cyber professionals is too small to staff voting systems offices in 50 states, much less over our 3,000 U.S. Counties. Hart InterCivic appears to use Hewlett-Packard computers, which are remanufactured and assembled overseas, containing overseas-manufactured components, built by foreign workers, and all without U.S government oversight and "effectively no safeguards in the entirety of the testing and certification regime for voting systems"

n.  "ES&S is owned by the private equity firm McCarthy Group, which doesn't disclose the information of investors, including if any other investments or financial interests, have a controlling interest in ES&S."

### G.  TEXAS COUNTY FAILURES

**HOOD COUNTY**

250.   Hood County Commissioners, in addition to election officials, have failed to confirm if the voting equipment in Hood County is properly certified.

251.   On July 28, 2021, Michele Carew was questioned about the issue of non-sequential ballots.[113]

252.   November 9, 2021, Plaintiff Karen Towell addressed the Hood County Commissioner's court regarding the lack of accredited VSTLs and thereby the lack of state certifications. Plaintiff provided evidence similar to the evidence in this case.[114]

253.   Michele Carew resigned shortly after the November 2021 meeting.

254.   ES&S was the voting system employed within Hood County.

   a.   ES&S was first utilized for elections in Hood County in 2008 and continued to be used through the November 2020 election.

   b.   According to Melissa Welborn, H. R. Director or Hood County, ES&S version 3.4.1.0 was utilized for the November 2020 elections.

   c.   The last certification on file indicates that ES&S version 3.4.1.0 was certified in April 2014.

255.   On February 9, 2021, a contract was signed with Hart Intercivic voting systems for use in elections in Hood County.

   a.   Certification for Hart Intercivic Verity Voting software version 2.4[115] is on file with the Secretary of State website.[116]

   b.   Hood County records indicate that Hart Intercivic software version 2.4.2 was utilized for the November 2, 2021, elections.

---

[113] https://www.texastribune.org/2021/10/01/texas-election-official-hood/ (Last visited 5/20/22)
[114]
https://duckduckgo.com/?q=hood+county+commissioner+meeting&iax=videos&ia=videos&iai=https%3A%2F%2F
www.youtube.com%2Fwatch%3Fv%3DuguFcPW7P_A (Lasted visited 5/20/22)
[115] https://www.sos.state.tx.us/elections/forms/sysexam/hart-verity-2.4-certification-order.pdf (Last visited on 5/18/22)
[116] See Tex. Elec Code § 122.036

c. During inspection of the Hart Intercivic Verity Voting 2.4.2, conducted on April 14-17, 2020, one examiner noted an "over-vote" issue and yet still recommended the version for certification.[117]

> 4. In the voting process, an "over-vote" bring up a warning when more than one candidate can be voted for in a specific race. However, when you make your selection to continue, there is an automatic de-selection of another candidate chosen rather than allowing the voter to decide who gets deselected. This could lead to voter confusion and a casting of an unintended vote without the voter's knowledge.

d. Another note in the Hart InterCivic Certification Test Report Modification document states that Verity Voting version 2.4 is Hart InterCivic Verity Voting 2.4.2. No other version of any Hart modified software/firmware is certified under an original version number as modified versions are not the same as the original. The original version is also not decertified for use in Texas.[118]

e. In an "Electrical Hardware Test Plan" Verity Voting 2.4 Discrepancies, conducted by SLI Compliance, issues arose with the *"proposition text not saving properly during election creation"* and *"loss of audio clarity when audio speed set to high"*. *(Emphasis added)* [119]

| Issue key | Status | Issue Type | EAC Priority | Summary | Description | SLI Comment | Hart Comment |
|---|---|---|---|---|---|---|---|
| HV24-13 | Discrepancy Addressed | Functional | 4-Insignificant | Verity Data/Build - Proposition Text Not Saving Properly During Election Creation | Summary: When creating an election on the Verity Data/Build, the proposition text would occasionally disappear at random occasions. When a user enters text for a proposition and then navigates away from the page, the text would occasionally no longer be present when the user navigates back to the page containing the proposition text entry. Expected Results: During creation of an election, when the user navigates away from the proposition text entry screen, the proposition text entered should be preserved when returning to the entry screen. Observed Results: During creation of an election, when the user navigates away from the proposition text entry screen, the proposition text would occasionally disappear when returning to the entry screen. | This has been sufficiently addressed in the latest build and firmware v.2.4.2. | |
| HV24-32 | Discrepancy Addressed | Functional | 4-Insignificant | Loss of Audio Clarity When Audio Speed Set To High | Summary: On the Touch with access and Touch Writer with access. When the volume rate was modified to be "High", the audio would stutter and not be completely comprehensible to the voter. However when the audio was set to "Normal" or "Slow" the audio would play back as expected. Expected Results: When the audio rate was set to "High", the audio should play at a coherent rate which is comprehensible by the voter. Observed Results: When the audio rate was set to High, the audio from the headphones would not be completely coherent and would stutter when audio was played. | This has been sufficiently addressed in the latest build and firmware v.2.4.2. | |
| HV24-5 | Discrepancy Addressed | RCA TDP | 4-Insignificant | Insufficient information to set up the Relay wireless network | Insufficient user information for the jurisdiction to set up the wireless network appropriate to the available wireless carrier(s) for Relay. This information may be in the "Verity Relay Implementation Guide" which was referenced, but not delivered with the TDP. | This was addressed in the 10/16/19 TDP by the addition of the document 'Verity_2.4_Verity_Relay Implementation Process 6673-000 D". | |
| HV24-5 | Discrepancy Addressed | RCA TDP | 4-Insignificant | Verity 2.4 COTS list is not current | Verity 2.4 COTS List is listed 2.3.X COTS list inside the file and does not include the Relay component(s). | In the 10/16/19 TDP, the COTS list side was corrected and the Relay items were added. | |

f. Listed discrepancies by SLI Compliance for Hart InterCivic Verity Voting version 2.4 were "repaired" by updating to Hart InterCivic Verity Voting firmware version 2.4.2.

---

[117] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf#search=hart%202.4.2 (Last visited 5/18/22)
[118] See Tex. Elec Code § 122.031(a)
[119] https://www.eac.gov/voting-equipment/verity-voting-24 (See Attachment G at bottom of page) (Last visited 5/20/22)

g.  All state of Texas certifications for these versions are currently approved under version 2.4.

256.  SLI Compliance is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.

257.  On May 3, 2021, Hood County Attorney, Matthew Mills, sent a letter to Attorney General, Ken Paxton, requesting clarification of ballot numbering issues associated with the use of election machines in Hood County.[120] [121]

258.  A letter from Roger B. Borgelt of Borgelt Law dated July 29, 2021, to the Attorney General, Ken Paxton, outlines the questions that Hood addressed in the cited letter above from Matthew Mills, May 3, 2021, concerning the ballot numbering for Hart Intercivic currently in use in Hood County.

a.  "Secretary of State claims that TEX ELEC § 122.001 provides authority for the Secretary to prescribe "operating procedures" related to voting systems, [122] nothing in the Election Code grants the Secretary the authority to provide advice to ignore specific sections of the Election Code – laws and procedures are not equal."

b.  Several times, in the letter from Borgelt Law, it is noted that inconsistent numbering violates several Texas Election Codes (TX Election Code § 52.062, §51.006, §51.007, §51.008, §51.010, §62.007, §62.009).

> "The Secretary is the Chief Election Officer of the State of Texas.[123]  Among other duties, the Secretary has been tasked by the Legislature with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of [the Election] code."[124] As part of performing this duty, the Secretary is required to "prepare detailed and comprehensive written directives and instructions relating to and based on [the Election] code and the election laws outside this code."[125] The Secretary must "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws."
>
> "The Secretary's deficient guidance to counties violates the Separation of Powers clause of Art. 2, Sec. 1 of the Texas Constitution. Further, because the Secretary is providing counsel to

---

[120] https://katychristianmagazine.com/wp-content/uploads/2021/12/Request-for-Opinion-on-Ballot-Numbering_RQ-0405-KP_status-Borgelt-letter.pdf (Last visited 5/18/22)
[121] See Tex. Elec Code § 52.062
[122] See Tex. Elec Code § 31.003
[123] See Tex. Elec Code § 31.001
[124] See Tex. Elec Code § 31.003
[125] Id.

counties to ignore Tex. Elec. Code §§ 52.062, 51.006, 51.007, and 51.008, this is a violation of the Suspension of Laws provision in Art. 1, Sec. 28 of the Texas Constitution. The Constitution provides that only the Legislature can suspend laws - not the Secretary, a member of the Executive Branch. These actions by the Secretary are contrary to the Legislature's intent that the Election Code be interpreted and applied uniformly across this State for voting systems. See Tex. Elec. Code § 122.032. By suspending laws and authorizing exceptions to Tex. Elec. Code § 52.062, and other statutes, the Secretary is failing to perform his ministerial duty. Surely the Legislature did not intend for any of these provisions to be waived, ignored, or violated."

259.    The SoS recommendations for ballot numbering procedures for Hart InterCivic System and correctly notes that Tex. Elec Code § 52.062 requires ballots to be prepared with

The first option, ordering blank ballot stock with pre-printed numbers, complies with Section 52.062, as the ballots can be numbered consecutively beginning with "1." This plainly satisfies both the letter and spirit of Section 52.062 and thus ensures counties' adherence to other election laws, such as those cited *supra*, that relate to ballot numbering.

The second option purports to provide an alternative to Section 52.062 for counties using the ES&S and Hart InterCivic systems. According to the Secretary, the Hart InterCivic "ballot is assigned a unique identifier when printed." However, the Secretary acknowledges in Appendix A that the lack of consecutively-numbered ballots renders it impossible for election officials to fully comply with portions of the Election Code:

"The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the *exception of notating the serial number of the ballot ranges*."[4] (Emphasis added.)

The alternative randomized ballot numbering procedure will cause counties to violate, at a minimum, Tex. Elec. Code §§ 52.062, 51.006, 51.007, and 51.008. Furthermore, the Secretary

consecutive numbers to begin with "1".  The two options for meeting this requirement.

does not provide sufficient instructions for how officials may comply with Tex. Elec. Code §§ 51.010 (how will officials deliver serial number range records to polls), 62.007 (how will officials at polls determine if ballots are properly numbered) and 62.009 (how will election judges place numbered ballots face down for voters to choose their ballot). In short, the Secretary's permission to ignore Section 52.062 causes a chain reaction in which counties may violate at least six other laws.

Should General Paxton determine that Tex. Elec. Code § 52.062 is discretionary and that computerized machines are permitted to generate random text values onto ballots in lieu of consecutive numbering starting with "1," Texas election law will be plunged into confusion and uncertainty because violations of several of these ballot numbering statutes are not only illegal, but punishable criminally:

a) To not deliver or distribute the required ballot numbering election records to a polling place is a Class C misdemeanor. *See* Tex. Elec. Code § 51.010(c)).

b) To not preserve precinct election records for ballot serial number ranges distributed to polling locations can result in criminal penalties (*see* Tex. Elec. Code §§ 51.007(b), 51.008(d)), and 13 TAC § 7.125(a)(10)), and Tex. Penal Code § 37.10(3)).

260. On November 1, 2021, Virginia Hoelscher, Chair of the Opinion Committee for Attorney General Ken Paxton, sent the following letter to Matthew Mills, Hood County Attorney:

> "Re: Procedure for numbering election ballots and which officials are authorized to select the method for numbering ballots (RQ-0405-KP) Dear Mr. Mills: Thank you for requesting a written opinion from this office. Section 402.042 of the Government Code requires this office to issue an opinion within 180 days of receiving a request for one unless we explain to the requestor in writing before the deadline why the opinion will be delayed. Accordingly, we are notifying you that we will not issue an opinion on your request within 180 days of the date received because we need more time to review the law, complete the analysis that your request requires, and finalize the formal opinion. We will make every effort to issue this opinion as soon as possible."

261. To our knowledge, non-sequential ballots have been used in all Hood County elections since the Hart InterCivic equipment was first employed in 2021.

262. By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.

**PARKER COUNTY**

263. Parker County Commissioners, in addition to election officials, have failed to confirm and properly certify the voting equipment in Parker County.

264. October 6, 2021, Plaintiff Jennifer Edwards met with Larry Walden, Parker County Commissioner, Precinct 3, regarding the lack of accredited VSTLs and thereby the lack of state certifications for the November 3, 2020, elections in Parker County.  Plaintiff provided evidence identical to this case.

265. October 13, 2021, Plaintiff Jennifer Edwards met with Larry Walden, Parker County Commissioner, Precinct 3 and John Forrest, Parker County Attorney regarding the lack of accredited VSTLs and thereby the lack of state certifications.  Plaintiff provided evidence identical to this case.

266. October 20, 2021, Plaintiffs Jennifer Edwards and Jennifer Williams met with Larry Walden, Parker County Commissioner, Precinct 3, Crickett Miller, Parker County

Elections Administrator and John Forrest, Parker County Attorney regarding the lack of VSTL's and thereby the lack of state certifications.

267.   October 23, 2021, Plaintiff Jennifer Edwards sent letter via email to Pat Deen, Parker County Judge requesting an emergency meeting of the Parker County Election Commission be called to present findings regarding the lack of accredited VSTLs and thereby the lack of state certifications. Plaintiff Jennifer Edwards again provided evidence identical to this case.

268.   November 1, 2021, Plaintiff, Jennifer Williams emailed all commissioners, county attorney, county judge and sheriff alerting them to fact that the election machines have not been certified as is required by law. Certified letters with evidence were sent to the District Attorney and the District Judges.

269.   March 25, 2022, Plaintiff Jennifer Edwards and Plaintiff Jennifer Williams submitted sworn affidavits to Jeffrey Swain, Parker County District Attorney in accordance with Tex. Elec. Code § 273. Plaintiffs provided evidence identical to this case.

270.   Hart InterCivic Voting System 2.4 was utilized in Parker County for the November 3, 2020, election.

   a.   According to the Crickett Miller, Parker County Election Administrator, Hart version 2.4 was utilized for the November 2020 general elections.

   b.   Certification for Hart Intercivic Verity Voting software version 2.4 is on file with the Secretary of State website.[126]   (Judicial Notice: Parker County regarding 2.4)

   c.   Inconsistent numbering violating several Texas Elections Codes (TX Election Code § 52.062, §51.006, §51.007, §51.008, §51.010, §62.007, §62.009).[127]

271.   SLI Compliance is the VSTL that certified Hart InterCivic voting systems and equipment.

272.   SLI Compliance is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.[128]

---

[126] https://www.sos.state.tx.us/elections/forms/sysexam/hart-verity-2.4-certification-order.pdf (Last visited 5/25/22)
[127] See Hood County page XX of this case
[128] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf   (Last visited 5/25/22)

273. By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.

**COMAL COUNTY**

274. Comal County Commissioners, in addition to election officials, have failed to confirm the voting equipment in Comal County was/is properly certified.

275. Comal County removed the Elections Administrator position due to malfeasance.

276. The County Clerk is the responsible elections official. There is a Deputy under the County Clerk named the Elections Coordinator.

    a. Bobbie Koepp, Comal County Clerk

    b. Cynthia Jacqua, Deputy under the Clerk - Elections Coordinator

277. Comal County used KNOWiNK Poll Pads that were updated the night before the November 3, 2020, General Election.

278. Comal County has not provided the version of KNOWiNK poll pad software that was utilized during the November 3, 2020.

279. KNOWiNK Poll Pads version 2.4.9 was certified by the SoS on January 23, 2020.[129] What version of software were the poll pads upgraded to the night before the November 3, 2020, General Election?

280. The purchase of these pads was contracted via Hart InterCivic under contract in 2018 with software, maintenance, and upgrade options.

281. The SoS's office did not inspect the KNOWiNK Poll Pad updated/modified changes as required by law.[130]

    1. Defendants Koepp and Jacqua did not address the violation of Tex. Elec Code with the SoS's office and or make the voters aware of lack of certification.

    2. Defendants Koepp and Jacqua authorized the update/modification of poll books with clear knowledge of Tex. Elec Code.

282. KNOWiNK preformed an update the night before the election of November 3, 2020,

---

[129] https://www.sos.texas.gov/elections/forms/sysexam/knowink-poll-pad-certification-letter.pdf Last visited 06/10/22
[130] See Tex. Elec Code 31.014

similar to how an iPhone updates via a network connection.[131]

283.   Election officials throughout the country-from North Texas to Georgia-reported issues with poll pads from St. Louis-based KNOWiNK.

284.   In some locations; the poll pads also activated ballots on voting machines which forced some voters to fill out selections on paper ballots.

285.   The Defendants proceeded to utilize the paper forms and provided pencils.[132]

286.   KNOWiNK poll pads went down November 3, 2020, across the state affecting Comal County elections.

   a.   Marcia Ridley, Spalding County Board of Elections, attributed the problem to a vendor's 11th hour update per a representative for the election technology vendor, dominion Voting Systems, told her office that it had uploaded some kind of ***"update"*** the night before the election and that this had created the glitch.[133] *(emphasis added)*

   Ridley initially told POLITICO on Nov. 3 that Dominion, which prepares the poll books for counties before elections, "uploaded something last night, which is not normal, and it caused a glitch." The glitch prevented poll workers from programming the voter smart cards for the voting machines.

   In her initial comments last week, Ridley said that a representative for the two companies called her office after poll workers began having problems with the equipment on the morning of the election. The representative said at the time that the problem was due to an upload to the machines by one of their technicians overnight, Ridley told POLITICO.

287.   As a result, "three reports of races not being included on a ballot,":[134]

   a.   Contests seats on the New Braunfels ISD Board of Trustees

      i.   District 2 (Nancy York claiming victory over incumbent Michael Calta by

---

[131] https://www.ksat.com/news/local/2020/11/03/polling-pads-down-at-comal-county-voting-locations/ Last visited 06/10/22
[132] https://www.ksat.com/news/local/2020/11/03/polling-pads-down-at-comal-county-voting-locations/ Last visited 06/10/22
[133] https://www.politico.com/news/2020/11/04/georgia-election-machine-glitch-434065 Last visited 06/10/22
[134] https://www.kcns5.com/article/news/community/hill-country-reporter/comal-county-investigates-scope-of-election-day-tech-issues/273-603cef42-e93a-483b-aa4d-60edde2db052 Last visited 06/10/22

12 votes)

   ii.  District 4 (John Tucker claiming victory over incumbent Matthew Sargent by 251 votes)

  b.  Lake Dunlap Proposition not being on the appropriate ballot.

288. Impacted precincts due to failure of poll pads include 301, 302, 303 and 201.

289. This resulted in County Judge to extend voting hours due to poll pad failures.

290. Defendant Bobby Koepp's statement to Kens5 in which she offers only a partial responsibility, "It's part of my duties to make sure that everybody gets what they're supposed to get when they come to vote, and I do take responsibility for that"; in which the Defendant continues placing blame at KNOWiNK. "But in my defense, I honestly feel [KnowInk] needs to make it right. They need to make a statement and need to tell everybody what happened."

291. Defendant Bobby Koepp believes it is up to the candidates to request a do-over. "We are doing everything in our power to…try to figure out exactly how many votes were cast that didn't get the opportunity to vote the way they needed to."

292. The day prior Defendant Bobby Koepp stated to one candidate, Sargent, that reported his name and race not on the ballot but submitted in error; "If this had been brought to our attention before the vote was submitted, we could have canceled out the vote and reviewed the problem…"[135]

293. Sargent is left wondering and…" waiting for the county to step up and say there is a problem or to let us know what they are going to do to fix it…..Or to make us feel all warm and fuzzy that every vote got counted."[136]

294. Sargent's complaint to the SoS Office  states…potential violation from the handbook for Election Judges and Clerks 2020, which in part requires presiding election judges to cease using malfunctioning equipment installed at polling places "immediately after discovering that the equipment is not functioning properly."[137]

---

[135] https://www.kens5.com/article/news/politics/elections/election-day-glitches-led-to-reports-of-absence-of-races-and-propositions-on-some-ballots-comal-co-says/273-308a3fae-49a9-41e4-a4bf-711266c28310 Last visited 06/10/22

[136] https://www.kens5.com/article/news/politics/elections/election-day-glitches-led-to-reports-of-absence-of-races-and-propositions-on-some-ballots-comal-co-says/273-308a3fae-49a9-41e4-a4bf-711266c28310 Last visited 06/10/22

[137] https://herald-zeitung.com/community_alert/article_862bdcaa-2483-11eb-9728-fb0da9e3734c.html Last visited 06/10/22

295.    Sargent's continues, "The county knew about the problem no later than 10:41 am and continued to utilize the equipment without shutting the polling places(s). Even though this was a software issue, and the ballots were not loading correctly the machines were not properly functioning. The equipment should have been shut down until the software issue could have been corrected."

296.    Defendants Koepp and Jacqua authorized and continued to use Hart InterCivic voting systems and equipment after many reported malfunctions including but not limited to lack of paper ballot and ballot numbering.

297.    After multiple PIA requests, Comal County did not provide the Letter of Approval from the SoS to Comal County approving the contract for the purchase of Hart Verity Voting 2.4. as pursuant to Tex. Elec Code.[138] Making the election null and void if the document does not exist.

298.    By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.

**TARRANT COUNTY**

299.    Tarrant County Commissioners, in addition to election officials, have failed to confirm and properly certify the voting equipment in Tarrant County.

300.    Hart Intercivic Verity Voting 2.3, 2.4 and 2.5 contain numerous COTS components,[139] and that all three versions lack proper EAC certifications according to HAVA 2002.

301.    Halderman's statement with regard to close proximity of the voting system to the internet rings true. There are several components of the election infrastructure ecosystem utilized by Tarrant County for all three elections that give cause for concern.

   a.    November 3, 2020, election contained one or more of these aspects/components but not limited to:

---

[138] See Tex. Elec Code § 123.035 (a), (b), (c), (d).
[139] https://www.eac.gov/voting-equipment/registered-manufacturers/hart-intercivic-inc (Last visited 5/23/22)

302. Verity Touch Writer DUO are daisy chain configurations comprised of a Verity controller device and up to twelve <u>Ballot Marking Devices</u>[140] (BMDs). The Implications of the utilization of these types of election systems will be addressed in a following section.

303. Verity Scan equipped with a <u>Relay Kit</u>[141] enables direct transmission of cast vote records from Verity Scan (precinct ballot counter or tabulator) via a preferred telecommunications carrier, to a central election office.

304. Per the contract obtained between Tarrant County and Hart Intercivic 9 Relay Kits (COTs modems) were acquired[142]

305. <u>Hart Intercivic,</u>[143] as well as Dominion Voting Systems, and ES&S, have <u>disclosed</u>[144] that some tabulators have wireless modem capabilities, offered as an add-on to base model kits. Add-on modem kits (e.g., Relay Kits) not only put elections at <u>heightened vulnerability,</u>[145] but also <u>decertify</u>[146] <u>EAC certification</u>[147] of the system, according to Kevin Skoglund, Senior Technology Advisor at the National Election Defense Coalition.

306. The Master Agreement between Tarrant County and Hart Intercivic was signed on August 13, 2019. However, the Relay Kits do not appear as a component included within the 2.3 version of Verity Voting per the <u>EAC Certificate for Conformance,</u>[148] nor is it mentioned in the <u>Memorandum</u> [149] of the SoS.

---

[140] <u>https://www.stat.berkeley.edu/~stark/Preprints/bmd-p19.pdf</u> **(Last visited 5/23/22)**

[141] <u>https://www.michigan.gov/documents/sos/071B7700128_Hart_Exhibit_2_to_Sch_A_Tec_Req_556894_7.pdf</u>

[142] <u>https://files.ttttexas.com/case/TX_SOS_Election_Violation_References</u> **See Appendices C & E**

[143] <u>https://www.eac.gov/sites/default/files/voting_system/files/Attachment_G_-_As_Run_Hart_Verity_Voting_2.2.2_EAC_Modification_Test_Plan_v1.21.pdf</u> **See page 15, 20 (Last visited 5/23/22)**

[144] <u>https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436</u> **(Last visited 5/23/22)**

[145] <u>https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials</u> **(Last visited 5/23/22)**

[146] <u>https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436</u> **(Last visited 5/23/22)**

[147] <u>https://www.documentcloud.org/documents/6602861-EAC-ESS-Letter-01-07-20.html</u> **(Last visited 5/23/22)**

[148] <u>https://www.eac.gov/sites/default/files/voting_system/files/Cert_of_Conformace_and_Scope_Verity_Voting_2.3_3.15.193.pdf</u> **Last visited 06/13/22**

[149] <u>https://www.sos.state.tx.us/elections/forms/sysexam/Chuck-Pinney-Voting2.3.pdf</u> **Last visited 06/13/22**

307. Relay Kits are listed as components of Verity Voting 2.2.2,[150] and as an option for Verity 2.4. Moreover, the application acceptance [151] date for version 2.4 (including the Relay kit) is after the contract for 2.3 was signed, on August 15, 2019, by Tarrant County[152].

308. The EAC later issued certification of Verity Voting 2.4 (despite the lack of examination by an accredited VSTL) on February 21, 2020[153]

309. The Relay Kit is never mentioned in the TX SoS Memorandum of certification, and yet somehow Tarrant County purchased 9 components outside of the scope of 2.4 that also had not even begun the EAC certification process.  (Exhibit X)

310. Brandon Hurley, an SoS appointed examiner, cited the connectivity capabilities of this make and version of voting system in his examination report.  He reported that Hart Intercivic representatives stated this capability was only available in the state of Michigan.[154]

    a. He did not identify the component(s) that would allow internet connectivity, nor evidence that the systems sold to Texas counties were absent of this capability.

    b. He also expressed concerns regarding this system adhering to the ballot numbering requirements of Texas, as well as issues with paper jams in the scanner.

311. Brian Mechler's, Technical Examiner Report, noted paper feed issues that resulted in spoiled ballots.  He also concluded his report with, "In order to fully comply with the EAC Voluntary Voting System Guidelines (VVSG) Vol 1.0, Hart needs to ensure that their documentation recommends hash verification software that uses a FIPS 140-2 level or higher validated cryptographic module."[155]

312. Lesley French, General Counsel for the office of the Texas Attorney General, stated in a letter to Keith Ingram, Director of Elections, Texas SOS, that "Both during and after the examination, the examiners raised specific concerns about the legal compliance of Verity

---

[150]
https://www.eac.gov/sites/default/files/voting_system/files/Cert._of_Conformace_and_Scope_Verity_Voting_2.2.2_5.22.18.pdf  Last visited 06/13/22

[151] https://www.eac.gov/voting-equipment/verity-voting-24 Last visited 06/13/22

[152] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix C

[153] https://www.eac.gov/voting-equipment/verity-voting-24 Last visited 06/13/22

[154] https://www.sos.texas.gov/elections/forms/sysexam/brandon-hurley-hart-2.4.pdf See page 2 Last visited 06/13/22

[155] https://www.sos.texas.gov/elections/forms/sysexam/brian-mechler-hart-2.4.pdf See page 9 Last visited 06/13/22

2.4." No further information in which these concerns were addressed to warrant the recommendation of certification was given.[156]

313. James Sneering, a Designee of the Attorney General, noted the presence of "some security risk in the polling places due to passcodes are the same throughout an election across all precincts for all voting stations and other precinct devices."[157]

314. The Relay Kit is never mentioned in the TX SoS Memorandum of certification Tarrant County purchased 9 components outside of the scope of 2.4 that also had not even begun the EAC certification process.[158]

315. As is demonstrated by the Election Judge and Clerk educational materials from Tarrant County's Elections website, the epollbooks are connected to a Mifi.[159]

316. 260 Epson Mobilink[160] P80 Plus 3" Wireless Receipt Printers with auto cutters, with blue tooth capability along with 16 hours of pairing services were purchased in January of 2020 by Tarrant County.



The fast, rugged, wireless, 3" receipt printer with auto cutter

Move customers in and out fast with the rugged Mobilink P80 Plus receipt printer with auto cutter. The P80 Plus provides the power and connectivity to drive both transaction efficiency and customer satisfaction. It delivers 3-inch receipts with clean, smooth edges. Compatible with iOS®, Android™ and Windows® mobile platforms, it speeds through jobs at up to 100 mm per second. It also offers seamless integration with smart devices, using wireless, Bluetooth® and NFC¹ pairing configurations. And, it enables easy printing with innovative epos™ technology. This reliable printer features a long-life battery and four-foot drop rating, plus paper-saving options. Get high-quality printing on the go.

Model: C31CD70751

Request More Info ▶

FIND ACCESSORIES ▶  |  SUPPORT ▶

317. In a response[161] to a news story, identifying Hart Verity Voting systems as "highly vulnerable," the company stated, "As part of the EAC certification, systems go through the "trusted build process" performed by accredited Voting System Testing Laboratories

---

[156] https://www.sos.texas.gov/elections/forms/sysexam/lesley-french-hart-2.4.pdf Last visited 06/13/22
[157] https://www.sos.texas.gov/elections/forms/sysexam/jim-sneeringer-hart-2.4.pdf See page 2 Lasted visited 06/13/22
[158] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix C
[159] https://access.tarrantcounty.com/content/dam/main/elections/Poll_Worker/TC_Election%20_Handbook.pdf See page 30
[160] https://epson.com/For-Work/Printers/POS/Mobilink-P80-Plus-3%22-Wireless-Receipt-Printer-with-Auto-Cutter/p/C31CD70751 Last visited 06/13/22
[161] www.hartintercivic.com/hartstatement-securityreporting/ Last visited 06/13/22

(VSTLs)." Ironically, Hart Intercivic went onto say, "Hart's Verity Voting system has passed multiple federal and many state certifications and has never failed." Without the establishment of proper certification, one could argue quite the opposite.

318.   Communications between Pat Geppert,[162] with Hart Intercivic, Jerome Lovato, Director of Voting System Testing and Certification of the EAC, and Jonathon Panek, SLI Compliance, during the application for certification for Hart Verity Voting 2.4 system, indicate that Hart InterCivic selected SLI Compliance as the lead VSTL for testing.

   a.   Jerome Lovato, clearly defined the process of certification by stating "testing will be conducted to the VVSG 1.0. If the system meets the criteria for a grant of certification, the system will be assigned number "HRT-Verity-2.4" per your request on the application form."

319.   In several instances in which Tarrant County Elections Administrator, Heider Garcia, indicated that he possesses extensive experience with implementing systems compliant to VVSG. One such example is: Garcia was a speaker in the webinar[163]"What City and County Officials Need to Know About Modernizing and Securing Campaign Finance".

320.   Garcia' s introduction, it is said, "In 2009, he was selected as the Election Systems Manager for the Project Team that ran the 2010 Automated Elections in the Philippines. In a country of over 50 million registered voters, Heider was responsible for customizing the technology, certifying the solution under VVSG standards in the United States, and ensuring 100% compliance with the local legislation."

321.   Two companies in particular that produce COTS are Huawei and Akamai, the latter of which is partnered with SCYTL and linked to Dominion Software.

322.   A very similar contractual relationship is noted per Tarrant County's contracts between SOE D/B/A Scytl (a foreign headquartered company located in Spain) and Hart InterCivic.[164]

323.   Emails, certified mail, as well as affidavits attesting to the aforementioned were sent to officials (Appendix G).

---

[162] https://www.eac.gov/sites/default/files/voting_system/files/HRT-Verity-2.4_Application_Approval_Letter.pdf
Last visited 06/13/22
[163] https://webinars.govtech.com/What-City-and-County-Officials-Need-to-Know-About-Modernizing-and-Securing-Campaign-Finance-127158.html (Last visited 5/23/22)
[164] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E

324. The extent of examinations, certifications, regulations, and oversight of the exact manner of how Tarrant County's election infrastructure ecosystem functions as a whole, in real-time (e.g., epollbooks, election night reporting, aggregation, databases and servers) lacks transparency.

325. As for 2020, and the primaries of 2022, significant irregularities occurred throughout the entire process in Tarrant County. [165]

326. Tarrant County contracted with SOE D/B/A SCYTL for such ENR purposes described previously in Terpsehore Maras' Affidavit.

327. Tarrant County's election system, combined with the aforementioned published opinions/presentations of numerous experts, and the irregularities observed in previous elections bring the Affidavit of Terpsehore Maras into the forefront; specifically, yet not limited to, lines: 9-12, 33-34, 50, 89, 112-118.

328. Vulnerabilities do not end with Tarrant County's ENR contracts, but rather extend across the entire election ecosystem (e.g., Hart InterCivic, ePollbook contracts, servers, and databases) and into the security and autonomy of private/personal information. [166]

329. Tarrant County has entered its citizens contractually into abominable circumstances extending beyond elections:

   a. ENR services through a company with foreign ties[167]

   b. ePollbook and pairing services that allows those with malicious intent to make significant changes to the voting process[168]

   c. provides vendors access to, the collection of, and the transfer (over the air) of private sensitive data[169]

   d. the "hosting" of sensitive data on servers belonging to/rented by vendors [170]

   e. grants and/or contracts that entrust personal information to corporations historically vulnerable to cyberattacks[171]

   f. the exposure of the election process to the influence of big tech and corporations[172]

---

[165] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendices B & E
[166] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E
[167] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendices D & E
[168] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E
[169] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E
[170] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E
[171] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendices A & E
[172] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E

      g. contracts with stipulations that violate the ability of citizens to request information regarding virtually any aspect of voting equipment their taxes funded[173]

      h. contracts giving vendors complete control over updating, upgrading, maintaining and enhancing security[174]

330. On September 23, 2021, the TX SoS announced that a forensic audit would occur in Tarrant County along with four other counties.

331. Many have pointed to hybrid voting systems (i.e. BMDs) as a means to provide a paper trail should the need for an audit arise.

332. A legitimate forensic audit, in the sense that we see in other industries (e.g, financial), is impossible within the current electronic voting/elections industry.

333. The reasoning revolves around two key foundational requirements of elections:

      a. the protection of privacy (of voters, ballots, and proprietary information)

      b. protection of voters' intentions.

334. The realm of an electronic system, the ability to ensure and provide proof of protections from manipulation, as well as evidence of votes being casted as intended, would require some breach of privacy with regard to a voter, ballot, and/or proprietary protections.

335. In effect, without sacrificing privacy for increased transparency, it is impossible to ever have the security our elections require.

336. Many states performed audits are essentially "self-audits," where the county and the SoS are essentially auditing themselves utilizing the same equipment, and the same methods, which brought about the need for an audit, absent the conditions present in a real-time election (e.g., voting day epollbook activity and transmission of election results).

337. Findings of experts that studied the Swiss Post/Scytl system[175] further increases doubt that the results of any audit would be transparent, reliable, or accurate.

338. Tex. Elec. Code § 43.007(j) authorizes the implementation of Community Voting Centers[176], substantially enhancing the risk of security breaches and vote manipulation by increasing the need for technology with internet connectivity: all for the sake of perceived convenience.

---

[173] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix G
[174] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Appendix E
[175] https://link.springer.com/chapter/10.1007%2F978-3-030-30625-0_6 Last visited 06/13/22
[176] https://www.tarrantcounty.com/en/elections/Election-CAC/VC-FAQ-QA.html Last visited 06/13/22

339.    Community Voting Centers require widespread use of epollbooks and internet connectivity.

340.    They also further complicate the ability to audit elections due to the significant strain added to the maintenance of chain of custody protocols (secondary to the injection of county-wide ballots and the shuffling of voters across precincts).

341.    Given the described environment, summoning one's ballot would be nearly impossible considering the chain of custody breaks which were evident in Tarrant County[177].

342.    Locating an individual's ballot and determining the manner in which it was cast and counted is further complicated by the laws designed to protect proprietary information. This gives rise to further possible violations with regard to the ballot numbering[178] protocols currently in place.

343.    TX SoS's audit as a potential waste of time, effort, and taxpayer funds; as it appears that investigation of proper EAC certification and many other irregularities are not within the scope of the SoS' audit.

344.    The audit in Tarrant County, approximately 1/3 (estimated to be up to 33,000 ballots) of Tarrant County's mail in ballots for the November 3, 2020, election, purchased from Runbeck,[179] were not scannable.

345.    Adjudication on this large of scale, affected thousands of votes; and brings other Texas Election Code violations into view.

346.    The exact manner, and who personally adjudicated thousands of mail in ballots over the course of several days lacked transparency, and warranted immediate investigation following the November 3, 2020 election.

347.    This occurrence was not mentioned by Heider Garcia, Tarrant County Elections Administrator, in his response to the SoS, found within the Phase 1 audit report [180]

348.    He did disclose Tarrant County Elections Administration is currently engaged in litigation and his access to equipment is limited.

---

[177] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References **See Appendix F**
[178] https://blackboxvoting.org/the-case-of-dr-laura-pressley/#fn-3370-2 **Last visited 06/13/22**
[179] https://www.survivethenews.com/maricopa-county-relegated-election-processes-to-a-printer-who-didnt-provide-accurate-counts-of-ballots-received-by-election-day-nor-chain-of-custody-details/ **Last visited 06/13/22**
[180] https://www.sos.state.tx.us/elections/forms/phase1-progress-report.pdf **Last visited 06/13/22**

349.   Given the administration's restricted access to evidence requested by the SoS, the absence of an investigation into proper EAC certifications, and the many points of vulnerabilities across all aspects of the Tarrant County election ecosystem it is apparent that this audit lacks integrity.

350.   An audit that lacks transparency, as well as thoroughness, will render invalid and incomplete results, leaving citizens with little faith in the outcome, and less confidence in the validity of future election results.

351.   By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.

**BEXAR COUNTY**

352.   Bexar County Commissioners, in addition to election officials, have failed to confirm the voting equipment in Bexar County are properly certified.

353.   Beginning on October 18, 2021, Plaintiff Amanda Eubanks requested multiple responses through the Bexar County PIA portal the information regarding the version of ES&S software used in the 2020 election. Defendant Jacquelyn Callanen responded to one PIA request by referring the plaintiff to the Secretary of State's website for current information. As of June 5, 2022, multiple PIA requests remain unanswered beyond the required 10 business day response window.

354.   ES&S was selected as the voting system to be employed within Bexar County.

   a.   A new ES&S contract was signed for elections in Bexar County in 2019 and continued to be used through the November 2020 election.

   b.   According to Jacquelyn Callanen and her direction to the Texas SOS website, ES&S version 6.0.2.0 was utilized for the November 2020 elections.

   c.   The last certification on file indicates that ES&S version 6.0.2.0 was certified in October of 2018.

   d.   Certification for ES&S Voting software version 6.0.2.0 is on file with the Secretary of State website.[181]

---

[181] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf (Last visited 6/5/2022)

e.  Bexar County records indicate that ES&S software version 6.0.2.0 was utilized for the November 2, 2021 as well as the May 7, 2022 joint amendment elections.

f.  Another note in the ES&S Certification Test Report Modification document states that EVS version 6.0.2.0 is actually ES&S EVS 6.0.0.0 with modifications in software. The original version is not decertified for use in Texas.

g.  ES&S made a modification of their system that caused hash tag validations to fail. In October 2020, this technical issue was deemed an administrative error and ruled a de minimus change, therefore neither certification nor testing were required. The EAC sent a memo to all 50 states and explained the hash tag discrepancy during an update when using a USB thumb drive.

    i.  The build did not match the **"CERTIFIED"** version because a file named SYSLOAD.BMP (image file) was not part of the update so the old SYSLOAD.BMP remained on the system causing the hash tag discrepancy. (Emphasis added)

    ii.  The issue with a bitmap file is that it should not be considered "minor in nature and effect"; a bitmap file has been known to contain malware.[182]

    iii.  Brian Mechler, SOS examiner, stated in September 2020 voting system examination report, "It was disclosed during the concurrent EVS 6.0.3.0 exam that ES&S personnel have performed the hash verification process instead of their customers. Jurisdiction should always perform this process themselves. To have the vendor perform a required component of acceptance testing creates, at best, a conflict of interest."[183]

    iv.  This method of introducing or keeping malware on a voting system lends support to researchers[184] and a witness explaining how code containing an algorithm can impact elections. We do not have assurance that the SYSLOAD.BMP file was not updated.

    v.  The Secretary of State (Ruth R. Hughes) authorized the continued use of this system with alleged malware. Respondents acquiesce in the matter and neglected enforcement of the "law of the land".

---

[182] https://www.zdnet.com/article/obliquerat-trojan-now-hides-in-images-on-compromised-websites/
[183] https://www.sos.state.tx.us/elections/forms/sysexam/brian-mechler-ESS-exam-report-EVS6110-aug.pdf
[184] https://www.digitalgesellschaft.ch/uploads/2019/03/UniversalVerifiabilitySwissPost.pdf

355.   SLI Compliance is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.

356.   The election department order for adopting a voting system to be used in elections since 2019 in Bexar County have reflected that, for each election excluding the primary and general election in 2020 and the primary and runoff elections in 2022, Bexar County has used EVS 6.0.2.0. Jacquelyn Callanen's direction to the Texas SOS website seems to conflict with the available information in Bexar County Commissioners Court documents which do not specify an approved EVS for use in the 2020 and 2022 elections.

357.   By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002 they knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.



82

ELECTION DEPARTMENT ORDER
ADOPTING THE VOTING SYSTEM
TO BE USED IN THE NOVEMBER 3, 2020
JOINT GENERAL, SPECIAL, CHARTER AND BOND ELECTION

WHEREAS, Election Code Section 123.001 requires the adoption of a voting system for the Joint General, Special, Charter and Bond Election to be held on Tuesday, NOVEMBER 3, 2020, throughout Bexar County, Texas;

BE IT ORDERED, ADJUDGED and DECREED by the Commissioners Court of Bexar County, Texas, that the voting system to be used in the NOVEMBER 3, 2020 JOINT, SPECIAL AND BOND ELECTION shall be as follows:

SECTION 1 – That County Commissioners Precinct One shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.
SECTION 2 – That County Commissioners Precinct Two shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.
SECTION 3 – That County Commissioners Precinct Three shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.
SECTION 4 – That County Commissioners Precinct Four shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.
SECTION 5 – That the AIS 450 and 850 Optical Scan tabulating systems shall be used for early voting by mail.

9-1-2020
Date

NELSON W. WOLFF
Bexar County Judge

VOL 1 2 4 3 P G 9 9 6

---

ELECTION DEPARTMENT ORDER
ADOPTING THE VOTING SYSTEM
TO BE USED IN THE NOVEMBER 2, 2021
CONSTITUTIONAL AMENDMENT ELECTION

WHEREAS, Election Code Section 123.001 requires the adoption of a voting system for the CONSTITUTIONAL AMENDMENT ELECTION to be held on Tuesday, NOVEMBER 2, 2021, throughout Bexar County, Texas;

BE IT ORDERED, ADJUDGED and DECREED by the Commissioners Court of Bexar County, Texas, that the voting system to be used in the NOVEMBER 2, 2021 CONSTITUTIONAL AMENDMENT ELECTION shall be as follows:

SECTION 1 – That County Commissioners Precinct One shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 2 – That County Commissioners Precinct Two shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 3 – That County Commissioners Precinct Three shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 4 – That County Commissioners Precinct Four shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 5 – That the DS 850 and DS 450 Central Scanner tabulating system shall be used for early voting by mail.

August 10, 2021
Date

NELSON W. WOLFF
Bexar County Judge

VOL 1 2 6 7 P G 5 4 9

---

ELECTION DEPARTMENT ORDER
ADOPTING THE VOTING SYSTEM
TO BE USED IN THE SEPTEMBER 28, 2021
SPECIAL ELECTION AND RUNOFF, IF NEEDED

WHEREAS, Election Code Section 123.001 requires the adoption of a voting system for the SPECIAL ELECTION and RUNOFF, if needed to be held on Tuesday, SEPTEMBER 28, 2021, throughout a portion of Bexar County, Texas;

BE IT ORDERED, ADJUDGED and DECREED by the Commissioners Court of Bexar County, Texas, that the voting system to be used in the SEPTEMBER 28, 2021 SPECIAL ELECTION AND RUNOFF, if needed shall be as follows:

SECTION 1 – That County Commissioners Precinct One shall use an ES&S EVS 6020 including the DS 200 precinct scanner.

SECTION 2 – That County Commissioners Precinct Two shall use an ES&S EVS 6020 including the DS 200 precinct scanner.

SECTION 3 – That County Commissioners Precinct Three shall use an ES&S EVS 6020 including the DS 200 precinct scanner.

SECTION 4 – That County Commissioners Precinct Four shall use an ES&S EVS 6020 including the DS 200 precinct scanner.

SECTION 5 – That the DS 850 and DS 450 Central Scanner tabulating system shall be used for early voting by mail.

9-14-2021
Date

Nelson W Wolff
Bexar County Judge

VOL 1 2 7 1 P G 3 6 7

---

ORDER ADOPTING THE VOTING
SYSTEM TO BE USED IN THE MARCH 1, 2022 or TBD
PRIMARY ELECTION AND THE MAY 24, 2022 or TBD RUNOFF

WHEREAS, Election Code Section 123.001 requires the adoption of a voting system for the Primary Election to be held on MARCH 1, 2022 or TBD and the Runoff Election on MAY 24, 2022 or TBD throughout Bexar County, Texas;

BE IT ORDERED, ADJUDGED and DECREED by the Commissioners Court of Bexar County, Texas, that the voting system to be used in the MARCH 1, 2022 or TBD Primary Election and the MAY 24, 2022 or TBD Runoff Election shall be as follows:

SECTION 1 – That County Commissioners Precinct One shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.

SECTION 2 – That County Commissioners Precinct Two shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.

SECTION 3 – That County Commissioners Precinct Three shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.

SECTION 4 – That County Commissioners Precinct Four shall use ES&S ExpressVote with paper trail, Express Touch with a DS 200 Tabulator.

SECTION 5 – That the ES&S 450 and 850 Optical Scan tabulating system shall be used for early voting by mail ballots for the Primary Election to be held on MARCH 1, 2022 or TBD and the Runoff Election to be held on MAY 24, 2022 or TBD.

1-11-2022
Date

NELSON W. WOLFF
Bexar County Judge

VOL 1 2 8 0 P G 6 0 1

**ELECTION DEPARTMENT ORDER
ADOPTING THE VOTING SYSTEM
TO BE USED IN THE MAY 7, 2022
CONSTITUTIONAL AMENDMENT ELECTION**

WHEREAS, Election Code Section 123.001 requires the adoption of a voting system for the CONSTITUTIONAL AMENDMENT ELECTION to be held on Saturday, MAY 7, 2022, throughout Bexar County, Texas;

BE IT ORDERED, ADJUDGED and DECREED by the Commissioners Court of Bexar County, Texas, that the voting system to be used in the MAY 7, 2022 CONSTITUTIONAL AMENDMENT ELECTION shall be as follows:

SECTION 1 - That County Commissioners Precinct One shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 2 - That County Commissioners Precinct Two shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 3 - That County Commissioners Precinct Three shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 4 - That County Commissioners Precinct Four shall use an ES&S EVS 6020 including the DS 200 precinct scanner.
SECTION 5 -  That the DS 850 and DS 450 Central Scanner tabulating system shall be used for early voting by mail.

April 19, 2022
Date

NELSON W. WOLFF
Bexar County Judge

## TRAVIS COUNTY

358.    Travis County Commissioners, in addition to election officials, have failed to confirm the voting equipment in Travis County are properly certified.

359.    On May 12, 2020, Modification No. 3 was approved in the Travis County Commissioners Court for the purchase of services for the version 6.1.0.0 election management system upgrade.

360.    6.1.1.0 was only "certified" by the Election Assistance Commission (EAC) on July 27, 2020 by Pro V&V which did so with an expired EAC VSTL accreditation and was not certified to do the examination at the time.

361.     On August 21, 2020, Election Systems & Software ("ES&S" or the "Vendor") presented the EVS 6.1.1.0 system for examination and certification by the Texas Secretary of State.

362.    Travis county officials have confirmed that Election Systems & Software's EVS 6.1.1.0 system was used to conduct the November 3, 2020, elections.

363.    On December 9, 2020, pursuant to TEX ELEC § 122.0371 of the Texas Election Code, the Office held a public hearing, by telephone, for interested persons to express views for or against the certification of the EVS 6.1.1.0 system.

364. On January 8, 2021, The Secretary of State's office pursuant to Section 122.039 wrote and filed their official report certifying Election Systems & Software's EVS 6.1.1.0 system for use in Texas elections.

365. EVS 6.1.1.0 was **NOT CERTIFIED** for use in any election prior to the state certification on January 8, 2021. *(Emphasis added)*

366. Defendants did not seek as stated per TX statutes temporary restraining order, or a writ of injunction obtained through the attorney general to prevent the use of any part of a voting system or voting system equipment that had not been approved per TX ELEC §122.031(b). Thereby, committing an offense by providing a voting system or voting system equipment that the Defendants knew has not been approved. An offense under this subsection is a Class A misdemeanor. TX ELEC §122.031(c)

367. By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting software, systems and modification without a valid VSTL accreditation via the EAC.

**HAYS COUNTY**

368. Hays County Commissioners, in addition to election officials, have failed to confirm if the voting equipment in Hays County is properly certified.

369. Cliff Ormiston, Technology Coordinator confirmed via email that Hays County used Hart InterCivic Verity Duo version 2.4 for the November 3, 2020, election.

370. On July 10, 2020, Peter Lichtenheld Senior VP of Customer Success contacted the SoS's to inform the states that Hart was working with the below counties to upgrade them from their current Verity voting system version to the latest Texas certified version of 2.4.



Christina Worrell Adkins
Legal Director, Texas Secretary of State Elections Division
1019 Brazos Street
Austin, Texas 78701

July 10, 2020

Dear Christina,

This letter is to inform the Texas Secretary of State Elections Division that Hart InterCivic is working with the following Hart customers in Texas to upgrade them from their current Verity voting system version (noted in the table below) to the latest Texas certified version, Verity version 2.4 certified by the State of Texas on June 26, 2020. There are 31 customers who are currently planning on upgrading after the July 14, 2020 election and before the November 3, 2020 election.

We will update you if there are any changes to this list.

| Customer Name | Customer Current System Version | Next Cert. System Version |
|---|---|---|
| Aransas County, TX | 2.0.2 | 2.4 |
| Brazoria County, TX | 2.3.1 | 2.4 |
| Brazos County, TX | 2.0.2 | 2.4 |
| Chambers County, TX | 2.0.2 | 2.4 |
| Comal County, TX | 2.0.2 | 2.4 |
| Coryell County, TX | 2.3.1 | 2.4 |
| Culberson County, TX | 2.8.1 | 2.4 |
| Denton County, TX | 2.3.1 | 2.4 |
| Falls County, TX | 2.3.1 | 2.4 |
| Gregg County, TX | 2.3.1 | 2.4 |
| Hardin County, TX | 2.8.1 | 2.4 |
| Hays County, TX | 2.3.1 | 2.4 |
| Hidalgo County, TX | 2.0.2 | 2.4 |
| Kerr County, TX | 2.0.2 | 2.4 |
| Liberty County, TX | 2.3.1 | 2.4 |
| Llano County, TX | 2.2.1 | 2.4 |
| Lubbock County, TX | 2.0.2 | 2.4 |
| Nacogdoches County, TX | 2.3.1 | 2.4 |
| Parker County, TX | 2.3.1 | 2.4 |
| Randall County, TX | 2.3.1 | 2.4 |
| Red River County, TX | 2.0.2 | 2.4 |
| Roberts County, TX | 2.0.2 | 2.4 |
| San Augustine County, TX | 2.3.1 | 2.4 |
| San Patricio County, TX | 2.0.2 | 2.4 |
| SJRA ISD, TX (San Patricio) | 2.0.2 | 2.4 |
| Tarrant County, TX | 2.3.1 | 2.4 |
| Titus County, TX | 2.0.2 | 2.4 |
| Tom Green County, TX | 2.0.2 | 2.4 |
| Uvalde County, TX | 2.3.1 | 2.4 |
| Ward County, TX | 2.3.1 | 2.4 |
| Wheeler County, TX | 2.3.1 | 2.4 |

Sincerely,

Peter Lichtenheld
Senior VP of Customer Success

371. Hart InterCivic with non-subsequent ballot numbers violated several Texas Election code.[185]

372. SLI Compliance was the VSTL that certified EVS 6.1.0.0.[186]

373. SLI Compliance is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.

---

[185] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009
[186] https://www.eac.gov/voting-equipment/evs-6100  Last visited 06/23/22

374. The Election Code specifically assigns the SoS duties[187] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code.[188]

375. The SoS Defendants and County Officials disregard for Tex. Elec Code in their guidance to jurisdictions violates the Separation of Powers clause of Art. 2 Sec. 1 of the Texas Constitution.

376. The Texas Constitution provides that only the Legislature can suspend laws – not the SoS whom is a member of the Executive Branch.

377. The SoS Defendants' and County Officials' defiance of Election Code knowingly caused the Plaintiff(s), registered voters of Texas; to cast a vote

    a. under false pretense[189]

    b. prevent a cast of a legal vote in which Plaintiff(s) are eligible to vote.[190]

    c. Cause the ballot not to reflect the intent of the Plaintiff(s)/voter[191]

    d. Defendants committed the offense while acting in the capacity of an elected official.[192]

**MONTGOMERY COUNTY**

378. July 27, 2004, the SoS's office certified Hart eSlate Voting System Version 3.3. for use in Texas elections without the required EAC certification.[193]

379. On or around November 2005, Montgomery County purchased Hart eSlate Voting System Version 3.3.

380. Hart eSlate Voting System Version 3.3 was "decertified" for use in the State of Texas by the Secretary of State's office on October 1, 2007.

381. On July 15, 2009, Montgomery County purchased Hart eSlate Voting System Version 6.2.1.

---

[187] See Elec. Code § 31.003
[188] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)
[189] See Tex. Elec Code 273.013(1)
[190] See Tex. Elec Code 273.013(2)
[191] See Tex. Elec Code 273.013(6)
[192] See Tex. Elec Code 273.013(b)(1)
[193] https://www.sos.state.tx.us/elections/forms/sysexam/hart.pdf

382.   April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification.[194]

383.   There is no indication as to when the Hart InterCivic 6.2.1 equipment was placed into service for county, state and federal elections in Montgomery County.

384.   This indicates an approximate 2-year gap (from 2007, when Version 3.3 was decertified, until 2009, when Version 6.2.1 was purchased) in which Montgomery County used an election system that did not even have certification from the SoS's office, much less meet the legal requirements of the State of Texas or HAVA 2002.[195]

385.   Montgomery County's and the SoS's illegal negligence impacted local, state, and federal elections held on November 6, 2007, March 4, 2008, April 8, 2008, May 10, 2008, June 21, 2008, November 4, 2008, and May 9, 2009.

386.   Depending on when the new equipment was placed into service, the elections of November 3, 2009, March 2, 2010, April 13, 2010, May 8, 2010, June 26, 2010, and November 2, 2010, may also have been affected.

387.   This system was not certified by an EAC accredited VSTL nor did it comply with the requirements of the Voting System Standards.[196]

388.   During the SoS's examination dated March 7, 2008, for Hart eSlate Voting System Version 6.2.1. Paul Miles, a staff attorney, and examiner; notated the following issues.[197]

   a.   "On January 17 and 18, 2008, Hart Intercivic presented modifications…The submitted versions of the voting system had undergone review at an independent testing authority ("ITA") and a copy of the ITA reports along with the NASED certification numbers were included with the application to the Secretary of State."

   b.   "Under current examination standards, all changes to a voting system required review both at the federal level, now through the Elections Assistance Commission (EAC) and at the state level by the Secretary of State."

   c.   Tally 4.3.10 "……technical examiners were able to exit Tally and enter access the operating system while Tally running. "

---

[194] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[195] See Tex. Adm Code § 81.61, Tex. Elec Code § 122
[196] See Tex. Adm Code § 81.61, Tex. Elec Code § 122
[197] https://www.sos.texas.gov/elections/forms/sysexam/paulmiles.pdf  Last visited 06/23/22

389. The Hart eSlate Voting System Version 6.2.1 was never examined/tested by an EAC accredited VSTL and did not receive the certification required by Texas in compliance with HAVA 2002 as noted by an attorney as a SoS examiner Paul Mills. [198]

390. SoS's certification letter of the Hart eSlate Voting System Version 6.2.1 identified 2 security concerns in the system.[199]

    a. Examiners discovered that if existing security protocols are not followed, then it is theoretically possible to access the operating system and run or delete other programs while Tally is tabulating results.

    b. Examiners expressed concern that Version 6.2.1 does not have a secure OS configuration.

391. The certification letter from the SoS's office states "…certification of Hart InterCivic Voting System 6.2.1, is conditioned on a political subdivision employing the following procedures:

392. Based on these security concerns the SoS's office *conditioned "certification"* of the Hart eSlate Voting System Version 6.2.1 *on the following procedures being employed* by each county (political subdivision) using this system:[200] *(Emphasis added)*

    a. "Two-person access for all Version 6.2.1 computers and servers is required: one person to log on to start the Windows 2000 OS and a second person to log on to start the specific application (e.g., BOSS, Tally, Ballot Now, eCM Manager)."

    b. "A two-person control team must be present any time the Tally application is open."

    c. "Version 6.2.1 Application Logs and Windows 2000 Audit Logs, which track user log-ons and log-on attempts, must be regularly reviewed by the local election officer. The Office of the Secretary of State may inspect these logs or may require the logs to be copied and mailed to this office."

    d. "Hart *Windows 2000 "Hardened" Operating System* Security Settings is *required*. Hart Windows 2000 "Hardened" Operating System Security Settings presents a table of Win2K system settings installed to achieve the "hardened" configuration.

---

[198] See Tex. Adm Code § 81.61
[199] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22
[200] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf Last visited 06/23/22

The format of the settings closely approximates that used in the applicable NIST checklist." *(Emphasis added)*

e.  *"Each political subdivision which adopts Version 6.2.1 must file an initial written confirmation with the Office of the Secretary of State that they are in compliance with Condition Numbers 1 through 4, above, and subsequent to the initial confirmation filing, must file annual, updated confirmations." (Emphasis added)*

393.   Although the Secretary of State placed some conditions on the certification of this vulnerable system a very important condition recommended by Stephen Berger (Berger) was ignored.

394.   In his report (Berger Report) dated March 3, 2008, Berger asserts[201]

"All files installed with the system must be filed with the NIST (National Institute of Standards and Technology) and NSRL (National Software Reference Library).

"Hart InterCivic's response is egregiously Deficient"

"To support incoming inspections of new systems a list of all files installed is need so that the new system can be verified as having only the system as certified."

"Pre and post election checks to confirm that software has not been changed or tampered with are recommended. To do this local jurisdictions must have HASH codes of all static files. Further to avoid the system having a single point vulnerability the non-static files, that change with use, should be evaluated by an entity other than the vendor. Why non-static files change should be understood by state and local authorities. Election officials should make their own independent determination that files that change with use and are not included in pre and post election checks are appropriate and do not represent a security vulnerability"

---

[201] https://www.sos.state.tx.us/elections/forms/sysexam/stephenberger621.pdf **See pages 1-2 Last visited 06/23/22**

"The Hart software makes 'broad use of Windows resources, including hundreds of DLLs and other executable files'. Each of those files represents a potential vulnerability, an opportunity to introduce malicious code into the system. For that very reason it is essential that the information be available to verify these files both in the certification process and pre and post election."

"Being able to confirm that the software certified at the national and state level is identical to that installed and used in elections is one of the most significant improvements to total election system security that can be made. Implementing such checks requires not modification or recertification of a voting system, unlike many changes. The tools to verify HASH codes are readily available and do not require extensive training to use. It is hard to imagine why a change that is this beneficial is being resisted."

395.  To clarify why the HASH codes are so important Berger goes on in his report to say "Further, safeguards are needed to assure that only the approved update is installed on systems. The current practice potentially allows additional software to be installed under the guise that it is part of the operating system update."

396.  And that, "It has been reported in reviews of this system in other states that it is possible to bypass the Hart software security settings. This item was discussed in the California evaluation of the Hart 6.2.1 system. "

397.  HASH code validation practices would have mitigated these risks.

398.  The most alarming statement in the Berger report is a quote from a California expert report that states: "Some of the findings from previous studies on precinct count optical scanners were replicated on the eScan, and they allowed the Red Team to maliciously alter vote totals with the potential to affect the outcome of an election. These attacks were low-tech and required tools that could be found in a typical office."[202]

399.  Berger[203] recommended that this system NOT be certified and repeatedly states throughout his report that there are serious concerns with the security of this voting system and that

---

[202] https://www.sos.state.tx.us/elections/forms/sysexam/stephenberger621.pdf **See page 19**
[203] https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/red-hart-final.pdf

those concerns should be addressed, and the system should be reevaluated to ensure they were addressed before the system was certified for use in Texas.

400.   Montgomery County is using Windows 7 operating system with the Hart eSlate Voting System Version 6.2.1 and not the required Windows 2000 "hardened" Operating System.

401.   A change in the type of operating system used with an election system would have required a new certification, especially when the operating system used was clearly spelled out in the certification process as vital to the security of the system.

402.   "Hart InterCivic 6.2.1 system should have been denied certification until these serious issues were addressed by Hart and once addressed should have been required to be fully reevaluated to ensure that the issues were resolved specifically via the legal route of the EAC.

403.   In fact, according to the Berger Report "Operating systems have many configuration options and depending on the options selected can range from relatively secure to very vulnerable.

404.   For this reason the VSS (Voting System Standards) 2002 and the VVSG (Voluntary Voting System Guidelines) 2005 require that the vendor specify the operating system configuration and that the security of the recommended by evaluated by the ITA, now VSTL (Voting System Test Laboratories).

405.   If the configuration of the operating system is not controlled many other security safeguards are of little value. The configuration of the operating system is a foundational piece essential to the overall security of the operating system. This fact is recognized and results in multiple requirements in the VSS 2002."

406.   Not only have multiple Secretaries of State knowingly "certified", or failed to decertify, an insecure election system, they have also failed to monitor and enforce the conditions they placed upon the contingency of certification of the equipment and the usage in the counties that utilized it.

407.   A Public Information Act request sent to the Secretary of State's office seeking to obtain the annual filings by Montgomery County for years 2018, 2019, 2020 and 2021, that were required by the Secretary of State to maintain "certification" of this election system, returned no results.

408. To be clear, in at least the last 4 years, the Secretary of State's office received none of the filings from Montgomery County that were required to obtain at least the appearance of certification of the election system they were using.

409. Montgomery County has used equipment that would have been considered uncertified even by the terms of the Secretary of State's "certification" letter since at least 2018.

410. The Secretaries of State holding office from 2008 to today had the legal and moral duty under Texas Election Code[204] to monitor and ensure receipt of the annual reports required for "certification" of Hart eSlate Voting System 6.2.1 and that all of the other 4 conditions for "certification" were met as they understood the system was vulnerable to manipulation.

411. We have filed a Public Information Act request with the Secretary of State's office to obtain the annual reports for Montgomery County for the years 2009-2017 but have not yet received an answer to that request.

412. Montgomery County was still using this uncertified election equipment as recently as the runoff election held on March 24, 2022, the Secretary of State has failed to protect the voting rights of the People of Montgomery County violating the election code.[205]

413. The SoS violated the Election Code in regards to uniformity as the people of Montgomery County were forced to vote on vulnerable equipment that was never certified by an EAC accredited VSTL.[206]

414. We contend that due to these actions and lack of action by the Secretary of State, the elections in Montgomery County have been illegal, unreliable, and therefore uncertifiable since at least January 1, 2006.

415. Currently, according to the SoS's website; 35 counties in the state of Texas in addition to Montgomery County are conducting illegal and uncertifiable elections due to the illegal "certification" of Hart eSlate Voting System 6.2.1 by the Secretary of State in 2009.[207]

---

[204] See Tex. Elec Code § 31.005
[205] See Tex. Elec Code § 31.005
[206] See Tex. Elec Code § 31.003
[207] https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf Last visited 06/23/22

a. Archer, Brown, Burleson, Burnet, Cass, Coke, Comanche, Crosby, Dawson, Delta, Duval, Ector, Falls, Fannin, Foard, Gray, Grimes, Harrison, Hudspeth, Jefferson, Jim Hogg, Karnes, Kennedy, Kimble, LaSalle, Lipscomb, Marion, Matagorda, Mclennan, Menard, Shackelford, Wichita, Wilbarger, Willacy and Wood.

416. We have filed a Public Information Act request with the Secretary of State's office to obtain the annual reports for these counties for the last 4 years but have not yet received an answer to that request.

417. Texas Certification Procedures for Electronic Pollbooks states: "Election Code 31.014 requires an electronic pollbook system that is used in Texas elections to be certified annually by the Secretary of State's Office. Accordingly, vendors will need to seek recertification of their system on an annual basis which will become effective on January 1 of the year in which the system will be used."[208]

418. Through a Public Information Act request with the Secretary of State's office we were able to determine that Montgomery County, as an Electronic Pollbook vendor, has failed to obtain recertification of its electronic pollbook for the election year 2022 in violation of Election Code.[209]

419. In the state of Texas for the years 2021 and 2022 only 3 of the 6 electronic pollbook vendors were certified by the Secretary of State.

420. April 1, 2021, the SoS's office certified Hart Verity Voting System Version 2.5 for use in Texas elections without the required EAC certification

421. While Hart Verity Voting System Version 2.5 has an illusion of certification by an EAC accredited VSTL, that certification is fraudulent because the Voting System Test Laboratory, SLI Compliance, that approved the certification is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1

---

[208] https://www.sos.texas.gov/elections/laws/certification-pollbooks.shtml See Tex. Elec Code § 31.014 Last visited 06/23/22
[209] See Tex. Elec Code § 31.014

422.   On October 26, 2021, Montgomery County purchased Hart Verity Voting System Version 2.5. This system was not certified by an EAC accredited VSTL and should have never been "certified" by the Secretary of State's office.[210]

423.   The Hart Verity Voting System Version 2.5 has not yet been placed into service in Montgomery County but will affect future elections.

**WILLIAMSON COUNTY**

424.   Williamson County Commissioners, in addition to election officials, have failed to confirm if the voting equipment in Williamson County is properly certified.

425.   The Williamson County Elections Administrator since 2019 is Christopher Davis.

426.   According to responses to Public Information Requests (PIR) for electronic voting system versions, Williamson County said:

    a.   2018 – Not applicable.

    b.   System purchased in Summer 2019

    c.   2019 – ES&S EVS 6.0.2.0

    d.   2020 – ES&S EVS 6.1.0.0

    e.   2021 – ES&S EVS 6.1.1.0

    f.   2022 – ES&S EVS 6.1.1.0

427.   Elections Administrator Chris Davis received approval from the SoS's office on April 23, 2019, for the purchase of ES&S's EVS 6.0.2.0.

428.   According Davis via email, ES&S's EVS 6.1.0.0 was utilized for the November 3, 2020.

429.   Chuck Pinney, Staff Attorney, Elections Division submitted a memorandum to Keith Ingram, Director of Elections notating. "At the time of the examination, the system was somewhat limited in its ability to comply with the non-sequential ballot serialization requirement in particularly large counties…Despite this issue, I would recommend certification."

430.   Williamson County has not answered my PIA request of the election ware used in the past few years.

431.   Williamson County commenced with a recount 235,000 of early voting ballots where vote totals were accurately recorded but could not be separated by voting precinct, as required by state law. Williamson County has 94 voting precincts.

---

[210] See Tex. Elec Code § 81.61

432.    A computer programming issue also caused ballots not to be separated by precinct.[211]

    a. On November 12, 2020, Williamson County still had 3,400 provisional ballots to be presented to the county's ballot board to determine how many should be accepted.

    b. The county on this date currently had 1,000 provisional votes had been accepted but not yet counted.

    c. Per Davis the county usually only receives 1,000 to 1,500 provisional votes in an election.  The election of 2020 was double the amount.

    d. Included in these provisional ballots were ballots cast by people who had requested mail-in ballots but cast in person instead.

    e. Due to these issues Davis said it is possible that outcomes may change for some races.

    f. The reasons there are so many provisional ballots, Davis said, is that poll workers are trained to never turn a voter away, even if they're not registered in the county poll book.

    g. "As a consequence of that, a provisional voter could be one that isn't registered at all," he said, "or is still registered in another state or county but could only vote in WilCo as a last resort."

    h. "So they voted provisionally," Davis said. "Most likely, if they didn't register in WilCo by the (Oct. 5) deadline, their ballot won't be accepted and counted. Same for voters that voted provisionally for lack of a voter ID and didn't come in to cure that deficiency within the state-mandated six days. Their ballot will most likely not be accepted."

433.    "Will most likely not be accepted" is not acceptable as the election code requires all voters be registered by October 5, 2020 of the election year.

434.    Brandon Jenkins, Voting System Analyst for Williamson County Elections sent an email to Darren Znamenacek and employee of ES&S regarding "wildly incorrect" precinct results.[212]

---

[211] https://www.statesman.com/story/news/local/2020/11/12/williamson-county-still-sorting-through-3400-provisional-ballots/43092675/ Last visited 06/23/22

[212] https://dl.airtable.com/.attachmentThumbnails/2c2a50d0c22985075d6bfa7465289821/409bb881 Last visited 06/23/22



435.  Williamson County decided to do a second recount by hand of early voting ballots due to inaccuracies.

436.  Davis presented the results of the first count of the early voting by precinct to commissioners and state, but he could not say how accurate the results were because 235,000 early votes had to be sorted manually into 94 precincts to meet a state deadline of November 16, 2020.[213]

   a.  The county's election office had to count the early voting ballots for precinct results by hand because a bar code that would have sorted them by each of the county's 94 precincts was not on the ballots.

   b.  Davis said it was caused by the county's vendor and was discovered and fixed before votes were cast on Election Day.

   c.  "It wasn't a mistake we made," said Gravell. "It was a mistake the vendor made and we are going to ger the right data."

437.  According to Commissioner Court minutes, Williamson County plans to canvas the 2020 election.

438.  ProV&V was the VSTL that certified EVS 6.1.0.0.[214]

439.  ProV&V is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.

---

[213] https://www.statesman.com/story/news/local/2020/11/18/williamson-commissioner-asks-for-possible-recount-of-precinct-by-precinct-election-results/114981050/ Last visited 06/23/22
[214] https://www.eac.gov/voting-equipment/evs-6100 Last visited 06/23/22

440.   It is unclear if Williamson County was affected by the HASH validation failure as the SoS has not released specific information regarding the affected counties that utilized ES&S for their elections.

**COLLIN COUNTY**

441.   Collin County Commissioners, in addition to election officials, have failed to confirm if the voting equipment in Collin County is properly certified.

442.   Cheryl Gorena via email confirmed EVS 6.1.1.0 was utilized for the November 3, 2020, election.  The SoS's website states 6.0.0.0.

443.   Bruce Sherbet, Elections Administrator confirms that per Election Advisory 2016-12, "All voting systems in use for Texas elections must be federally certified by the Texas Secretary of State…To execute a contract to sell, lease or otherwise provide a voting system that has not been approved by the Texas Secretary of State is a Class A Misdemeanor."



426.   Chuck Pinney, Staff Attorney, Elections Division of SoS noted in memorandum from the examination of EVS 6.1.1.0; "The technical examiners identified concerns regarding the complexity of the hash validation process for this system and regarding the password reset requirements authorized by the system. Those concerns do not affect the reliability, accuracy, or security of the system if proper procedures are followed. I would recommend that the vendor make adjustments to these procedures based on the feedback of the examiners."[215]

---

[215] https://www.sos.texas.gov/elections/forms/sysexam/chuck-pinney-examiner-report-ESS-6110-aug.pdf#search=evs%206.1.1.0 **Last visited** 06/23/22

98

427. Election Advisory No. 2019-23, cover hash validation procedure as well as the "Tracking of Ballot Numbers Through the ExpressVote Activation Card Printer/ExpressLink Software"[216]

    a. Ballot sequential advising jurisdiction to ignore election law.[217]

> 4. For tracking purposes, you will continue to have the presiding judge fill out the Ballot Register (PDF), and the original and duplicate forms will be returned in the applicable envelopes. The ballots shall be tracked, distributed, and retained just as you would with a traditional pre-printed full ballot in accordance with Sections 51.006, 51.007, 51.008 with the exception of notating the serial number of the ballot ranges.

    b. Hash validation advising jurisdictions MUST complete with the vendor provided specific instructions.

> 3. The entity MUST complete a system validation. Your vendor should provide you with specific instructions on how to validate that software that is being installed and used on your voting system is the same software that was certified by the EAC.

428. On June 4, 2019 executed ES&S vendor contract for ES&S voting equipment and systems.

    a. **General Term Section 7(b) Exclusive Remedies Disclaimer** expressly requires the Collin County to use ES&S for hash-validation testing. Below is the provision.[218]

> b. **Exclusive Remedies/Disclaimer.** IN THE EVENT OF A BREACH OF SUBSECTION 7(a), ES&S' OBLIGATIONS, AS DESCRIBED IN SUCH SUBSECTION, ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES. ES&S EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHICH ARE NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. FURTHER, IN THE EVENT CUSTOMER DECLINES ES&S' INSTALLATION AND ACCEPTANCE TESTING SERVICES OR IN ANY WAY AT ANY TIME ALTERS, MODIFIES OR CHANGES ANY EQUIPMENT, SOFTWARE, THIRD PARTY ITEMS AND/OR NETWORK (COLLECTIVELY "SYSTEM") CONFIGURATIONS WHICH HAVE BEEN PREVIOUSLY INSTALLED BY ES&S OR WHICH ARE OTHERWISE REQUIRED IN ACCORDANCE WITH THE CERTIFIED VOTING SYSTEM CONFIGURATION, ALL WARRANTIES OTHERWISE PROVIDED HEREUNDER WITH REPECT TO THE SYSTEM PURCHASED, LEASED, RENTED AND/OR LICENSED UNDER THIS AGREEMENT SHALL BE VOID AND OF NO FURTHER FORCE AND EFFECT.

    b. Listed under Dell Poweredge T430 is listed a component "iDRAC8" which is installed in the EMS.

---

[216] https://www.sos.state.tx.us/elections/laws/advisory2019-23.shtml Last visited 06/23/22
[217] See Tex. Elec Code § 51.006, 51.007, 51.008, 52.062
[218] https://eagenda.collincountytx.gov/docs/2020/CC/20200601_2483/48428_2018241%20Contract.pdf Last visited 06/023/22

| Qty Ord. | Description | Price | Ext. Price |
|---|---|---|---|
| | **EMS FILE SERVER** | | |
| 1 | **DELL POWEREDGE T430** | $7,200.00 | $7,200.00 |
| | PowerEdge T430 Server, No TPM<br>• Chassis with up to 8, 3 5" Hot Plug Hard Drives, Tower Configuration  Intel® Xeon® E5-2620 v3 2.4GHz, 15M Cache, 8.00GT/s QPI,  Turbo, HT, 6C/12T(85W) Max Mem 1866MHz<br>• 1 CPU Standard<br>• 2133MT/s RDIMMS<br>• (2) 4GB RDIMM, 2133MT/s, Single Rank, x8 Data Width<br>• RAID 1+ RAID 1 for H330/H730/H730P (2 + 2 HDDs or SSDs)<br>• PERC H730 RAID Controller, 1GB NV Cache<br>• (4) 2TB 7.2K RPM SATA 6Gbps 3.5" Hot-Plug Hard Drive<br>• On-Board Broadcom 5720 Dual Port 1Gb LOM<br>• iDRAC8, Basic<br>• DVD+/-RW, SATA, Internal<br>• Casters for PowerEdge Tower Chassis<br>• Power Saving Dell active Power Controller<br>• Dual, Hot-Plug, Redundant Power Supply (1+1), 750W<br>  (2) NEMA 5-15P to C13 Wall Plug, 125 Volt, 15 AMP, 10 Feet (3m), Power Cord, North America<br>• Keyboard and Optical Mouse, USB, Black, English Windows Server 2016, Standard Ed, Factory Inst, No MED,<br>  2SKT, 2VM, NO CAL - Downgraded to Windows Server 2008 R2 Windows Server 2016, STD Ed, Media Kit w/Factory Inst ENT  DGRD Images<br>  5-pack of Windows: Server 2016 Device CALs (Standard  or Datacenter)<br>• 5 Year ProSupport and NBD On-Site Service | | |



100







    c.  Dell touts the (iDRAC) as an integrated Dell Remote Access Controller. "iDRAC....is part of a larger datacenter solution that helps keep business critical applications and workloads available at all times...allows administrators to deploy, monitor, manage, configure, update, troubleshoot and remediate Dell servers from any location, and without the use of agents."

    d.  "Leveraging the incomparable agent-free capabilities of the embedded, integrated Dell Remote Access Controller (iDRAC) with Lifecycle Controller technology, server deployment, configuration and updates are streamlined across the OpenManage portfolio and through integration with third-party management solutions."[219]

    e.  "Remote management: iDRAC8 with Lifecycle Controller, iDRAC8 Express (default), iDRAC8 Enterprise (upgrade), 8GB vFlash media (upgrade), 16GB vFlash media (upgrade)"

    f.  The iDRAC8 modem creates a serious security breach and violates a multitude of election and penal codes.[220]

    g.  According to Bruce Sherbet, Elections Administrator's own words via email states that the county must receive an approval from the SoS's office prior to purchasing a voting system.[221]

431.    ProV&V was the VSTL that certified EVS 6.1.1.0.[222]

432.    ProV&V is not an accredited laboratory in accordance with the Voting System Test Laboratory Program Manual ver. 2.0 effective May 31, 2015, page 38, Sec 3.6.1.

**DENTON COUNTY**

433.    The voting machines used in Denton County for the November 2020 elections were not certified, as is required by Texas law (TX Election Code § 122.001, TX Admin. Code § 81.60 (3). TX Admin. Code § 81.60 (8)(B) and TX Admin. Code § 81.61), therefore

---

[219] https://i.dell.com/sites/csdocuments/Shared-Content_data-Sheets_Documents/en/aa/Dell-PowerEdge-T430-Spec-Sheet.pdf Last visited 06/23/22
[220] See Tex. Elec Code 122.001(a)(4), TEX. PEN. CODE § 16.02, § 33.05, 18 U.S.C. § 1030
[221] See Tex. Elec Code 122.005(a)
[222] https://www.eac.gov/voting-equipment/evs-6110 Last visited 06/23/22

violating Art 6, § 2(c) and Art 6, § 4 of the Texas Constitution. TX Election Code § 122.001 prevents voting systems from being used in an election unless they met the

434.   VOTING SYSTEM STANDARDS contained within, one such requirement ensuring the system "operates safely, efficiently, and accurately and complies with the voting system standards adopted by the Election Assistance Commission".

    a.   The Denton County Elections Administrator, Frank Phillips, recommended and the County Commissioners Court approved canvassing of the 2020 General Election on Nov 17, 2020.[223]

    b.   An assistant District Attorney (John Feldt) informed the Elections Administrator (Frank Phillips) in June 2021 of allegations that county voting machines were not certified[224].

    c.   A county resident (Alana Phillips, a Plaintiff) publicly informed the Commissioners Court on September 28, 2021, that the Hart InterCivic voting machine systems were not certified.[225]

    d.   Denton County initially stated it used Hart InterCivic Verity 2.4 voting machine systems for the November 2020 election, as shown by an October 6, 2021, email statement from the county[226].[227] SLI Compliance was the Voting System Test Laboratory (VSTL) for version 2.4 of that voting system, per the EAC website.[228] SLI Compliance has a three-year accreditation certificate on the EAC website from Jan 10, 2018, through Jan 10, 2021[229]. Accreditation, per the EAC Voting System Test Laboratory Program Manual 2 "is valid for a period not to exceed two years."[230] Therefore, this is an invalid accreditation certificate.

[223] https://dentoncounty.granicus.com/MediaPlayer.php?view_id=26&clip_id=1787&meta_id=197132 Last visited 06/06/22
[224] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 1
[225] https://rumble.com/vn6791-denton-county-commissioners-meeting-92821-crowdstrike-purchase.html Last visited 06/07/22
[226] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 2
[227] https://www.eac.gov/sites/default/files/voting_system/files/HRT-VERITY-2.4%20Certificate%20and%20Scope%2002-21-2020.pdf Last visited 06/06/22
[228] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl/sli-compliance-division-gaming-laboratories Last visited 06/06/22
[229]
https://www.eac.gov/sites/default/files/voting_system_test_lab/files/SLI_Compliance_Certificate_of_Accreditation011018.pdf Last visited 06/06/22
[230] https://www.eac.gov/sites/default/files/eac_assets/1/28/VSTLManual%207%208%2015%20FINAL.pdf See 3.8 – page 40

e. On October 8, 2021, two county commissioners (Edmondson and Williams), the elections administrator (Frank Phillips), and IT and elections personnel met with county residents to discuss election issues. During the discussion about voting machine certification, the elections administrator (Frank Phillips) read aloud the EAC letter claiming Covid-19 was the reason for VSTLs not being certified.[231] A county resident (Alana Phillips) explained that the state of emergency was declared after the VSTL accreditation had already lapsed. Both the IT representative (Todd Landrum) and the elections administrator (Frank Phillips) received a copy of Terpsehore Maras's affidavit.

f. A county resident (Alana Phillips) publicly explained the accreditation and certification issue to the county commissioners on February 1, 2022[232], and again on April 5, 2022[233]. The commissioners court and elections administrator (Frank Phillips) continued to deny that the voting machines lacked certification.

g. During the canvas of the Republican Primary election results on March 10, 2022, a precinct chair (Alana Phillips) informed the county chair (Jayne Howell) that voting machines were not certified. The elections administrator (Frank Phillips) continued to state that they are certified.

h. Denton County later stated in a May 2022 email that it had instead used Hart InterCivic Verity 2.4.2 for the November 2020 general election.[234] Neither the EAC nor the SoS website show certification or approval of that version.

435. Tex. Elec Code states a "voting system may not be used in an election unless the system" ... "prevents counting a vote on the same office or measure more than once..."[235]. The list of November 2020 voters the county provided shows 49 people voted twice[236]

436. Tex. Elec Code states a "voting system may not be used in an election unless the system" ... "is safe from fraudulent or unauthorized manipulation".[237]

---

[231] https://www.eac.gov/sites/default/files/voting_system_test_lab/files/VSTL%20Certificates%20and%20Accreditation.pdf Last visited 06/07/22
[232] https://rumble.com/vucli7-county-commissioners-meeting-feb-1-2022.html Last visited 06/07/22
[233] https://rumble.com/v106quo-commissioners-court-april-5-2022.html Last visited 06/07/22
[234] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 3
[235] See TX Election Code § 122.001(a)(8)
[236] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 4
[237] See Tex. Elec Code § 122.001(a)(4)

437.   The list of November 2020 registered voters from the county indicates the registered voters from ages 60 and over exceeded the 2020 Census estimate for those ages. The actual voters exceeded the 2020 Census estimate from ages 70-85[238].

438.   The linear forecast of presidential election voter turnout in Denton County since 1992 indicates 56,967 more ballots than expected were received in November 2020[239].

439.   Voters have standing and are not barred by sovereign immunity claims to challenge an unconstitutional voting system, in spite of what the SoS or other government officials might claim. As stated in Andrade v. NAACP of Austin, 345 S.W.3d 1, 8 (Tex. 2011), "The Secretary urges a blanket rule that would ensure no voter ever has standing to challenge a voting system. We think the Secretary overreaches in that respect. The voters assert a denial of equal protection — a claim voters often have standing to bring. See Baker v. Carr, 369 U.S. 186, 206, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (noting that voters have standing to bring equal protection challenges to complain of vote dilution, and observing that "[m]any of the cases have assumed rather than articulated the premise in deciding the merits of similar claims"). For example, the Supreme Court has permitted Virginia residents to sue for a declaration that Virginia's poll tax was unconstitutional. Harper v. Va. State Bd. of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (holding that poll tax violated the equal protection clause)."

HARRIS COUNTY

440.   Harris County Commissioners, in addition to election officials, have failed to confirm if the voting equipment in Hays County is properly certified. The Harris County elections office has been unresponsive to numerous Public Information Requests. Harris County utilized Hart InterCivic 6.2.1 according to the SoS website "Voting Systems by County" dated 2/11/2020. 4. On July 10, 2020, Peter Lichtenheld Senior VP of Customer Success contacted the SoS's to inform the states that Hart was working with the below counties to upgrade them from their current Verity voting system version to the latest Texas certified version of 2.4 including Harris County.

---

[238] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 5
[239] https://files.ttttexas.com/case/TX_SOS_Election_Violation_References See Exhibit 6

**H A R T**
Intercivic

Christina Worrell Adkins
Legal Director, Texas Secretary of State Elections Division
1019 Brazos Street
Austin, Texas 78701

July 10, 2020

Dear Christina,

This letter is to inform the Texas Secretary of State Elections Division that Hart InterCivic is working with the following Hart customers in Texas to upgrade them from their current Verity voting system version (noted in the table below) to the latest Texas certified version. Verity version 2.4 certified by the State of Texas on June 26, 2020. There are 31 customers who are currently planning on upgrading after the July 14, 2020 election and before the November 3, 2020 election.

We will update you if there are any changes to this list.

| Customer Name | Current Verity Version | Next Cert Verity Version |
|---|---|---|

Sincerely,

*[signature]*

Peter Lichtenheld
Senior VP of Customer Success

441.   Hart InterCivic with non-subsequent ballot numbers violated several Texas Election codes[240]. April 30, 2009, the SoS's office certified Hart eSlate Voting System Version 6.2.1. for use in Texas elections without the required EAC certification[241]. The Hart InterCivic 6.2.1 was notated to have many security issues during examination as stated in Montgomery County section of this complaint on pages 87-95. The Election Code specifically assigns the SoS duties[242] to ensure uniform compliance but does NOT provide the SoS with "discretion" to advise any jurisdictions to ignore or refuse to comply with the Election Code[243]. The SoS Defendants and County Officials disregard for Tex. Elec Code in their guidance to jurisdictions violates the Separation of Powers clause of Art. 2 Sec. 1 of the Texas Constitution.

---

[240] See Tex. Elec Code § 52.062, § 52.006, § 51.007, § 51.008, § 51.10, § 62.007 and § 62.009
[241] https://www.sos.state.tx.us/elections/forms/sysexam/hart621cert.pdf
[242] See Elec. Code § 31.003
[243] See Elec. Code § 52.062, § 51.010(c), § 51.007(b), 51.008 (d)

106

442.   The Texas Constitution provides that only the Legislature can suspend laws – not the SoS whom is a member of the Executive Branch. Currently, Isabel Longoria has admitted she knew about 10,000 extra ballots having not been counted but states she was too exhausted to count them. In an email from Alan Vera, Chairman, HCRP Ballot Security Committee-President/CEO to Defendant Jose "Joe" Esparza and Keith Ingram of the SoS office the following issue are reported:  The iPads were not giving confirmation of cancelled mail in ballots. Vera goes on to state, "…stack of mail ballots siting in every early voting location.  There is apparently no record in the system that these ballots have been cancelled….county clerk is…picking up these mail ballots in an inappropriate way…with no apparent record in the system that THE BALLOTS HAVE BEEN CANCELLED, they are still "live" ballots that could be filled out and voted…….This mess needs immediate attention."



**From:** Alan Vera [████████] >
**Sent:** Sunday, October 18, 2020 8:06 AM
**To:** Sonya Aston [████████] >; Josh Helton [████████] >; Joe Esparza
<JEsparza@sos.texas.gov>; 'Keith Nielsen [████████] >; Keith Ingram
<KIngram@sos.texas.gov>; Mitch Carney [████████] >
**Cc:** 'Kevin Fulton' [████████] ; Sarah Singleton <[████████] >; KEN
REMBERT [████████] >; Colleen M. Vera
[████████] ; Mano DeAyala <[████████] >
**Subject:** RE: Chaos in BBM Processing & Chain of Custody
**Importance:** High

> **CAUTION:** This email originated from OUTSIDE of the SOS organization. Do not click on links or open
> attachments unless you are expecting the email and know that the content is safe. If you believe this to be
> a malicious or phishing email, please send this email as an attachment to

In follow-up to the note below from last night, I asked Republican AJ Deborah Carr some important follow up questions. Her answers are attached.

The most alarming element in her attached answers is the following:

> In the last election she worked, when she had to cancel a mail ballot on the iPad she
> received a confirmation on the iPad that the mail ballot "has been successfully cancelled."
> Per her attached comments, they are NOT getting that message this year.

So we have a stack of mail ballots sitting in every early voting location. There apparently is no record in the system that these ballots have been cancelled. The county clerk is apparently picking up these mail ballots in an inappropriate way. And with no apparent record in the system that THE BALLOTS HAVE BEENCANCELLED, these are still "live" ballots that could be filled out and voted. .

This mess needs immediate attention.

Regards,

Alan D. Vera
Chairman, HCRP Ballot Security Committee
President/CEO

TX-SOS-20-2697-A-000032

443.  How many of these cancelled ballots that were not recorded correctly and still considered "live" were voted and counted?  How does the SoS or the Harris County election officials or County Commissioner's Court account for this massive security breach? The Harris County Defendants certified the general election of November 3, 2020 with numerous issues regarding the security of the voting system and possibly numerous cancelled ballots voted and counted. August 4, 2021, National File reported voter fraud in Harris

County[244]. This information from this report was provided to the SoS office and the Texas Attorney General Ken Paxton's office in formal investigations.

444.   Audio Clips reveal:

a.   Charles Marler, FBI Special Surveillance Group, contacted Sylvia Thomas, whom shows voted in Harris County election of 2020, but has not in in Harris County for years.  Syliva Thomas says "I've been away from Harris County" and confirmed that she has not voted in Harris County in recent years even though someone has been obtaining absentee ballots on her behalf.  A Tomar Bishop, who obtained the absentee ballots is associated with Thomas's identity, or Gloria Palmer, the recent Sheila Jackson-Lee campaign PAC vender wo oversaw Tomar Bishop.  Sylvia Thomas doe does not recognize or know a Tomar Bishop.

b.   Charles Marler confirms with a woman in Harris County that a man who applied to "vote" in the election named Jesse Burks passed away on November 4, 2015.  The woman confirms this death. The dead Burks' address matches the address of the "voter." The woman does not recognize Tomar Bishop, who obtained the absentee ballot, or Gloria Palmer, who mailed the dead man's ballot application in.

c.   Charles Marler confirms with a woman in Harris County that her mother Gloria Chambers, born in 1946, voted in the election despite dying in 2010. The daughter of the deceased voter does not know Tomar Bishop, who obtained the absentee ballot, or Gloria Palmer, who mailed the dead woman's vote in. "That's fine, because we don't know either one of those people," said the daughter of the dead voter, consenting to cooperate with Marler's investigation.

d.   There are numerous counts of voter fraud sited within this one article with affidavits from a veteran Texas Peace Officer, a retired Houston Police Officer, and Former FBI Agent Charles Marler.

445.   The SoS Defendants' and County Officials' defiance of Election Code knowingly caused the Plaintiff(s), registered voters of Texas; to cast a vote

a.   Under false pretense [245]

b.   Prevent a cast of a legal vote in which Plaintiff(s) are eligible to vote[246]

c.   Cause the ballot not to reflect the intent of the Plaintiff(s)/voter[247]

d.   Defendants committed the offense while acting in the capacity of an elected official[248]

---

[244] https://nationalfile.com/watch-black-democrat-operative-blows-the-lid-off-democrat-voter-fraud-in-texas/
[245] See Tex. Elec Code 273.013(1)
[246] See Tex. Elec Code 273.013(2)
[247] See Tex. Elec Code 273.013(6)
[248] See Tex. Elec Code 273.013(b)(1)

## IX.   FAILURES, NEGLECT AND OFFENSIVE VIOLATIONS

UNDER 42 U.S.C. §1985, 42 U.S.C. §1986, GUARANTEE CLAUSE, 28 U.S.C §1367

446.   Defendant Ruth R. Hughs, as Texas Secretary of State, Defendant Jose "Joe" Esparza as Texas Deputy of State and Defendant Keith Ingram as Texas Director of Elections have violated state and federal law.  Defendants' violations include failing to:

   a.   Under the guise of 'protecting the vote', Defendants with undisputed knowledge of HAVA2002 have nefariously sought to suppress the violations of federal and state law from Plaintiffs.  After multiple attempts in the form of PIA(s), county and state actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

   b.   Defendants and employees, under the directive of the SoS Office, certified the election results of the 2020 election through present elections with the knowledge that voting equipment and software had defective issues prior to the day of the election.  Defendants did not issue public statements and solely relied on the "vendor" to contact affected counties with software malfunctions and perform "testing" of said software malfunctions.

   c.   Defendants and employees under the directive of the SoS Office under her direction certified the election results of the November 3, 2020, election with the knowledge that voting equipment and software were not properly certified in accordance with Tex. Elec. code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § (2) and Art. 6 § 4.

   d.   Defendants and employees under the directive of the SoS Office withheld from the public that the malfunctions of the voting equipment/software were not resolved but were in fact affecting multiple counties during the 2020 and 2021 elections.

   e.   Defendants and employees under the directive of the SoS Office  certified the election results with the knowledge that voting equipment and software were not certified as the Voting System Test Laboratories were not accredited in accordance with HAVA and Tex. Elec. Code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2(c) and Art. 6 § 4.

f.  Failed to seek an injunction and or restraining order from the attorney general on the voting equipment/software to prevent the use of any part of the voting system/ software.

g.  Failed to revoke any voting system/software from being used in any of the counties and or the state.

h.  Defendants, acting under the color of law, certified non HAVA complaint voting system equipment, software, and modifications for the state of Texas to be used in state and federal elections in 2020 to present with the knowledge in violating Tex. Elec. code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2(c) and Art. 6 § 4.

i.  Defendants and employees under the directive of the SoS Office  withheld from the public that the malfunctions of the ES&S voting equipment/software were not resolved but was in fact affecting multiply counties during the 2020 election.

j.  Defendants and employees under the directive of the SoS Office  to violate Tex. Elec Code § 52.062 in manner that Defendants advised to counties to ignore election laws, violating Art. 1 § 28 of the Texas Constitution.

k.  SoS Defendants violated Tex. Const. Art. 6 § 4; by "providing for numbering of tickets" specifically reserved for the Legislative Branch.

l.  SoS Defendants impeded CO's ability to "detect and punish fraud and preserve the purity of the ballot box" as randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations violating Tex. Const. Art. 6 § 4.

m.  Defendants initiated confusion and uncertainty to the COs and caused a chain reaction of violations of several ballot numbering statues that are not only illegal but punishable criminally in the election code.  Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and Tex. Penal Code § 37.10(3)

n.  By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA 2002; knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation via the EAC.

111

o. Defendants' duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

p. Defendant John Scott, as Texas Secretary of State, Jose "Joe" Esparza as Texas Deputy of State and Keith Ingram as Texas Director of Elections has violated state and federal law. Defendants' violations include failing to:

q. Under the guise of 'protecting the vote', Defendants with undisputed knowledge of HAVA have nefariously sought to suppress the violations of federal and state law from Plaintiffs. After multiple attempts in the form of PIA(s), the county and state actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

r. Defendants and employees under the directive of The SoS Office  certified the 2021-2022 election results with the knowledge that voting equipment and software were not certified as the Voting System Test Laboratories were not accredited in accordance with HAVA and Tex. Elec. Code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. § 20971.

s. Defendants were knowingly remiss in their duties acting under the color of law and are in violation of Texas statute in not acknowledging the expiration of certifications of accreditation of VSTLs or the lack of legal signature per HAVA thereby allowing voting machines to be used in statewide elections since 2020 violating Tex. Elec. code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. 20971.

t. Defendants acting under the color of law certified non HAVA complaint voting system equipment, software, and modifications for the state of Texas to be used in state and federal elections in 2021 and 2022 violating Tex. Elec. Code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. 20971.

u. Defendants and employees under the directive of The SoS Office  withheld from the public that the malfunctions of the ES&S voting equipment/software were not resolved but were in fact affecting multiple counties during the election.

v.   Defendants and employees under the directive of The SoS Office  to violate Tex. Elec Code § 52.062 in manner that Defendants advised to counties to ignore election laws, violating Art. 1 § 28 of the Texas Constitution.

w.   Defendants violated Tex. Const. Art. 6 § 4; by "providing for numbering of tickets" specifically reserved for the Legislative Branch.

x.   Defendants impeded CO's ability to "detect and punish fraud and preserve the purity of the ballot box" as randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations violating Tex. Const. Art. 6 § 4.

y.   Defendants initiated confusion and uncertainty to the COs and caused a chain reaction of violations of several ballot numbering statues that are not only illegal but punishable criminally in the election code.  Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and Tex. Penal Code § 37.10(3)

z.   By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA; knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation via the EAC.

aa.  Failed to seek an injunction and or restraining order from the attorney general on the voting equipment/software to prevent the use of any part of the voting system/software.

bb.  Defendants' duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

447.   Defendant County Officials, Jacquelyn Callanen, Nelson Wolff, Bobbie Koepp, Cynthia Jacqua, Frank Phillips, Jennifer Doinof, Ron Massingill, Michele Carew, Pat Deen, Cricket Miller, George Conley, Craig Peacock, Larry Walden, Steve Dugan,  Heider Garcia, Roy Charles Brooks, Devan Allen, Gary Fickes, J.D. Fickes, Dana Debeauvoir, Rebecca Guerrero, Bill Gravell, Christopher Davis, Terry Cook, Cynthia Long, Valerie Covey, Ross Boles, Suzie Harvey, Robert C. Walker, Charlie Riley, James Noack, James Metts has violated state and federal law.  Defendants' violations include failing to:

a.   Operating systems lacking proper certifications.

b.   Unmonitored network communications.

c.   Restricting access to public information.

d.  Concealing and refusing to release voting system software versions.

e.  CO once informed of any problematic issues with voting systems/software proceeded with elections without informing the public nor issued any public statement as the malfunction continued to affect casting of ballots during the election.

f.  CO Defendants under the advice of SoS violated Tex. Elec Code § 52.062 requiring numbering ballots producing violation Art. 1 § 28.

g.  CO Defendants under the advice of SoS Defendants violated Tex. Const. Art. 6 § 4; by providing for numbering of tickets specifically reserved for the Legislative Branch.

h.  CO Defendants impeded election workers and staff from "detect and punish fraud and preserve the purity of the ballot box" as randomized ballot numbers prevented recording, violating, and tracking the official ballot serial number ranges in possession of, personally distributed, and retained at polling locations violating Tex. Const. Art. 6 § 4.

i.  CO Defendants set off a chain reaction of violations of several ballot numbering statues that are not only illegal but punishable criminally in the election code.  Tex. Elec. Code § 51.010(c), 51.007(b), 51.008(d), and 13 TAC § 7.125(a)(10), and Tex. Penal Code § 37.10(3)

j.  CO Defendants certified not only the November 3, 2020, election results but every election since after receiving evidence from Plaintiffs that cast doubt on integrity of the ballot.

k.  CO Defendants were knowingly remiss in their duties acting under the color of law and are in violation of Texas statue in not acknowledging the expiration of certification of accreditations of VSTLs or the lack of legal signature per HAVA thereby allowing voting machines to be used in county elections since 2020.  What is confirmed is that Pro V& V and SLI Compliance were *Not Accredited* VSTL. *(Emphasis added)*

l.  Under the guise of 'protecting the vote', CO Defendants with undisputed knowledge of HAVA have nefariously sought to suppress the violations of federal and state law from Plaintiffs.  After multiply attempts in the form of PIA(s), the county actors have attempted to conceal public information regarding the voting equipment and software utilized in the election process.

m. CO Defendants and employees under the directive of The SoS Office withheld from the public that the malfunctions of the voting equipment/software were not resolved but was in fact affecting multiply counties during the elections.

n. CO Defendants acting under the color of law administered elections with non HAVA complaint voting system equipment, software, and modifications for the state of Texas to be used in state and federal elections in 2020 through 2022 violating Tex. Elec. Code § 122.032, § 50.062, Tex. Admin. Code § 81.60 and § 81.61, which are apparent violations of Tex. Const. Art. 6, § 2 and Art. 6 § 4 and federal 52 U.S.C. 20971.

o. By Defendants' own admission via the State of Texas' Secretary of State website regarding education of the HAVA; knowingly certified voting system equipment, software, and modification without a valid VSTL accreditation via the EAC.

p. Defendants' duplicitous activity and arrangement seem to only exist for a singular self-serving purpose of covering misdeeds and offenses.

## X.   PLAINTIFF(S) FACE DIFFICULT CIRCUMSTANCES

448. The Secretary (s) of State, the Deputy Secretary of State, the Election Director and the County Election Administrator(s) and officials knowingly allowed Texans to vote on networked machines that were not certified due to lack of accredited VSTL(s) since the November 3, 2020, elections. This onerous conduct renders the results void. The Defendants continued to certify election results knowing they violated Texan's civil liberties subsequently forcing Plaintiff(s) into fraudulent contracts with illegally elected government officials: providing said officials with unlawful power to enforce actions under the color of law coercing and subjecting Plaintiffs into servitude in which our liberty to determine our own course and way of life has been strong-armed from us. "The secretary of State has no authority to pass upon the question of negligence or freedom from negligence. He has no discretion but is obliged to act as the law provides." *DeVries v. Secretary of State, 329 Mich. 68 (1950). 44 N.W.2d 872.*

449. Plaintiff(s) are entitled to free and fair elections of our representatives. This is affirmed in the U.S. Constitution, Article 1. The government provides the means by which we exercise that Right. Plaintiffs do not have an alternate means of ensuring our election process. Therefore, we are burdened by the system put in place through our elected officials. In Rice v. Cayetano, the Court ruled the Fifteenth Amendment, "...reaffirms the

equality of races at the most basic level of the democratic process, the exercise of the voting franchise." The Court did not specify the 15th Amendment applies only to a protected class, but rather it applies to everyone.[249]

450.   As part of their sworn duty, it is imperative our elected officials guarantee the election process is protected from any form of fraud or profiteering as this could lead to discrimination of voters regardless of classification. Additionally, when elected officials fail to provide the level of protection necessary to secure the election franchise, it is the Right and Duty of the American people to correct this deficiency. The Court cannot deny this Right to the people when the injury is widespread. It is infeasible to imagine an entire population advancing on the Court for relief.

451.   Failure to perform their sworn duty has allowed discrimination to occur across the equality of races in the State of Texas. This violates the Right to Vote Clause of the Fifteenth Amendment. Furthermore, by failing to protect against private interference (i.e.: vendor voting systems, Scytl, et al) of the election process by not adhering to Federal election/ voting system certification standards (HAVA 2002), and the most basic cyber security defense and hardening frameworks, Defendants failed to comply with 18 USC Section 245(1)(a). Therefore, Defendants do not comply with the Enforcement clause of the Fifteenth Amendment.[250]

452.   Each day Plaintiff(s) has suffered irreparable harm living under a government that no longer represents we the people and deprives us, the Plaintiffs and all voters of the state of Texas, of the Republic that the Constitution of the State of Texas and United States Constitution outline as protection from a tyrannical government. The general public benefits from the remedy against the constitutional infringements where any citizen can bring a case before the court as long as it impacts the public interest, and benefits the general public, not just the Plaintiff. *Assoc. Indus. of New York v. Ickes, 134 F.2d 694, 704 (2d Cir. 1943).*

453.   It is our constitutional duty to invoke our authority as free persons to petition and address this court regardless of the outcome of this complaint, it serves as notice to all acting officials and non-officials within our government that we demand justice for any and all criminal behavior and fraud. 'When a State exercises power wholly within the domain of

---

[249] http://cdn.loc.gov/service/ll/usrep/usrep528/usrep528495/usrep528495.pdf
[250]
https://uscode.house.gov/view.xhtml?req=(title:18%20section:245%20edition:prelim)%20OR%20(granuleid:USC-prelim-title18-section245)&f=treesort&num=0&edition=prelim

state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' *Baker v. Carr 369 US 186, 208 (1962) citing 364 U.S. at 347, 81 S.Ct. at 130.57.*

454. *Sherar v. Cullen, 481 F 946 (1973)*, "There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights." "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958).* Although defendants may assert immunity against these claims, the constitution theory is that we the people are the sovereigns, the state and federal officials only our agents. As Judge P. Higginbotham dissented, "the 11th Amendment does not bar these claims under the 14th Amendment… The role of the Court in protecting the most vital right of a democratic government: the right to vote; should not be denying the right to vote." *Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC v. Scott Secretary of State 20-40643 March 16, 2022. United States Court of Appeals, Fifth Circuit.*

455. The immediate injury continues as Texas officials continue to allow us to vote in another election conducted on uncertified and networked machines is a violation of our 1st 14th and 15th amendment rights and in violation of Tex. Elec. Code §52.062, §122.01(3)(4), § 129.054(a) (b)(c), § 122.031(c) and United State Code 52 U.S.C. § 20511 (2)(a)(b)**,** which is criminal. The Plaintiff(s) stand to lose more of our freedoms as each day passes without resolution.

456. However, knowing what we, the Plaintiffs, now recognize as the illegality of the certifications. Did the Plaintiffs cast an illegal ballot unknowingly at the time? Since 2020, we have been **Forced** to continue this illegal practice by our own government due to their reckless disregard for the law and constitution. Our only remedy thus far has been:

457. Notify the proper authorities in our respective counties and our state government in pursuant with Tex. Elec. Code § 273 in which the Plaintiffs have made many attempts for over a year.

458. Not to participate in unlawful elections and thereby denied our right to vote as our last alternative.

459. Seek legal means via the Peoples' court.

460.   Which brings us here today seeking redress of our 1st, 14th, and 15th amendment rights under 42 U.S.C. § 1983 "taking on the mantel of the sovereign,' guarding for all of us the individual liberties enunciated in the Constitution. Section 1983 represents a balancing feature in our governmental structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden." Frankenhauser v. Rizzo, 59 F.R.D. 339 (E.D. Pa. 1973).

461.   We, the people, have the Right to elect our representatives. The government provides the means by which we exercise that Right. The Framers couldn't foresee the day computerized touch screens or FROG ciphers would be used any more than they could an AR-15. But we the people have the Right to ensure elections are free and fair. It's not just the Right to CAST the vote. It is the Right to ELECT our government. The entire process must be guaranteed. Anything that circumvents that process is inherently infringing upon the Right we have to pursue life, liberty, and happiness.

462.   We have a Right to defend ourselves and others from attack. We have the same Right to defend our election process when it is subject to profiteering by actors who would seek to abolish our sovereignty in favor of a dictatorship. We the people carry this Right, and every Right, in the same manner we would a physical firearm. Every single Right we enjoy, as affirmed in the Constitution, is a weapon against tyranny. A violation of one Right, is a violation of all Rights. We exercise our free will and choose, through our Rights, to remain free. As Justice Oliver Wendell Holmes put it: "We do not inquire what the legislature meant; we ask only what the statute means."

## XI.   COUNTS

### COUNT I - Violation of Procedural Due Process
### UNDER 42 U.S.C. §1983, 28 U.S.C. §1331dp
### (1st, 14th, and 15th Amendments)

(Seeking declaratory and injunctive relief against All Defendants)

463.   Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

464.   In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. *42 U.S.C. §1983.*

465.   For this matter, Defendants violated the federally protected rights of voting. *18 U.S.C. 245.*

466.   In the instant case, Defendants unquestionably acted under the color of state and federal law.

467.   Each Individual Defendant is an appointed official with the authority of duties pursuant to Texas Statutes for the State of Texas.

468.   Under the First Amendment to the Constitution, no abridging the freedom of speech.

469.   The Fourteenth Amendment applies the protections of the First and Fifteenth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

470.   Under the Fifteenth Amendment to the Constitution, no citizen of the United States the right to vote shall not be denied or abridged by any state on account of servitude by those in power without due process of law. U.S. Const. Ann., Amendment XV.

471.   Plaintiffs have constitutionally protected interests in the benefits that come from the right to vote and not being subject to the illegal voting systems/equipment, software, and modifications, including the ability to pursue our First Amendment right to legal elections without being subjected to casting an illegal vote that violates federal and state laws.

472.   Defendants' knowingly certified voting system/equipment, software and modifications unlawfully deprives Plaintiffs of these and other constitutionally protected interests without due process of law. Such deprivation occurred after Defendants had open communications with voting vendors and the EAC in which Defendants did not disclose to the public and gave no notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Plaintiffs prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas and Federal laws and other applicable laws. Such deprivation violates the First, Fourteenth, and Fifteenth Amendments of the Unites States Constitution thereby depriving Plaintiffs civil rights in regard to casting a "legal" vote.

473.   Despite Defendant's knowledge of voting systems noncompliance with state and federal law, Defendants intend to continue to utilize these non-compliance systems in future elections.

119

474.   Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.06.*

## COUNT II - Violation of Substantive Due Process
## UNDER 42 U.S.C. §1983, 18 U.S.C. §245
## (Fourteenth Amendment, Equal Rights)

(Seeking declaratory and injunctive relief against All Defendants)

475.   Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

476.   In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

477.   For this matter, Defendants violated the federally protected rights of voting. *18 U.S.C. §245.*

478.   In the instant case, Defendants unquestionably acted under the color of state law.

479.   Each Individual Defendant is an appointed official with the authority of duties pursuant to Texas Statutes for the State of Texas.

480.   Under the Fourteenth Amendment of the Constitution, and as established by state law, including the state created Accardi doctrine, Plaintiffs have a fundamental right to cast a ballot and vote in a legal and fair election.

481.   Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. ELEC. CODE § 276.013(a)(4)*

## COUNT III – Deprivation of Civil Rights
## UNDER 42 U.S.C §1983vp, 28 U.S.C. 1985
## (TX Const. Art. I, § 13 and Art. I, § 19)

(Seeking declaratory and injunctive relief against All Defendants)

482.   Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

483.    Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him, in his land, goods, person, or reputation, shall have remedy by due course of law."

484.    Article 1, § 19 of the Texas Constitution affords the people of Texas with the right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

485.    Plaintiffs have constitutionally protected interests in the benefits that come from the right to vote and not being subject to the illegal voting systems/equipment, software, and modifications, including the ability to pursue our First Amendment right to legal elections without being subjected to casting illegal votes in violation of both state and federal laws.

486.    Defendants' knowingly certified voting system/equipment, software and modifications unlawfully deprives Plaintiffs of these and other constitutionally protected interests without due process of law. Such deprivation occurred after Defendants had open communications with voting vendors and the EAC in which Defendants did not disclose to the public and gave no notice or meaningful opportunity for open public discussion regarding defects of voting equipment/software to the Plaintiffs prior to certifications. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the Texas and Federal laws and other applicable laws. Such deprivation violates Article 1, § 13 and Article 1, § 19 of the Texas Constitution thereby depriving Plaintiffs civil rights regarding casting a "legal" vote. *TEX. PEN. CODE § 37.03, § 37.10.*

487.    Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications.

## COUNT IV – Deprivation of Constitutional Rights

### UNDER 28 U.S.C. 1331vc

### (TX Const. Art. I, § 13 and TX Const. Art. I, § 19)

(Seeking declaratory and injunctive relief against All Defendants)

488.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

489. Article 1, § 13 of the Texas Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law."

490. Article 1, § 19 of the Texas Constitution affords the people of Texas with the right to be free from violations of the substantive due process rights, and no person may be deprived of life, liberty, or property without due process of law.

491. Under Article 1, § 19 of the Texas Constitution, and as established by state law including the state created Accardi doctrine, Plaintiffs have a fundamental right to cast a ballots and vote in a legal and fair election.

492. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contracts with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE §39.03(2).*

## COUNT V – Voting Rights Violation
## UNDER 52 U.S.C § 20511 (2)(a)(b), 52 U.S.C. §10101, 28 U.S.C. 1943
## (First and Fourteenth Amendment)

### (Seeking declaratory and injunctive relief against All Defendants)

493. Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

494. In order establish a claim under section 20511(a)(b) of Title 52-Voting and Elections, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. *42 U.S.C. §1983.*

495. In the instant case, Defendants unquestionably acted under the color of state and federal law.

496. Each Individual Defendant is an appointed official with the authority of duties pursuant to Texas Statues for the State of Texas.

497. Under the First and Fourteenth Amendment to the Constitution, and as established by state law including the state created Accardi doctrine, Plaintiffs have a fundamental right to cast a ballot and vote in a legal and fair election.

498. Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering forced contract with representatives through deceptive practices and fraudulent certifications. *TEX. PEN. CODE § 39.02.*

## COUNT VI – DECLARATORY JUDGMENT
## UNDER 28 U.S.C. § 2201
(Against All Defendants)

499.   Plaintiffs incorporate the foregoing paragraphs as set forth in full herein.

500.   Defendants' conduct has and will continue to violate the rights of citizens of Texas, as set forth above.

501.   The Court has the authority pursuant to 28 U.S.C. § 2201 to issue an Order enjoining the State from conduction an election in which the votes are not accurately or securely tabulated.

502.   If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an unsecure, vulnerable electronic voting systems which is susceptible to manipulation and intrusion.

503.   If the State of Texas proceeds with the forthcoming election as described above, it will violate the rights of Texans by conducting an election on illegally certified voting systems in violation of both the State of Texas and Federal election laws.

504.   The Court should issue an Order enjoining the State from using any electronic voting system and respective devices to include but not limited to poll pads, tabulators, printers, etc.

## XII.   PRAYER FOR RELIEF

WHEREFORE, "For there is no authority except from God, and the authorities that exist are appointed by God." *Romans 13:1* (NKJV). Plaintiffs request that the Court grant the following relief:

a.   Assume jurisdiction of this action in the interest of justice.

b.   Vacate and set aside all uncertified and illegal voting systems/equipment, software, and modifications and implement a paper ballot and hand counting system as permissible by Tex. Elec. Code Chp 65.

c.   Enter a preliminary and permanent injunction prohibiting Defendants from requiring or permitting voters to have votes cast or tabulated using any electronic voting systems.

123

d.   Enter a preliminary and permanent injunction prohibiting Defendants from destruction/deletion of any and all election records created under Chapter 129 and Chapter 128 of the Tex. Elec Code to include all paper ballots created by voting systems, mail in ballots, tabulation tapes, USB final counts from precincts and all other election records not specifically stated.

e.   Declare that the Defendants' certifications of all voting system/equipment, software, and modifications are void and without legal force or effect;

f.   Declare that the institution of the certification policies are arbitrary, capricious, and based on negligence and disregard in accordance with law, and without observance of required procedure, Accardi doctrine;

g.   Declare that the certifications and the actions taken by Defendants are in violation of the Constitution and contrary to the laws of the United States and the State of Texas;

h.   Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing and/or enforcing the certifications of all voting systems/equipment, software and modifications that is to in compliance with the applicable law, and

Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of any attorneys' fees and costs to Plaintiffs.

Respectfully submitted this XX th day of XXX, 2022.

By: /s/ *Jason S. Buster*

2003 Mulberry Tree
San Antonio, TX 78251
210.265.7914
jason.s.buster@gmail.com
Bexar County

**Pro se Counsel for Plaintiffs**

/s/ Kyle Strongin
253 Martin Dr.
Granbury, TX 76049
979.492.0023
kstrongin04@gmail.com>
Hood County

/s/ Lindsey Gremont
4502 Deepwoods Drive
Austin, TX 78731
512.879.7069
linny2777@protonmail.com
Travis County

/s/ Christine Koepke
19509 Encino Crown
San Antonio, Texas 78259
210.845.9448
stina4kids@protonmail.com
Bexar County

/s/ Travis Wayne Eubanks
1823 Lookout Forest
San Antonio, TX 78260
505.506.1050
travis.eubanks@gmail.com
Bexar County

/s/ Amanda Marie Eubanks
1823 Lookout Forest
San Antonio, TX 78260
505.818.8824
amanda.eubanks710@gmail.com
Bexar County

/s/ Kristen Plaisance
22355 Log Orchard Lane
Porter, TX 77365
713.724.0474
robbiekristenp@gmail.com
Montgomery County

/s/ Karen Rene 'Towell
1015 Teresa Court
Granbury, TX 76048
817.300.0827
renetowell6165@gmail.com
Hood County

/s/ Jason S. Buster
2003 Mulberry Tree
San Antonio, TX 78251
210.265.7914
jason.s.buster@gmail.com
Bexar County

/s/ Alexandra Campo
PO Box 40
Weir, Texas 78674
512.790.8774
acampo0312@gmail.com
Williamson County

/s/ James L Clark
1750 Loop 165
Dripping Springs, TX 78620
512.808.6734
rccpd715@protonmail.com
Hays County

/s/ Jose Christine Silvester
8055 Garden Oaks Drive
San Antonio TX, 78266
830.515.3212
lousilvester@msn.com
Comal County

/s/ Tommie Dickinson
1231 W Goodwin
Pleasanton, TX 78064
830.570.1366
tommie.dickinson@yahoo.com
Atascosa County

/s/ Robert James Brooks Jr
3414 Zebecca Creek Drive
Austin, TX 78732
512.550.8688
brooks@mindsetatx.com
Travis County

/s/ Alana S. Phillips
3461 Highway 8 E,
Mena, AR 71953
940.437.0049
Phillipsar@yahoo.com
Denton County

/s/ Jennifer B Edwards
422 WW Lane
Millsap, TX 76066
940.682.5214
Jenn@jennz.com
Parker County

/s/ Aubrey Brandon Rhymes
3522 Turkey Pen Branch Road
Maryville, TN 37083
469.714.1157
brandon.rhymes@protonmail.com
Collin County

/s/ Amber Cloy
421 Palisades Trail
Keller, TX 76248
817.522.2732
Amberb2222@yahoo.com
Tarrant County

/s/ Sheron Jennifer Lipper
11700 Preston Road, Ste.660-275
Dallas,TX 75230
214.679.5760
Theburgundyacademy@gmail.com
Dallas County

/s/ Jennifer Mienke
713 Ruby Ct.
Grapevine, TX 76051
817.538.2847
goldengirlj723@gmail.com
Tarrant County

/s/ Jennifer Williams
1613 Sandle Wood Drive
Weatherford, TX 76087
817.565.9137
Jennifer.Williams2236@yahoo.com
Parker County

/s/ Sonja Zielsdorf
400 County Road 369
Taylor, TX 76574
512.667.1746
Sonjaz22@yahoo.com
Williamson County

/s/ Juan Carlos Arias
9415 Pagewood Lane
Houston, TX 77063
713.204.0981
Altcode1969@proton.me
Harris County

/s/ Lynn Christine Davenport
9627 Windy Hill Road
Dallas, TX 75238
214-673-4018
Ldaven@me.com
Dallas County

/s/ Beverly Foley
8 Oak Village Ct
Trophy Club TX 76266
214.415.7154
Beverlyfoley@gmail.com
Denton County

**Defendants**

John B. Scott
Secretary of State of Texas
1019 Brazos Street
Austin, TX 78701

Jose A. Esparza
Deputy Secretary of State
1019 Brazos Street
Austin, TX 78701

Keith Ingram
Director of Elections
1019 Brazos Street
Austin, TX 78701

Ruth R. Hughs
Kelly Hart & Hallman
303 Colorado Street
Suite 2000
Austin, TX 78701-0022

**BEXAR COUNTY**

Jacquelyn Callanen
Bexar County Elections Administrator
1103 S. Frio
Suite 100
San Antonio, TX 78207

Nelson Wolff
Bexar County Judge
101 W. Nueva, 10th Floor
San Antonio, TX 78205

Rebeca Clay-Flores
Bexar County Commissioner
101 W. Nueva, 10th Floor
Suite 1009
San Antonio, TX 78205

Justin Rodriguez
Bexar County Commissioner
101 W. Nueva, 10th Floor
San Antonio, TX 78205

Marialyn Barnard
Bexar County Commissioner
101 W. Nueva, 10th Floor
Suite 1007
San Antonio, TX 78205

Tommy Calvert
Bexar County Commissioner
101 W. Nueva, 10th Floor
Suite 1029
San Antonio, TX 78205

**COMAL COUNTY**

Bobbie Koepp
Comal County Clerk
150 N. Seguin
Suite 1037
New Braunfels, TX 78130

Cynthia Jacqua
Comal County Deputy
396 N. Seguin Avenue
New Braunfels. TX 78130

**DENTON COUNTY**

Andy Eads
Denton County Judge
1 Courthouse Drive
Suite 3100
Denton, TX 76208

Ryan Williams
Denton County Commissioner
1 Courthouse Drive
Suite 3100
Denton, TX 76208

127

Ron Marchant
Denton County Commissioner
1029 W. Rosemeade Parkway
Sandy Jacobs Government Center
Carrollton, TX  75007

Bobbie J. Mitchell
Denton County Commissioner
400 N. Valley Parkway
Suite 2068, Government Center
Lewisville, TX  75067

Dianne Edmondson
Denton County Commissioner
6200 Canyon Falls Drive
SW Courthouse
Suite 900
Flower Mound, TX  76226

Frank Phillips
Denton County Elections Administrator
701 Kimberly Drive
Denton, TX  76208

**HAYS COUNTY**

Jennifer Doinoff
Hays County Elections Administrator
712 South Stagecoach Trail
Suite 1012
San Marcos, TX  78666-6294

Ruben Becerra
Hays County Judge
Hays County Courthouse
111 E. San Antonio St.
Suite 300
San Marcos, TX  78666

Debbie Ingalsbe
Hays County Commissioner
Hays County Courthouse
111 E. San Antonio St.
Suite 304
San Marcos, TX  78666

Mark Jones
Hays County Commissioner
5458 FM 2770 at Crystal Meadow Drive
Kyle, TX  78640

Lon Shell
Hays County Commissioner
200 Stillwater
Wimberley, TX  78676

Walt Smith
Hays County Commissioner
195 Roger Hanks Parkway
Dripping Springs, TX  78620

**HOOD COUNTY**

Ron Massingill
Hood County Judge
Hood County Justice Center
1200 W. Pearl Street
Granbury, TX  76048

Michele Carew
Hood County Elections Administrator
100 Helton Drive
Granbury, TX  76049

**MONTGOMERY COUNTY**

Suzie Harvey
Montgomery County Elections
Administrator
9159 Airport Road
Conroe, TX  77303

Charlie Riley
Montgomery County Commissioner
19110 Unity Park Drive
Magnolia, TX  77355

Robert C. Walker
Montgomery County Commissioner
510 Highway 75 North
Willis, TX  77378

James Noack
Montgomery County Commissioner
1130 Pruitt Road
Spring, TX 77380

James Metts
Montgomery County Commissioner
23628 Roberts Road
New Caney, TX 77357

## PARKER COUNTY

Crickett Miller
Parker County Elections Administrator
1112 Santa Fe Drive
Weatherford, TX 76086

Pat Deen
Parker County Judge
1 Courthouse Square
Weatherford, TX 76086

George Conley
Parker County Commissioner
3000 Veal Station Road
Weatherford, TX 76085

Craig Peacock
Parker County Commissioner
3033 FM 1885
Weatherford, TX 76086

Larry Walden
Parker County Commissioner
1111 FM 1189
Weatherford, TX 76087

Steve Dugan
Parker County Commissioner
1320 Airport Road
Aledo, TX 76008

## TARRANT COUNTY

Heider Garcia
Tarrant County Elections Administrator
2700 Premier Street
Fort Worth, TX 76111

B. Glen Whitley
Tarrant County Judge
100 E. Weatherford Street
Fort Worth, TX 76196

Roy Charles Brooks
Tarrant County Commissioner
Tarrant County Administration Building
100 E. Weatherford Street
Suite 502A
Fort Worth, TX 76196

Devan Allen
Tarrant County Commissioner
Tarrant County Administration Building
100 E. Weatherford Street
Suite 502A
Fort Worth, TX 76196

Gary Fickes
Tarrant County Commissioner
Tarrant County Administration Building
100 E. Weatherford Street
Suite 502A
Fort Worth, TX 76196

J. D. Johnson
Tarrant County Commissioner
Tarrant County Administration Building
100 E. Weatherford Street
Suite 502A
Fort Worth, TX 76196

## TRAVIS COUNTY

Andrew Steven Brown
Travis County Judge
700 Lavaca
Suite 2300
Austin, TX 78701

Dana Debeauvoir
Travis County Clerk
5501 Airport Blvd
Austin, TX 78751

Rebecca Guerrero
Travis County Clerk
5501 Airport Blvd
Austin, TX 78751

## WILLIAMSON COUNTY

Christopher Davis
Williamson County Elections Administrator
Inner Loop Annex
Elections Department
301 SE Inner Loop, Suite 104
Georgetown, TX 78626

Bill Gravell
Williamson County Judge
Williamson County Courthouse
710 S. Main Street
Suite 101
Georgetown, TX 78626

Terry Cook
Williamson County Commissioner
Williamson County Jester Annex
1801 East Old Settlers Blvd
Suite 110
Round Rock, TX 78664

Cynthia Long
Williamson County Commissioner
Cedar Park Annex
350 Discovery Blvd
Suite 201
Cedar Park, TX 78613

Valerie Covey
Williamson County Commissioner
Georgetown Annex
100 Wilco Way, CO201
Georgetown, TX 78626

Ross Boles
Williamson County Commissioner
Williamson County Hutto Annex
3001 Joe DiMaggio Blvd
Unit 1300
Round Rock, TX 78665

## HARRIS COUNTY

Lina Hidalgo
Harris County Judge
1001 Preston Street,
Suite 911,
Houston, TX. 77002
713-274-7000
Judge.hidalgo@cjo.hctx.net

Rodney Ellis,
Harris County Precinct One Commissioner
1001 Preston Street,
9th Floor,
Houston, TX. 77002
713-274-1000
Comm_ellis@cp1.hctx.net

Adrián Garcia
Harris County Precinct Two Commissioner
1001 Preston Street,
Suite 924,
Houston, TX. 77002
713-274-2222
713-755-6220
Commissioner@pct2.hctx.net

Tom S. Ramsey, P. E.
1001 Preston Street,
9th Floor,
Houston, TX. 77002
713-274-3000
Pct3@pct3.com

R. JACK Cagle
Harris County Commissioner Precinct 4
1001 Preston Street,
Suite, 950,
Houston, TX. 77002
713-755-6444
Service@hcp4.net

Isabel Longoria,
Harris County Elections Administrator
Main office (downtown)
1001 Preston Street,
Houston, TX. 77002
(There is no suite number)
713-755-6965